ACCEPTED
03-15-00464-CV
6283523
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/29/2015 8:08:50 PM
JEFFREY D. KYLE
CLERK

NO. 03-15-00464-CV

IN THE COURT OF APPEALS

FOR THE

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/29/2015 8:08:50 PM
JEFFREY D. KYLE
Clerk

THIRD SUPREME JUDICIAL DISTRICT

AT AUSTIN, TEXAS

VICTORY CHEVAL HOLDINGS, LLC, GARRETT JENNINGS
AND CASTLE CROWN MANAGEMENT, LLC,

Appellants

v.

DENNIS ANTOLIK, VICTOR ANTOLIK
and CHEVAL MANOR, INC.,

Appellees

APPELLANTS' MOTION TO STAY TEMPORARY INJUNCTION

TO THE HONORABLE COURT OF APPEALS:

Pursuant to Rule 29.3, Texas Rules of Appellate Procedure, Appellants, Victory Cheval Holdings, LLC ("VCH"), Garrett Jennings ("Jennings") and Castle Crown Management, LLC ("Castle Crown"), move the Court to stay certain provisions of the Temporary Injunction that is the subject of this interlocutory appeal. In support of this motion, Appellants would show the Court as follows:

## A. Introduction. [1]

1. VCH owns an 88-acre tract of land in eastern Travis County near the northwest corner of US 290 and SH 130 (the "Property"). VCH bought the property from Cheval Manor, Inc. in late December 2013. VCH is owned 51% by Jennings and 49% by Victor Antolik. Jennings Aff. at ¶ 3. Jennings is the sole managing member of VCH; Victor Antolik has no management authority with VCH. Jennings Aff. at ¶ 2.

2. Castle Crown is a management company wholly owned by Jennings. Jennings and Castle Crown have been managing the horse boarding and polo activities at the Property since January 2014. The Temporary Injunction that is the subject of this interlocutory appeal dramatically alters the status quo that has been in place for the past year and a half and does so in a manner that is both unrealistic and unworkable.

3. The Order is subject to reversal for many reasons, chief of which is its failure to comply with the requirement of Rule 683, Texas Rules of Civil Procedure,

---

[1] A certified copy of the Temporary Injunction is attached as **Exhibit A**. Certified copies of the "live pleadings" on file at the time of the hearing, consisting of Victor Antolik's pleading containing his Application for a Temporary Injunction, and Appellants' Response thereto, are attached as **Exhibits B and C**, respectively.

The factual allegations of this Application are supported by the supporting Affidavits attached hereto and referenced herein, and by the factual allegations of Appellants' Response to Victor Antolik's Application for a Temporary Injunction (Exhibit C), which are verified by the attached Affidavit of Garrett Jennings.

that the Order set forth in a non-conclusory fashion the purported probable, imminent and irreparable harm that Appellees would allegedly suffer absent an injunction. The Order merely states that it "is necessary and proper as a temporary injunction in order to prevent harm, injury or loss to the parties, including injury to persons and property, during the pendency of this matter." Temporary Injunction, para. C8. This is clearly inadequate and, *standing alone*, cause for reversal. See *El Tacasco, Inc. v. Jireh Star, Inc.*, 356 S.W.3d 740, 747-748 (Tex.App.-Dallas 2011, no pet.).

4. Pending this Court's review of the appeal on the merits, however, Appellants would show that granting a stay of the enforcement of certain provisions of the Order is necessary in order to protect both Appellants' rights and the Court's jurisdiction.

**B. The Court should stay paragraph C6 of the Order, requiring Jennings to pay the reasonable and necessary costs, not to exceed $35,000, for repair of the damage to the polo field on the property.**

1. As an initial matter, Appellee never requested this relief in its Motion for Temporary Injunction. *See* Ex. B. Without any supporting pleading or factual basis, and in contravention of the VCH organizational documents, the Court ordered Jennings to make this payment. Furthermore, the evidence at the hearing was undisputed that the damage to the polo field was caused solely by Appellee, Dennis Antolik. Dennis Antolik allowed his horses (approximately 13) to roam free over the polo field after the torrential rains in the Austin area in late May 2015 that saturated

4

and soaked the field, essentially turning it into a bog with the obvious result being that the field was rutted and filled with holes. *See*, *e.g.*, Greening Aff. at ¶ 2. None of Appellants, including Jennings, caused any damage to the field.

2.     If Jennings complies with the Order and pays up to $35,000 for repair of the damage caused to the polo field (which was caused by Dennis Antolik) it would be the same as a party paying a monetary judgment on appeal. Ordering such a payment would have the effect of causing the Court to lose jurisdiction because the appeal of that provision of the Order would become moot. *Highland Church of Christ v. Powell*, 640 S.W.2d 235, 236 (Tex. 1982) (voluntary payment of a judgment moots the controversy between the parties, and appellate courts will not decide moot cases involving abstractions); *see also*, *Valley v. Patterson,* 614 S.W.2d 867, 869 (Tex.Civ.App.-Corpus Christi 1981, no writ) (the appellate court had jurisdiction to grant an injunction to stay the proposed trustee's sale to preserve subject matter of the appeal and protect the appellate court's jurisdiction); *Sonny Arnold, Inc. v. Sentry Sav. Ass'n,* 602 S.W.2d 90, 93 (Tex.Civ.App.-Amarillo 1980, orig. proceeding) (a temporary injunction to enjoin the respondents from selling property until the appeal was resolved was proper).

3.       Therefore, the Court should stay paragraph C6 of the Order pending the appeal in order to preserve its jurisdiction.

**C.       The Court should stay paragraphs C1, 2, 3 and 6 of the Order and allow funds to be collected and used as they have been in the past, for use for the repair and maintenance of the polo field.**

1.       As shown by the Affidavit of John Greening attached as Exhibit D, Mr. Greening and Mr. Joe Trimble, have for the past three years collected "green fees" from persons who use the polo field and they have used those funds to provide for the maintenance of the field.  Greening Aff. at ¶ 2.  Mr. Greening has already mowed the polo field, obtained estimates for its repair, and begun the process of repair.  *Id*. Therefore, it is not necessary for Mr. Jennings to additionally pay any amount of money to repair the damage to the polo field caused by Dennis Antolik. The Court should, however, stay enforcement of paragraphs C1, 2, and 3 of the Order with respect to the funds collected by Mr. Greening and Mr. Trimble to allow those funds to be used to pay for repair and maintenance of the polo field.

2.       As also shown by Mr. Greening's Affidavit, the polo season begins September 1, 2015, and there is a substantial polo event (3000+ expected attendance) scheduled for October 2015.  Greening Aff. at ¶ 2, 4. The field will need to be repaired before that date in order for that event to proceed.  If it is not and the event is cancelled, it will cause irreparable injury to VCH, including damage to its image in

6

the polo community as a facility for polo events. In order to repair the field in time, the persons paying green fees will need assurance that the funds they are paying will be used for their intended purpose, namely, to repair and maintain the polo field and not to be deposited into a VCH account whose control and use, as discussed below, is, at best, unclear. The only way to avoid the harm associated by the loss of the polo operations to VCH is to stay enforcement of paragraphs C1, 2 and 3 of the Order with respect to the funds collected by Mr. Greening and Mr. Trimble and allow those funds to be used to directly pay for the repair and maintenance of the polo field.

**D.    The Court should stay paragraphs C2 and C3 of the Order because they are ambiguous, unrealistic, unworkable, and their enforcement will result in harm to Appellants.**

1.    For over a year and a half the boarding and polo operations have been managed by Jennings through Castle Crown.[2] The current revenue from boarding operations at the Property is minimal. Attached as Exhibit E is the Affidavit of Paula Eckberg, Accounting Manager for Castle Crown, to which is attached a current "rent roll" from the boarding operations. Eckberg Aff. at ¶ 2. As shown therein, net income for the Property is currently $3,350 per month. *Id.* Under Sections C2 and

---

[2]    As discussed in Appellants' Response to Victor Antolik's Application for a Temporary Injunction (Exhibit C), the Antoliks have occupied and refused to vacate the residence on the Property since the December 2014 closing. Their right to possession of the residence is the subject of a separate action pending in the Travis County Court at Law as a de novo appeal of a judgment of the Justice Court in an eviction proceeding. VCH and Castle Crown are the Plaintiffs in that proceeding and they have filed a Motion for Summary Judgment on the issue of the Antoliks' right to possession of the residence. The motion is currently set for hearing on August 19, 2015.

C3 of the Order, this income is now supposed to be deposited into a newly created "Operating Account" of VCH (on which Jennings and Victor Antolik are the only "authorized persons") and the funds are to be used to pay a laundry list of expenses set forth at Section C3(a) through (j) of the Order.

2.      Despite the fact that Victor Antolik may be an "authorized person" on the Operating Account (whatever that may mean), Appellants interpret the first sentence of C5 to make Jennings the *sole* signatory on the Operating Account: "***Garrett Jennings is authorized to make*** and shall be responsible for making and keeping an accurate accounting of ***all payments outlined in paragraph C3 of this Order from the Operating Account***" (emphasis added).  Appellants assume Victor Antolik will dispute this interpretation, which will lead to an inability to even open the Operating Account, much less use it for the deposit of revenue from the Property and payment of expenses associated with the Property.

3.      Furthermore, although Appellants do not interpret C3 as *requiring* that the persons or sums listed in subparagraphs (a) through (j) be paid (but rather that the money in the "Operating Account" may only be used for the type of expenses listed in C3, subparagraphs (a) through (j), and only up to any maximum amounts stated), the Order is nevertheless silent as to how the income is to be allocated when (as will obviously be the case) there is not enough income to pay all of the expenses listed in (a) through (j).  The Order also does not address the ramifications of the fact that

persons listed in (a) through (j) may claim to have fulfilled some role as outlined in C3, yet are unpaid because there is simply not enough money in the Operating Account, and then expect payment under some type of implied contract theory, presumably from VCH.[3]

4.      Texas law is clear that "…an injunction must be as definite, clear and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing." *Villalobos v. Holguin,* 146 Tex. 474, 208 S.W.2d 871, 875 (Tex. 1948). The provisions of C2 and 3 of the Temporary Injunction in this case are anything but definite, clear and precise and is, therefore, they should be stayed. In addition, they should be stayed to prevent harm to Appellants and the Property.

5.      There are currently only four individuals who pay to board horses at the Property: April Lucas, George Humphrey, John Greening and Suzanne Trimble (wife of Joe Trimble).[4] As explained in the Affidavit of Mr. Greening, the paid boarders are not likely to make payments unless they are assured that their money is going to

---

[3] For example, Dennis Antolik may contend that his company, Cheval Manor, Inc. purportedly provided care and feeding of the paid boarder horses during the day and is thus entitled to compensation of $2,500 per month under C3(c).

[4] The "paid" boarders are listed on the rent roll attached to Ms. Eckberg's Affidavit. *See* Ex. E. In addition to their horses, the Antoliks maintain 13 horses on the Property (Greening Aff. at ¶ 2) but, like the situation with the house in which they are living, they don't pay anything toward the cost of boarding those horses.

be used to pay for food for their horses and to take care of their horses. Greening Aff. at ¶ 6. Specifically, boarders have stated that they will withdraw their horses from the Property if Dennis Antolik's company, Cheval Manor Inc. is given control over the feeding and care of the horses as indicated in paragraph C3(c) of the Order. *Id*. at ¶ 5.[5] Under the terms of the Temporary Injunction, if there is not a clear delineation of who gets to decide what to use the funds for, then there will be a problem in securing payments from the boarders and continuing to operate the facility. To the extent the Order, in fact, makes Victor Antolik and Garrett Jennings *jointly* responsible for determining what services and items the money is paid for, then, given the ongoing litigation and conflict between these parties, it is not likely that they will be able to agree on the use of funds and the entire boarding operation will grind to a halt. The Order is silent on what occurs when such disagreements inevitably arise.

6.     Further, Victor Antolik agreed that Garrett Jennings would have management authority over VCH. Jennings Aff. at ¶ 2. The effect of the Order (if interpreted to give Victor Antolik and Garrett Jennings joint control of the account)

---

[5] A stay is further warranted given Dennis Antolik's upcoming sentencing for felony tax fraud. Dennis Antolik has plead guilty to tax fraud (Ex. G) and will be sentenced on August 7, 2015 (Ex. H). The Court refused to consider Dennis Antolik's plea and upcoming sentencing during the Temporary Injunction hearing, which will be an additional point of error for the Court of Appeals to consider. First, it is possible that Dennis Antolik will be sentenced to prison on August 7th and be unable to perform the duties afforded him in paragraph C3(c) of the Order. Regardless, any association required by the Order between Dennis Antolik and VCH will chase paying boarders away and irreparably harm VCH's business.

10

would be to radically change the status quo, put Victor Antolik in a position of management authority at VCH (which he does not have) and result in the loss of boarders and the polo operations.

7.      In summary, the boarding and polo operation is conducted on limited resources. Jennings Aff. at ¶ 5. In the past, the negative cash flow has been handled by Jennings contributing additional money out of his own pocket to meet operating expenses. Jennings Aff. at ¶ 5. This will not occur in the future if the terms of the Temporary Injunction are imposed. Going forward under the terms of paragraphs C1, 2, 3, 4 and 5 of the Temporary Injunction will result in loss of boarders, loss of the polo operations, the loss of the limited income currently being generated on the Property and potentially would expose VCH to liability for claims for expenses under C3 of the Order. Jennings Aff. at ¶ 7. Therefore, it should be stayed pending appeal.

## CERTIFICATE OF CONFERENCE

Counsel for appellants attempted to confer via email with counsel for Appellees regarding the contents of this Motion. To this date, counsel for Appellees have not responded or attempted to resolve the matters in this Motion.

## PRAYER

WHEREFORE, Appellants pray that this Court stay certain provisions of the Temporary Injunction that are the subject of this interlocutory appeal and for all such other and further relief to which they may be justly entitled at law or in equity.

11

Respectfully submitted,


*/s/ Kemp Gorthey*

Kemp W. Gorthey
State Bar No. 08221275
Kendall L. Bryant
State Bar No. 24058660
THE GORTHEY LAW FIRM
604 West 12th Street
Austin, Texas 78701
Tele: 512/236-8007
Fax: 512/479-6417
Email: kemp@gortheylaw.com
Email: kendall@gortheylaw.com
ATTORNEY FOR APPELLANTS,
GARRETT JENNINGS and CASTLE
CROWN PROPERTIES
MANAGEMENT, LLC

and


*/s/ Peyton Smith*

PEYTON N. SMITH
State Bar No. 18664350
Brian L. King
State Bar No. 24055776
**REED & SCARDINO LLP**
301 Congress Avenue, Suite 1250

Austin, Texas 78701
Tel: 512/474-2449
Fax: 512/474-2622
psmith@reedscardino.com
bking@reedscardino.com
ATTORNEY FOR APPELLANT,
VICTORY CHEVAL HOLDINGS,
LLC

## CERTIFICATE OF SERVICE

By my signature above I certify that a true and correct copy of the foregoing Appellants' Motion to Stay Temporary Injunction has been served upon the below-named counsel on this the 29th day of July, 2015 as follows:

Donald R. Taylor               Via Email: dtaylor@taylordunham.com
Isabelle M. Antongiorgi        Via Email: ima@taylordunham.com
Taylor, Dunham & Rodriguez, LLP
301 Congress Avenue, Suite 1050
Austin, Texas 78701

Mark Taylor                    Via Email: MarkT@hts-law.com
Cleveland Burke                Via Email: cburke@taubesummers.com
Taube Summers Harrison Taylor Meinzer Brown LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701

Filed in The District Court
of Travis County, Texas

JUL 1 6 2015

At _____ 11:34 ___ AM.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-14-002607

| | | |
|---|---|---|
| VICTORY CHEVAL HOLDINGS LLC<br>*Plaintiff and Counter-Defendant*<br><br>v.<br><br>DENNIS ANTOLIK and<br>VICTOR ANTOLIK<br>*Defendants and Counter-Plaintiffs*<br><br>CHEVAL MANOR, INC.<br>dba AUSTIN POLO CLUB<br>*Intervenor*<br><br>v.<br><br>GARRETT JENNINGS,<br>CASTLE CROWN MANAGEMENT LLC, AND<br>CASTLE CROWN PROPERTIES-VICTORY<br>CHEVAL, LLC<br>*Third-party Defendants* | § § § § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT<br><br><br><br>OF TRAVIS COUNTY TEXAS<br><br><br><br>250th JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION

On June 22, 2015 and continuing on July 14, 2015, the Court held a hearing on Defendant/Counter-Plaintiff Victor Antolik's Application for Appointment of a Receiver and Temporary Injunction and the Application for Temporary Injunction of Plaintiff Victory Cheval Holdings LLC against Defendants/Counter-Plaintiffs Dennis Antolik and Victor Antolik.

Victor Antolik appeared in person and through counsel Donald R. Taylor and Isabelle M. Antongiorgi and announced ready. Victory Cheval Holdings LLC appeared through counsel Peyton N. Smith and announced ready. Dennis Antolik appeared in person and through counsel Cleveland Burke and Mark Taylor and announced ready. Cheval Manor, Inc. appeared through counsel Cleveland Burke and Mark Taylor and announced ready. Garrett Jennings and Castle Crown Management LLC appeared in person and through counsel Kemp Gorthey. Castle Crown



004120771



**Exhibit A**

Management LLC appeared through counsel Kemp Gorthey. The record of testimony was duly reported by Della Rothermel, the court reporter for the 250th Judicial District Court.

After considering the Application, the arguments of counsel, the evidence presented, the pleadings on file and all other relevant factors, the Court rules as follows:

## A. Definitions

1. Herein, "Parties" shall collectively refer to Dennis Antolik; Cheval Manor, Inc.; Victor Antolik; Victory Cheval Holdings LLC ("VCH"); Garrett Jennings; Castle Crown Management LLC ("Castle Crown"); and Castle Crown Properties-Victory Cheval LLC ("CC-VC"). "Party" shall refer to any of the foregoing. This Order shall bind the Parties, and their respective officers, agents, servants, employees, attorneys, representatives, or any person in active concert or participation with them who receives actual notice of this Order by personal service or otherwise.

2. "Property" shall refer to the entirety of the 88 acre ranch located at 13628 Gregg Manor Road, Manor, Texas 78653.

## B. Agreed Injunctive Relief

The parties agreed in open Court and it is THEREFORE ORDERED that:

1. VCH, Castle Crown, and Garrett Jennings shall not use the name "Austin Polo Club" or limit Dennis Antolik from using it in any way;

2. VCH, Castle Crown, and Garrett Jennings shall not list the Property for sale or attempt to sell the Property;

3. VCH, Castle Crown, and Garrett Jennings shall not charge legal expenses, travel, meals or aircraft fuel expenses to VCH or to Victor Antolik;

TEMPORARY INJUNCTION (VICTORY CHEVAL HOLDINGS LLC)

Page 2 of

# Exhibit A

4. VCH, Castle Crown, and Garrett Jennings shall not cut-off the utilities at the residence on the Property while Dennis Antolik or Victor Antolik retain possession of the residence; Dennis Antolik or Victor Antolik will provide for, maintain, and pay all the utilities for the residence on the Property;

5. Victor Antolik and Dennis Antolik agree to not maintain any dogs on the Property.

6. Dennis Antolik, Victor Antolik, and Cheval Manor, Inc. shall keep all of the thirteen (13) horses that may be owned by them or business entities owned by them, or under their control, restrained behind a gated and secured fence; Dennis Antolik, Victor Antolik, and Cheval Manor, Inc. are solely responsible for the expense, care, feeding and watering of those horses; and

7. Dennis Antolik, Victor Antolik, and Cheval Manor, Inc. shall use reasonable efforts to clean, maintain, and prevent any damages to the residence on the Property and the gated and fenced area immediately surrounding the residence on the Property.

## C. Temporary Injunctive Relief

It is FURTHER ORDERED that:

1. On or before July 31, 2015, VCH shall establish an operating account (the "Operating Account") for the maintenance of the Property and business conducted on the Property, including but not limited to horse boarding, polo operations, events, and residential leasing. All revenue collected in association with business conducted on the Property shall be deposited into the Operating Account. Garrett Jennings and Victor Antolik shall be the only authorized persons on the Operating Account and shall have access to all statements;

2. The Parties shall direct boarders and other customers to make payments to VCH, which shall deposit all such payments into the Operating Account;



**Exhibit A**

3. Unless otherwise agreed in writing by Garett Jennings and Victor Antolik, funds in the Operating Account shall only be used to fund the following:

a. Payment to Veterinarian DVM Jonathan Cohen to provide veterinary bi-weekly assessments of the health and safety of the horses on the Property;

b. Payment at the current market rate for continued employment of Shay Pfieffer to maintain the Property and to provide for the care and feeding of the paid boarder horses during the evening and early morning hours;

c. Payment of $2,500.00 per month to Cheval Manor, Inc. to provide care and feeding of the paid boarder horses during the day and to maintain the Property, provided that Cheval Manor, Inc.: (1) is able and willing to provide such services; and (2) lawfully resides on the Property. Otherwise, Garrett Jennings shall have the right to direct payment to a third party for the care and feeding of the paid boarder horses during the day and to maintain the Property;

d. Up to $6,000.00 per month for labor and maintenance relating to the polo field;

e. Payment of up to $500.00 per month to Janine Rosen to supervise the horse care and boarding services to boarders and equestrians on the Property;

f. Payment of up to $325.00 per stall-boarded horse, per month for feed and supplies;

g. Payment of up to $140.00 per pasture horse, per month for feed and supplies;

h. Payment of up to $1,500.00 per month for utilities;

i. the cost of insurance for the Property; and

j. Up to $500.00 per transaction for any other bona fide operating expense.

**Exhibit A**

4. VCH shall retain the services of Janine Rosen, or other mutually agreed upon third party, to supervise the horse care and boarding services to boarders and equestrians on the Property, and, beginning on August 1, 2015, provide a monthly report to the parties and to the Court regarding the status of care of the horses on the Property;

5. Garrett Jennings is authorized to make and shall be responsible for making and keeping an accurate accounting of all payments outlined in Paragraph C.3 of this Order from the Operating Account. Any additional expenditures must be approved, in writing, by Victor Antolik and Garrett Jennings, either of whom may move this Court to request the release of additional necessary expenses. Any excess funds remaining in the Operating Account after final trial of this cause shall be distributed in accordance with the Court's final judgment;

6. Garrett Jennings shall pay the reasonable and necessary costs, not to exceed $35,000.00, for the repair of the damage to the polo field on the Property. Victory Cheval Holdings, LLC shall fund the repair through a capital contribution of Garrett Jennings, for which he may seek reimbursement at trial;

7. Garrett Jennings shall be permitted access to the residence on the Property for inspection at a date/time mutually agreeable upon by parties on or before September 31, 2015;

8. Pursuant to the agreements of the Parties and the Court's authority to issue temporary injunctive relief in order to maintain the status quo and to protect persons and property, including horses, from harm, injury or loss, the Court ORDERS the parties to comply with the provisions herein, finding that such Order is necessary and proper as a temporary injunction in order to prevent harm, injury or loss to the parties, including injury to persons and property, during the pendency of this matter. The agreements of the parties and the



**Exhibit A**

Order of the Court stated herein does not constitute an adjudication of responsibility and any Party may seek to recover as damages any costs or expenses incurred;

9. This Order shall take effect immediately, shall be binding on the parties and all persons in active concert or participation with them who receive notice of this Order by any means, and shall remain in effect until modified by agreement of the parties or further order of this Court;

10. This matter is set for trial on January 25, 2016;

11. Victor Antolik is ORDERED to post a bond in the amount of $500.00 or cash in lieu thereof, in conformity with the law, conditioned that he will abide by the decision which will be made in this cause, and that he will pay all sums of money and costs that may be adjudged against him if the temporary injunction shall be dissolved in whole or in part; and

12. All other relief requested is denied.

SIGNED this July 16, 2015.

_____
JUDGE PRESIDING

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____7/27/2015_____

VELVA L. PRICE
DISTRICT CLERK
By Deputy:

TEMPORARY INJUNCTION (VICTORY CHEVAL HOLDINGS LLC)       Page 6 of 6

# Exhibit A

CAUSE NO. D-1-GN-14-002607

| | | |
|---|---|---|
| VICTORY CHEVAL HOLDINGS LLC<br>*Plaintiff and Counter-Defendant*<br><br>v.<br><br>DENNIS ANTOLIK and<br>VICTOR ANTOLIK<br>*Defendants and Counter-Plaintiffs*<br><br>CHEVAL MANOR, INC.<br>dba AUSTIN POLO CLUB<br>*Intervenor*<br><br>v.<br><br>GARRETT JENNINGS,<br>CASTLE CROWN MANAGEMENT LLC,<br>AND CASTLE CROWN PROPERTIES-<br>VICTORY CHEVAL, LLC<br><br>*Third-party Defendants* | § § § § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT<br><br><br><br>OF TRAVIS COUNTY TEXAS<br><br><br><br><br><br>250th JUDICIAL DISTRICT |

### COUNTER-PLAINTIFF VICTOR ANTOLIK'S SECOND AMENDED COUNTERCLAIM AND VERIFIED REQUEST FOR TEMPORARY, PERMANENT INJUNCTION OR IN THE ALTERNATIVE, APPOINTMENT OF A RECEIVER

TO THE HONORABLE JUDGE OF SAID COURT:

Counter-Plaintiff Victor Antolik ("Victor Antolik") files his Second Amended Counterclaim and Verified Request for Temporary, Permanent Injunction, or in the Alternative, Appointment of a Receiver and shows the Court as follows:

### I. DISCOVERY CONTROL PLAN

1. Discovery is intended to be conducted under Level 3 of the Texas Rules of Civil Procedure. Victor Antolik seeks monetary relief of over $1,000,000.00.

### II. JURISDICTION AND VENUE

2. The amount in controversy is in excess of this court's jurisdictional minimum. Venue is proper pursuant to Section 15.002 of the Tex. Civ. Prac. & Rem. Code.



# Exhibit B

## III.  PARTIES

3.     Plaintiff/Counter-Defendant Victory Cheval Holdings, LLC ("VCH") is a Texas limited liability company that filed the original suit and has answered herein.

4.     Third-Party Defendant Garrett Jennings ("Jennings") is a resident of California and has already appeared and answered herein.

5.     Third-Party Defendant Castle Crown Management, LLC ("Castle Crown") is a limited liability company with its principal place of business in Travis County, Texas. Its office is located at 1105 Clayton Lane, Austin, Texas 78723.  Castle Crown has already appeared and answered herein.

6.     Third-Party Defendant Castle Crown Properties-Victory Cheval, LLC ("CC-VC") is a Texas Limited Liability company with its principal place of business located at 13628 Gregg Manor Road, Manor, Texas 78653.  CC-VC has already appeared and answered herein.

## IV.  FACTS

### A.     The Dispute and Players

7.     This dispute arises out of VCH's purchase of real property and a ranch located at 13628 Gregg Manor Road, Austin, Texas 78653 ("Property") from Debtor/Intervenor Cheval Manor, Inc. ("Chavel Manor") in connection with its Chapter 12 bankruptcy and Jennings' subsequent unilateral repudiation of a lease and breach of fiduciary duties.

8.     Via an assignment of an initial purchase contract and lease, VCH (an entity created by Jennings and Victor Antolik) purchased the Property out of bankruptcy.

9.     The agreement between Jennings and Victor Antolik called for them to be 50/50 partners in VCH.  At the closing, Jennings reneged on his agreement and Victor Antolik was made 49% owner of VCH.



# Exhibit B

10. Jennings is also a principal in and operates Castle Crown. Castle Crown is the purported manager of the Property but does not have the proper license to do so nor does it have a valid contract to manage the property.

11. Cheval Manor is the Chapter-12 debtor in possession of the Property, was the former owner of the Property, and is now a Lessee and in possession. Cheval Manor does business as the Austin Polo Club.

12. Defendant/Counter-Plaintiff Dennis Antolik ("Dennis Antolik") is also a Lessee or Sub Lessee on the Property and is the sole owner of Lessee Cheval Manor.

13. CC-VC is a Texas limited liability company formed by Jennings without authorization from Victor Antolik or Dennis Antolik. Jennings represented to the IRS that CC-VC is the new name of Austin Polo Club on an EIN application and Victor Antolik is a 49% managing member of the company; however, Victor Antolik did not consent to the creation of the entity with him as a 49% owner nor did Dennis Antolik give any rights in the Austin Polo Club's name or business to CC-VC. CC-VC is a sham organization.

14. Non-party Richard Antolik executed the original purchase contract and lease for the Property and assigned both to VCH before closing. Victor Antolik was made manager of VCH and had authority to and did assign the contract to purchase and assumed the lease obligations.

**B. Victor Antolik and Jennings Create VCH to Acquire the Property Pursuant to Cheval Manor's Confirmed Bankruptcy Plan Including a Five-Year Leaseback.**

15. This dispute arises out of the Chapter 12 bankruptcy of Cheval Manor, a company owned by Dennis Antolik. For years Cheval Manor had operated an equestrian center known as the "Austin Polo Club" and a horse boarding facility on the Property. Facing foreclosure of the Property, Cheval Manor filed for Chapter 12 bankruptcy in the United States Bankruptcy Court for the Western District of Texas.

Counter-Plaintiff Victor Antolik's Second Amended Counterclaim and Verified Request for Temporary, Permanent Injunction or in the Alternative, Appointment of a Receiver – Page 3



**Exhibit B**

16.     Pursuant to the plan confirmed and approved by the Bankruptcy Court on November 7, 2013, (the "Plan"), *see* **Exhibit 1**, Cheval Manor entered into a farm and ranch contract to sell the Property to "Ric Antolik or his assigns" (the "Purchase Contract"). The Purchase Contract is attached to the Plan as Exhibit B. The Plan required the purchaser to enter into a 5-year lease back with Cheval Manor/Austin Polo Club at $4,800 per month and provided a commercial lease as the form for the lease, leaving nothing for Cheval Manor to negotiate with the Purchaser. The purpose of the leaseback in the Plan was to permit Cheval Manor to continue the Austin Polo Club's operations. The purpose of the leaseback in the Plan was to permit Cheval Manor to continue the Austin Polo Club's operations.

17.     Section 5.02.02 of the Plan, entitled "Lease of Real Property," provides as follows:

> In connection with the sale of the real property, the purchaser shall execute a lease to the Debtor for such property at a rental rate not to exceed $4,800.00 per month in the form of the attached Exhibit C.

18.     Ric Antolik or his assigns, as Landlord, and Dennis Antolik/Cheval Manor, as Tenant, executed the form five-year commercial lease (the "Lease") required by and attached to the Plan as Exhibit C. The lease obligation is incorporated by reference into the Purchase Contract and obligates the Buyer to agree to a lease back of the Property to the Seller. Specifically, paragraph 11 of the Purchase Contract provides that "Buyer will agree to a mutual lease back of the property to the Seller." The express terms of the Lease authorized assignment to any subsequent owner of the Property and subletting with the Landlord's consent. The Lease also required the Landlord to provide Tenant with 10 days to comply in the event of alleged breach by Tenant of the Lease before such breach constitutes a default under the Lease. The Lease authorized any Tenant to use the Property as a polo club, residential rental units, events facility



**Exhibit B**

and full service equestrian facility including boarding lessons and horse training.

19.     Victor Antolik played a significant role in obtaining a buyer for the Property. He was able to find traditional debt financing for the Property where he and Ric Antolik would have owned the Property. However, because Jennings had the financial capability to close the sale of the Property more quickly and Jennings and Victor Antolik had a prior business relationship, Victor Antolik and Jennings formed VCH to acquire the Property as a real estate investment.. Jennings attempted to circumvent the Plan by initially proposing that VCH purchase the debt directly from the foreclosing lender, Amplify Credit Union, and subsequently proposing a deal different than the one contained in the Plan. When those efforts failed, Jennings agreed that VCH could purchase the Property according to the Plan. Thus, VCH's two members executed a Unanimous Written Consent dated December 27, 2013 requiring VCH to purchase the Property under the terms set out in the Purchase Contract including the obligation to agree to a 5-year lease back of the Property to Cheval Manor/Austin Polo Club. *See* **Exhibit 2.**

20.     Richard Antolik did not end up closing on the Property. Before closing, Richard Antolik assigned to VCH the Purchase Contract and the Lease previously executed and incorporated by reference into the Purchase Contract.. *See* **Exhibit 3**. But for the assignment, VCH would not have been able to purchase the Property pursuant to the Purchase Contract and under the terms mandated by VCH unanimous consent.

21.     The sale closed on December 26, 2013. VCH received an approximate $64,000.00 credit on the purchase price ($980,000) that was applied to Cheval Manor's first year's rent. Pursuant to authority granted by corporate resolution, Victor Antolik acted as agent for VCH at the closing. *See* **Exhibit 4.** Victor Antolik had actual, implied and apparent authority to approve the assignment, sale, and assumption of the lease, and he did so on behalf of VCH in accordance



# Exhibit B

with the company's unanimous consent.

22.     Jennings and Dennis Antolik/Cheval Manor hosted a party in December of 2013 (a week or so before the purchase closed) that was attended by Austin Polo Club boarders, members and vendors. During the party, Dennis Antolik made a speech to the guests that the Austin Polo Club had made an agreement with VCH (Jennings' and Victor Antolik's company) to buy the land, lease it back to the Antolik brothers (and Dennis's company) and make a series of improvements to the Property, including putting in a polo arena and fencing. After Dennis Antolik's speech, Jennings spoke briefly and echoed all of Dennis Antolik's comments and did not challenge any of them. This was consistent with the multiple meetings Jennings had with Dennis Antolik, Victor Antolik, Steve Sather, Wally Tingle and others prior to purchasing the Property.

23.     In March 2014, Dennis Antolik/Cheval Manor hosted another party. Dennis Antolik made a similar speech as did Jennings.

24.     Jennings and Victor Antolik agreed to and did split the cost of building an arena on the Property.

25.     Victor and Dennis Antolik lived on the Property for seven months after closing without any claim by VCH or Jennings that they (or their respective businesses) were trespassing, the Lease was not in effect or that Dennis Antolik/Cheval Manor were late on rent. Thus, there has been actual performance under the Lease such that even if there was no written agreement the performance takes the Lease outside of the statute of frauds. Further, the Lease is enforceable pursuant to the doctrines of promissory estoppel and/or constructive fraud.

C.     **Jennings Reneges on 50/50 Agreement with Victor Antolik and Jennings' Self-Dealing Runs the Company into the Ground Revealing his True Intent to Acquire the Property on the Cheap for Himself**

26.     VCH was formed by its two members Jennings (51%) and Victor Antolik (49%)



**Exhibit B**

precisely to acquire the Property as an investment. The 51/49 ownership split was a last minute change forced by Jennings. Victor Antolik and Jennings had initially agreed to a 50/50 ownership split. *See* **Exhibit 5**. Jennings used duress and fraud and breached his fiduciary obligations in failing to document Victor Antolik's 50% and his estopped from claiming no such agreement exists. Just days before the Cheval Manor's creditor would proceed with the foreclosure and at Jennings' insistence, Victor Antolik was forced to agree to a 51/49 split. However, Jennings promised that once the Property was refinanced, ownership would be split 50/50. However, when the time and opportunity to refinance came, Jennings refused to go forward.

27. Jennings then proceeded to take control of the Property through his unlicensed property management company Castle Crown and on information and belief, his intent has always been to drive the value of the Property down in order to force Victor Antolik out of VCH at less than fair value and to acquire the Property for himself on the cheap.

28. Under the pretense of providing Dennis Antolik with more time to improve the Austin Polo Club's equestrian services, Jennings persuaded Dennis Antolik to allow his California management company, Castle Crown, to assume Cheval Manor's bookkeeping and other some administrative tasks, including advertising for boarders and managing their accounts.

29. Without Victor Antolik's agreement, Jennings engaged Castle Crown as the property manager for VCH. Castle Crown is not a licensed property management company in Texas and this engagement violates the Texas Real Estate License Act. Tex. Occ. Code §§ 1101.001, *et seq.*

30. Jennings and Castle Crown soon began charging VCH unreasonable fees and unnecessarily running up the expenses of the company. Jennings sent bills to Victor Antolik, claiming he had to pay one- half of the then outstanding bills associated with the Property. First,



# Exhibit B

the bills were not appropriate to be reimbursed for the Property, including extravagant costs and personal expenses. Second, VCH's Company Agreement did not permit secondary capital calls.

31. During the time that unlicensed Castle Crown managed the Property, Castle Crown ripped out expensive windows from the horse barn and confiscated commercial equipment belonging to Victor Antolik.

32. In late February of 2013, Jennings suggested that Vic Antolik could not afford the property and offered to buy his interest. Subsequently expenditures dramatically increased.

33. As a complement to his self-dealing and the overbilling, Jennings and Castle Crown have slowly run Austin Polo Club's business to the ground. They incrementally encroached on Austin Polo Club's rights as a tenant and business owner, ran off many of the boarding customers, and began to act as if Austin Polo Club had no rights in the Property, despite the Lease and bankruptcy order. Before Castle Crown began its management, the horse stalls were full. Eight months later, only a small handful of boarders remained. Jennings and Castle Crown have jeopardized Austin Polo Club's ability to operate efficiently and profitably. This has also diminished the value of the Property, thereby jeopardizing VCH's ability to refinance as Jennings had previously agreed.

34. On information and belief, these acts were part of Jennings's scheme to force Victor Antolik out of VCH at less than fair value and to acquire the Property and Austin Polo Club for himself on the cheap.

**D. In Retaliation to Dennis Antolik's Termination of Castle Crown's Services and Victor Antolik's Refusal to Be Bought Out at Less than Fair Value, Jennings Causes VCH to File Suit, Obtain a TRO and Seek Eviction.**

35. After Castle Crown assumed the bookkeeping and financing affairs of the Austin Polo Club, the business deteriorated largely as a result of its poor management. Consequently, on July



**Exhibit B**

21, 2014, Dennis Antolik terminated Castle Crown and then wrote to Austin Polo Club's customers and instructed them to submit their payments directly to Austin Polo Club and not to Castle Crown. Castle Crown refused to relinquish control. Around the same time, Victor Antolik refused to allow Jennings to buy his ownership interest in VCH for less than fair value.

36. In retaliation and without reference to the Lease, Victor Antolik's ownership interest in VCH, or the Plan, Jennings caused VCH to file this suit seeking an *ex parte* TRO expelling Dennis and Victor Antolik, the Austin Polo Club, and Victor Antolik's brokerage business from the Property. The court granted the request *ex parte* on July 30, 2014. The *ex parte* TRO effectively and improperly evicted Dennis and Victor Antolik (and their businesses) from their home of over 20 years without any notice, hearing, or due process and was issued from a court without jurisdiction. Victor and Dennis Antolik promptly moved to dissolve the TRO. However, on August 5, 2014, the parties entered into a Rule 11 Agreement and agreed to mediate this dispute. Although the parties have been involved in extensive negotiations, they have been unable to resolve the dispute. The TRO expired and Dennis and Victor Antolik resumed residence on the Property. A temporary injunction hearing has not been held due to, at least in part, a change in counsel.

37. Jennings' lawsuit against Defendants is part of a larger effort to wrongfully control VCH and own the Property outright without complying with the rules of governing limited liability companies and controlling shareholders.

38. On March 12, 2015, Jennings also caused VCH and Castle Crown to file a forcible entry and detainer lawsuit in Precinct One of the Justice of the Peace Court in Travis County, Texas seeking eviction of Dennis and Victor Antolik from the Property. After VCH and Castle Crown's motion for summary judgment was denied, a jury trial was held on May 11, 2015

Counter-Plaintiff Victor Antolik's Second Amended Counterclaim and Verified Request for Temporary, Permanent Injunction or in the Alternative, Appointment of a Receiver – Page 9



# Exhibit B

returning a verdict that Victor and Dennis Antolik and Cheval Manor/Austin Polo Club had the right to immediate possession of the Property. VCH and Castle Crown appealed requesting a trial de novo in the County Court at of Travis County.

39. After threatening to cut off the utilities, VCH and Castle Crown disconnected the electricity to the house on the Property in April 2015. *See* Exhibit 6.

## V. CAUSES OF ACTION

### A. Count One- Breach of Contract by Jennings and VCH

40. The foregoing allegations are incorporated by reference as if fully set out herein.

41. Victor Antolik and Jennings made an oral agreement that the loan for the Property would be refinanced by May 2014 and that upon refinance, the ownership of VCH would change from 51-49% to 50-50%. The oral agreement was memorialized in writing and Jennings agreed to sign at the closing. Jennings breached this agreement by failing to refinance the Property and change the ownership to 50-50.

42. Pursuant to the express terms of the Purchase Contract and VCH's unanimous written consent, VCH was obligated to agree to a leaseback of the Property. Further, VHC was bound to the Lease executed prior to closing and incorporated by reference into the Purchase Contract upon assignment of the Purchase Contract and subsequent closing. VCH's repudiation of the Lease and/or insistence that there is no lease obligating it to lease the Property to Cheval Manor and/or Victor and Dennis Antolik is a material breach of the Purchase Contract and the Lease. Victor Antolik seeks rescission of the Purchase Contract.

### B. Count Two-Declaratory Judgment

43. The foregoing allegations are incorporated by reference as if fully set out herein.

44. Victor Antolik asserts this claim in his derivative capacity. VCH purchased the Property

## Exhibit B

subject to the bankruptcy court order confirming the Chapter 12 Plan or Reorganization. There is a live dispute concerning whether VCH is bound by the bankruptcy court order requiring the purchase of the Property to be subject to the 5-year lease to Cheval Manor/Dennis Antolik and whether Victor Antolik is a 50% owner in VCH. Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Victor Antolik seeks the court's declaration that; (1) VCH is bound by the bankruptcy court plan, the Plan and that the Lease is binding on VCH; (2) Dennis Antolik/Cheval Manor, Inc. are not currently in default of the lease and are entitled to the rights set forth in the Lease including the right to sublet to Dennis Antolik, Victor Antolik and/or his brokerage business; and (3) Victor Antolik is a 50% owner in VCH.

C. **Count Three- Derivative Breach of Fiduciary Duty Against Jennings**

45. The foregoing allegations are incorporated by reference as if fully set out herein.

46. Jennings owes principal VCH a fiduciary duty of loyalty, good faith, integrity of the strictest kind, fair, honest dealing and the duty not to conceal matters. In addition, due to previous business dealings between Victor Antolik and Jennings a fiduciary relationship existed between Jennings and Victor Antolik. Although a fiduciary duty encompasses the duty of good faith and fair dealing, the fiduciary duty requires more. It imposes an obligation on the fiduciary to place the interest of the beneficiary before the fiduciary's own interest and includes dedication of their uncorrupt business judgment for the sole benefit of the company. Jennings cannot use his position as the 51% owner in VCH to place himself in a position where his self-interest will or may conflict with obligations owed to VCH. Jennings' refusal to refinance and his last minute reneging on the 50/50 split are likewise breaches of his fiduciary duties.

47. Both through VCH and Castle Crown, Jennings is intentionally running the income producing aspect of Cheval Manor into the ground. He is making it so Cheval Manor will never

**Exhibit B**

be able to pay rent by without limitation interfering with the contracts Cheval Manor has with its customers. Jennings refuses to refinance the Property in a ruse to keep from changing the ownership percentages to 50-50, so that he can maintain control of VCH and continue his unauthorized, unilateral efforts that jeopardize VCH's business and expose it to liability from Cheval Manor and Dennis Antolik. VCH has an obligation to comply with its agreements, court orders and not interfere with Cheval's Manor's agreements with its customers. Jennings' actions are preventing VCH from engaging in such compliance.

48. Jennings has breached his fiduciary duty to VCH by self-dealing, overbilling and charging improper expenses to VCH's books and attempting to require Victor Antolik to pay for half. Jennings has permitted Castle Crown to charge VCH unreasonable fees and unnecessarily running up the expenses of the company. Jennings sent bills to Victor Antolik, claiming he had to pay one- half of the then outstanding bills associated with the Property. First, the bills were not appropriate to be reimbursed for the Property, including extravagant costs and personal expenses. Second, VCH's Company Agreement did not permit secondary capital calls.

49. Castle Crown Management is participating in the breach of fiduciary duty and benefitted from Jennings' breach of fiduciary duty.

50. Jennings has also breached the duty of care by failing to disclose all material facts to Victor Antolik regarding the relationship with Castle Crown and no vote was held with respect to the agreement with Castle Crown. Jennings' approval of the management agreement with Castle Crown was not done in good faith and is not valid and enforceable under section 21.418 of the Texas Bus. Org. Code. VCH and Victor Antolik have sustained significant losses both directly and indirectly since Castle Crown took over management.

**D.** **Count Four- Derivative Breach of Contract and Fiduciary Duty by Castle Crown**

**Exhibit B**

51. The foregoing allegations are incorporated by reference as if fully set out herein.

52. Jennings' Castle Crown apparently believes it has an agreement with VCH to manage the Austin Polo Club. Because Jennings will not enforce that agreement, Victor Antolik, on behalf of VCH, must. Castle Crown has breached that agreement by failing to competently manage the Austin Polo Club. During its management, revenues plummeted, it spent money frivolously and failed to maintain the Property and initiated verbal confrontations with customers. It also failed to work for Dennis Antolik/Cheval Manor and instead worked for Jennings, to the detriment of Dennis Antolik/Cheval Manor and VCH.

53. Castle Crown owes VCH a fiduciary duty of loyalty, good faith, integrity of the strictest kind, fair, honest dealing and the duty not to conceal matters.

54. Castle Crown breached its duty to VCH by: (1) failing to competently manage its assets; (2) actively attempting to put Dennis Antolik/Cheval Manor out of business; (3) failing to recognize the lease; (4) tortiously interfering with Dennis Antolik/Cheval Manor's agreements; (5) acting only to Jennings' benefit (not VCH's); and (6) exposing VCH to significant liability to Dennis Antolik/Cheval Manor and their customers.

55. Jennings participated in Castle Crown's breaches and benefitted from same.

E. **Count Five-Fraudulent Inducement Against VCH, Jennings and Castle Crown**

56. The foregoing allegations are incorporated by reference as if fully set out herein.

57. Victor Antolik played a significant role in obtaining a buyer for the Property. He was able to find traditional debt financing for the Property where he and Ric Antolik would have owned the Property. However, Jennings was able to close the sale of the Property more quickly. In the confirmed plan and the Purchase Contract, VCH agreed to purchase the Property subject to the Lease. Jennings' agreement to purchase as set out in the bankruptcy plan was important because



**Exhibit B**

it gave Victor and Dennis Antolik a place to live and run their businesses, gave Cheval Manor a continued source of income, and allowed for development in the area and the Property to appreciate without an immediate need to sell the Property. In the interim, VCH would have the payments from the Lease to pay a re-financed loan. At all relevant times, Jennings and VCH represented that they understood, acknowledged and agreed to the conditions including Victor Antolik's right to reside on and run his brokerage business from the Property.

58. Jennings never intended for VCH to be bound by the Lease, the bankruptcy court's order or the plan of reorganization. Jennings never intended to be bound by the VCH Company Agreement or agreements to re-finance the Property and split the ownership 50/50.

59. All of the representations by VCH, Jennings and Castle Crown described herein were false when made. Victor Antolik would not have brought Jennings in to participate in the purchase of the Property or entered into a business relationship with Jennings had Vic Antolik known any one of these representations were false.

60. Jennings and Castle Crown fraudulently induced Victor Antolik to enter into the VCH Company Agreement, buy the Property and divide ownership of VCH to 51/49. The representations were made both through the documents and affirmative conduct and by silence or omission when Jennings and Castle Crown had a duty to speak or provide additional information and disclosures. Jennings and Castle Crown intended that Victor Antolik rely on the representations, and he did so rely by, among other things, bringing Jennings into the deal, entering into the Company Agreement, agreeing to refinance and adjust the ownership to 50-50, closing the sale and managing the Property.

61. VCH, Jennings and Castle Crown were parties to a fraudulent scheme and are responsible for the acts of the other participants done in furtherance of the scheme. Jennings in particular was



**Exhibit B**

aware that both of the entities he controls were working under the false representations as alleged herein. VCH, Jennings and Castle Crown are liable for fraud because they participated in the fraudulent transactions and reaped the benefits.

62. VCH, Jennings and Castle Crown knew that the representations were false, or made them with reckless disregard for their truth or falsity, at the time that they were made.

63. As a result of VCH, Jennings and Castle Crown's fraud and fraudulent inducement, Victor Antolik has suffered actual damages in excess of this court's jurisdictional minimum in the form of lost profits and other damages. Victor Antolik also seeks rescission of the Purchase Contract and punitive damages in an amount determined by the jury.

64. The limits placed on the recovery of punitive damages do not apply because the conduct involved violates Tex. Penal Code Ann. §32.46.

F. **Count Six- Fraud in Real Estate Transaction**

65. The foregoing allegations are incorporated by reference as if fully set out herein.

66. In the alternative, VCH, Jennings and Castle Crown intended that Victor Antolik rely on their false representations and Victor Antolik did. VCH, Jennings and Castle Crown made the false representations with actual awareness of their falsity. VCH, Jennings and Castle Crown failed to disclose the falsity of the representations and promises to Victor Antolik and benefited from their false representations and promises.

67. As a result, Victor Antolik has suffered actual damages in excess of this court's jurisdictional minimum in the form of lost profits from his brokerage business and other damages. Victor Antolik also seeks rescission of the Purchase Contract and punitive damages in an amount determined by the jury.

68. The limits placed on the recovery of punitive damages do not apply because the conduct

**Exhibit B**

involved violates Tex. Penal Code Ann. §32.46.

### G. Count Seven-Breach of the VCH Company Agreement and Removal of Jennings as Manager/Member of VCH

69. The foregoing allegations are incorporated by reference as if fully set out herein.

70. Jennings has willfully violated the VCH Company Agreement, committed fraud against VCH and/or Victor Antolik, and/or engaged in wrongful conduct that adversely and materially affects VCH's business or operation.

71. Pursuant to section 15.04 of the VCH Company Agreement, Victor Antolik seeks expulsion of Jennings as a member of and from any ownership interest or management right in VCH.

### H. Count Eight-Alternative Request for Corporate Judicial Remedies Including the Need for a Receiver

72. The foregoing allegations are incorporated by reference as if fully set out herein.

73. Victor Antolik also seeks all other alternative corporate remedies authorized under the VCH Company Agreement and/or by law including the appointment of a receiver over VCH or the appointment of an independent manager for VCH.

74. Jennings and Castle Crown have shown that they are incapable of operating/managing the Property. Victor Antolik requests that a receiver is appointed pursuant to the Texas Civil Practice and Remedies Code § 64.001(3), (5) and (6) and Texas Business Organizations Code § 11.403(a)(3),(5), 11.403(b), and/or 11.404(a),(b) with the full authority to manage any and all aspects of the business. Such appointment is lawful and in the best interest of the members, creditors and employees of VCH and Cheval Manor. In the alternative Victor Antolik should be appointed manager, or at the minimum, an independent licensed property management firm should be obtained. The receiver or property management company should be given all

**Exhibit B**

authority to manage the business.

## I. Count Nine-Injunctive Relief from VCH, Jennings, Castle Crown, and CC-VC

75.     The foregoing allegations are incorporated by reference as if fully set out herein.

76.     Victor Antolik has no other adequate remedy at law and will suffer irreparable and imminent harm unless VCH, Jennings, Castle Crown, and CC-VC are temporarily enjoined from continuing the improper conduct described above and prohibited in Paragraph 77 below.   Such restraint is necessary to maintain the status quo and protect the rights and interests of Victor Antolik, individually, and in the business and property of VCH.   Such restraint is necessary to maintain the status quo to prevent any further dissipation or diminution of VCH's business and property.

77.     VCH, Jennings, Castle Crown, and CC-VC and their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them who receive actual notice shall be enjoined and prohibited from:

   a.  Castle Crown and its officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them who receive actual notice from entering or accessing the Property to exercise or attempt to exercise any management or control over the Property;

   b.  CC-VC and its officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them who receive actual notice from using the name Austin Polo Club in any of its business operations, marketing and/or advertising, and identifying Victor Antolik as a 49% owner, manager, and/or person responsible on any corporate documents including those filed with any governmental entity;

   c.  instructing Cheval Manor's customers to make payment for services to Castle Crown, Jennings, or VCH or otherwise receiving money from Cheval Manor's business;

   d.  taking any action whatsoever to attempt to evict Victor Antolik and/or his brokerage business from the Property;

   e.  listing the Property for sale or making any attempts to sell the Property;

Counter-Plaintiff Victor Antolik's Second Amended Counterclaim and Verified Request for Temporary, Permanent Injunction or in the Alternative, Appointment of a Receiver – Page 17



# Exhibit B

f.  charging management fees or other excessive improper or unauthorized charges to VCH or Victor Antolik;

g.  from cutting off utilities;

h.  entering into any other management contracts related to the Property without written consent of Victor Antolik;

i.  Jennings acting as managing partner and/or member of VCH (i.e., Jennings must be removed as managing partner and/or member of VCH and a receiver or independent manager over VCH should be appointed- See Count 8); and.

j.  entry into any self interested contract concerning the Property.

## J.  Count Ten-Castle Crown Operates in Violation of the Real Estate Licensing Act

78.  The foregoing allegations are incorporated by reference as if fully set out herein.

79.  Castle Crown is not licensed with the State of Texas as a real estate broker or sales person in violation of Chapter 1101 of the Texas Occupations Code also known as the Texas Real Estate License Act. Accordingly, VCH's contract with Castle Crown is illegal, void and/or voidable.

## K.  Count Eleven - Unjust Enrichment

80.  The foregoing allegations are incorporated by reference as if fully set out herein.

81.  After receiving the benefit of Victor Antolik's relationship with Cheval Manor and Dennis Antolik and ultimately purchasing the Property that Jennings would not otherwise have been able to purchase and having management over same, Jennings and Castle Crown took actions to drive the value of the Property down in order to force Victor Antolik out of VCH at less than fair value and acquire the Property on the cheap.

82.  Jennings and Castle Crown received the benefit of Victor Antolik's relationship and ultimate ownership and management of the Property by fraud, duress or the taking of undue advantage. Jennings and Castle Crown wrongfully secured or passively received this benefit and

Counter-Plaintiff Victor Antolik's Second Amended Counterclaim and Verified Request for Temporary, Permanent Injunction or in the Alternative, Appointment of a Receiver – Page 18



# Exhibit B

it would be unconscionable for them to retain it.

**L.    Count Twelve - Conversion by Castle Crown and Jennings**

83.    The foregoing allegations are incorporated by reference as if fully set out herein.

84.    Victor Antolik and/or Dennis Antolik owned possessed, or had the right to immediate possession of the windows on the horse barn and the commercial business property.

85.    The windows on the horse barn and the commercial business property are personal property that Castle Crown and Jennings wrongfully exercised dominion or control over and Victor and/or Dennis Antolik suffered injury.

**M.    Count Thirteen - Common Law Service Mark Infringement and Dilution by Jennings and CC-VC**

86.    The Austin Polo Club is a name used to identify and distinguish the services of Cheval Manor/Dennis Antolik's equestrian services. Austin Polo Club is eligible for protection under state statutory and common law. Cheval Manor/Dennis Antolik has used the service mark in the Austin area for at least ten years and is the senior user. Jennings' and CC-VC's intentional use of the service mark without authorization has caused damage to Cheval Manor/Dennis Antolik and Victor Antolik as an un-consenting member of CC-VC.

**N.    Count Fourteen – Request for Accounting**

87.    Since the date of closing in December 2013, Castle Crown, VCH, and/or CC-VC has received all the income derived from the Property leased by Dennis Antolik/Cheval Manor.

88.    Castle Crown, VCH, and/or CC-VC has not accounted to Dennis Antolik/Cheval Manor for the income received from the Property as lessee or to Victor Antolik as a 49% owner of VCH.

## VI.    CONDITIONS PRECEDENT

89.    All conditions precedent necessary for Victor Antolik to have and recover in this action



# Exhibit B

have been performed, have occurred or have been waived.

## VII. ATTORNEYS' FEES

90.     Pursuant to Chapters 37 and 38 of the Texas Civil Practice and Remedies Code, Tex. Bus. Org. Code §101.461, and Tex. Bus. Com. Code §27.001, et. seq. Victor Antolik is entitled to his attorneys' fees as the prevailing party and/or as is equitable and just.

## REQUEST FOR RELIEF

Victor Antolik respectfully requests that he be awarded his requested relief including a temporary injunction as set forth above and that upon final trial he take judgment jointly and severally against Jennings, Castle Crown and VCH for the following:

    (a)  all actual, economic, direct, indirect, special and incidental damages;

    (b)  declarations that (1) VCH is bound by the bankruptcy court plan, the Plan and that the Lease is binding on VCH; (2) Dennis Antolik/Cheval Manor, Inc. are not currently in default of the lease and are entitled to the rights set forth in the Lease including the right to sublet to Dennis Antolik, Victor Antolik and/or his brokerage business; and (3) Victor Antolik is a 50% owner in VCH.

    (c)  rescission of all agreements with VCH, Jennings and Castle Crown and any other agreements involving the Property, including the Purchase Contract/Farm and Ranch Contract;

    (d)  lost profits;

    (e)  pre- and post- judgment interest at the highest rate allowed by law and costs of court;

    (f)  the issuance of a temporary injunction as requested above and/or the appointment of a receiver/and/or independent manager;

    (g)  reasonable and necessary attorney's fees;

    (h)  punitive or exemplary damages in an amount to be determined by the trier of fact; and



**Exhibit B**

(i)  such other and further relief, special or general, legal or equitable, to which he is entitled.

Respectfully submitted,

**TAYLOR DUNHAM AND RODRIGUEZ, LLP**
301 Congress Avenue
Suite 1050
Austin, Texas 78701
512.473.2257 Telephone
512.478.4409 Facsimile

By: _____
Donald R. Taylor
State Bar No. 19688800
Email:  dtaylor@taylordunham.com
Isabelle M. Antongiorgi
State Bar No. 24059386
Email:  ima@taylordunham.com
Stacey V. Reese (Of Counsel)
State Bar No. 24056188
Email: Stacey@reeselawpractice.com

**ATTORNEYS FOR DEFENDANT VICTOR ANTOLIK**



# Exhibit B

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was served on the attorney of record by delivering a true and correct copy via email on June 2, 2015 as follows:

Kemp Gorthey
604 West 12th Street
Austin, Texas 78701
kempgorthey@austin.rr.com
**Attorney for Plaintiffs**

Warren Wills
WILLS LAW, P.C.
100 Congress Avenue, 20th Floor
Austin, Texas 78701
warren@willslegal.com
**Attorney for Plaintiffs**

Mark C. Taylor
TAUBE SUMMERS TAYLOR MEINZER LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
mtaylor@taubesummers.com
**Attorney for Defendant Dennis Antolik**

Peyton N. Smith
REED & SCARDINO LLP
301 Congress Avenue, Suite 1250
Austin, Texas 78701
psmith@reedscardino.com
**Attorney for Victory Cheval Holdings, LLC**

Donald R. Taylor



# Exhibit B

## VERIFICATION OF VICTOR ANTOLIK

STATE OF TEXAS               §
                            §
COUNTY OF TRAVIS             §

BEFORE ME, the undersigned notary, on this day personally appeared Victor Antolik, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.      My name is Victor Antolik. I am over the age of eighteen (18) years, I have never been convicted of a crime, I am of sound mind and have personal knowledge of the facts stated herein, which are all true and correct.

2.      I am a Defendant and Counter-Plaintiff in Cause No. D-1-GN-14-002607 styled *Victory Cheval Holdings LLC, et al. v. Dennis Antolik, et al.*, In the 250th Judicial District Court of Travis County, Texas.

3.      The facts in Counter-Plaintiff Victor Antolik's Second Amended Counterclaim and Verified Request for Temporary and Permanent Injunction or in the Alternative Appointment of Receiver are within my knowledge and are true and correct.

Victor Antolik

SUBSCRIBED AND SWORN TO BEFORE ME on this the 2nd day of June, 2015.

Notary Public, State of Texas

TAMARA BOSTON
Notary Public, State of Texas
My Commission Expires
July 27, 2017



**Exhibit B**

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: November 07, 2013.**

_Tony M. Davis_
_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CHEVAL MANOR, INC. | § | Case No. 12-10269 |
| | § | (Chapter 12) |
| Debtor. | § | |
| | § | |

### ORDER CONFIRMING DEBTOR'S AMENDED CHAPTER 12 PLAN DATED SEPTEMBER 13, 2013 AS MODIFIED

CAME ON TO BE HEARD on September 30, 2013, Debtor's Amended Chapter 12 Plan dated September 13, 2013. The Debtor, the Chapter 12 Trustee, Amplify Federal Credit Union, Travis County, and Dennis Jasek each appeared through counsel. The parties appeared and announced that they had reached an agreement to confirm the plan with the modifications contained herein. The Court finds that the Plan as modified should be CONFIRMED.

IT IS THEREFORE ORDERED AS FOLLOWS:

1.     The Amended Plan of Reorganization dated September 13, 2013, a copy of which is attached hereto, and subject to the modifications contained herein, is hereby confirmed.

**EXHIBIT 1**


DEPOSITION
EXHIBIT
1
DB 12-29-14



# Exhibit B

2.      Cheval Manor, Inc. is hereby authorized to sell its real property described as 13628 Gregg Manor Road, Manor, TX 78653 and containing approximately 109.135 acres located in Abs. 160 Sur 50, Castro, M. survey, to Travis County and Richard Antolik or assigns free and clear of liens, claims and encumbrances for $1,350,000.00. Notwithstanding the terms of the Amended Plan, the Debtor shall pay the pro-rated 2013 ad valorem taxes at closing.

3.      If Debtor does not close and fund the sale of the property as described above within 60 days of November 1, 2013 the Trustee is authorized to submit an Order Summarily Dismissing Case to the Court.

###

APPROVED AS TO FORM AND SUBSTANCE:

*/s/Ray Hendren*
Ray Hendren, Chapter 12 Trustee

*/s/Stephen W. Sather*
Stephen W. Sather, Attorney for Debtor

*/s/C. Daniel Roberts*
C. Daniel Roberts, Attorney for Amplify Federal Credit Union

*/s/William Peckham*
William Peckham, Attorney for Dennis Jasek

David Escamilla , Travis County Attorney by

*/s/ Kay Brock*
Kay Brock, Attorney for Travis County, Texas



**EXHIBIT 1**

**Exhibit B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

In re: §
 §
CHEVAL MANOR, INC. § Case No. 12-10269
 § (Chapter 12)
Debtor. §
 §

## MODIFIED AMENDED CHAPTER 12 PLAN OF REORGANIZATION
## DATED SEPTEMER 13, 2013

Barbara M. Barron
Stephen W. Sather
**BARRON & NEWBURGER, P.C.**
1212 Guadalupe, Suite 104
Austin, Texas 78701
(512) 476-9103
(512) 476-9253 (Facsimile)

ATTORNEYS FOR DEBTOR-IN-POSSESSION

**EXHIBIT 1**



**Exhibit B**

## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS AND USE OF TERMS.................................................................................1
ARTICLE II - CONCEPT OF PLAN.................................................................................................6
ARTICLE III - PROVISIONS APPLICABLE TO ALL CLAIMS.................................................................6
ARTICLE IV - CLASSIFICATION AND TREATMENT OF CLASSES UNDER THE PLAN .......................8
ARTICLE V - MEANS FOR IMPLEMENTATION OF PLAN.................................................................11
ARTICLE VI - LIQUIDATION ANALYSIS.......................................................................................13
ARTICLE VII - TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................13
ARTICLE VIII - PROVISIONS FOR THE RETENTION, ENFORCEMENT, SETTLEMENT, OR
ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR AND THE ESTATE INCLUDING
PREFERENCES AND CONVEYANCES..........................................................................................13
ARTICLE IX - EFFECT OF CONFIRMATION...................................................................................14
ARTICLE X - MODIFICATION OF PLAN .......................................................................................15
ARTICLE XI - DEFAULT AND OTHER RELATED PROVISIONS .......................................................15
ARTICLE XII - RETENTION OF JURISDICTION ..............................................................................15
ARTICLE XIII - MISCELLANEOUS PROVISIONS..............................................................................16

i

**EXHIBIT 1**



# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CHEVAL MANOR, INC. | § | Case No. 12-10269 |
| | § | (Chapter 12) |
| Debtor. | § | |
| | § | |

### MODIFIED AMENDED CHAPTER 12 PLAN OF REORGANIZATION
### DATED SEPTEMBER 13, 2013

**Cheval Manor, Inc.** ("Debtor") propose the following Modified Amended Chapter 12 Plan of Reorganization ("Plan") Dated September 13, 2013, pursuant to chapter 12, title 11, United States Code ("Bankruptcy Code" or "Code").. Debtor's Plan will be funded out of future income and sale of real property. Debtor shall file periodic financial reports with the Court as required by the Bankruptcy Code covering Debtor's progress in repaying its creditors. These reports shall be available on the Court's PACER site an www.txwb.uscourts.gov using Debtor's name and/or case number as referenced above.

### ARTICLE I
### DEFINITIONS AND USE OF TERMS

1.01    **Defined Terms.** Unless the context otherwise requires, capitalized terms shall have the meanings set forth in this Section 1.01.

1.01.01    **Administrative Expense Claim** means an administrative expense or Claim described in 11 U.S.C. § 503 and entitled to administrative priority pursuant to 11 U.S.C. § 507(a)(1), including but not limited to Claims for compensation of professionals made pursuant to 11 U.S.C. §§ 330 and 331, and all fees and charges assessed against Debtors and Debtors' property under 28 U.S.C. § 1930, which arose after February 7, 2012.

1.01.02    **Administrative Tax Claim** means an Unsecured Claim by a governmental unit for taxes (including interest or penalties related to such taxes) for any tax year or period, all or a portion of which occurs or falls within the period from and including the Petition Date through the Effective Date.

1.01.03    **Allowed Claim** means a Claim against the Debtors allowable under the Bankruptcy Code to the extent that (i) a proof of Claim, proof of Interest, or request for payment was timely filed or, with leave of the Bankruptcy Court, late filed, and as to which no objection has been timely filed or, if filed, is allowed by a Final Order, unless otherwise provided in this Plan or (ii) the Claim is scheduled and not listed as disputed, contingent or unliquidated, and to

1

## EXHIBIT 1



## Exhibit B

which no objection has been timely filed or, if filed, is allowed by a Final Order.

1.01.04 **Allowed Secured Claim** means an Allowed Claim secured by a lien, security interest or other charge or interest in property in which the Debtors have an interest, to the extent of the value thereof as determined in accordance with 11 U.S.C. § 506(a).

1.01.04A **Antolik** means Dennis Michael Antolik, the Debtor in Case No. 12-10268.

1.01.05 **Bankruptcy Code** or **Code** means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

1.01.06 **Bankruptcy Court** means the United States Bankruptcy Court for the Western District of Texas, or such other Court that may have jurisdiction with respect to Debtors' chapter 11 case, including the States District Court for the Western District of Texas to the extent reference of the chapter 11 Case is withdrawn.

1.01.07 **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, promulgated under 28 U.S.C. § 2075, and the Local Rules of the Bankruptcy Court, as applicable from time to time to the Debtors' chapter 11 Case.

1.01.08 **Bar Date** means the date subsequent to which a proof of pre-petition Claim may not timely be filed or the date by which proofs of claims held by governmental agencies must be filed.

1.01.09 **Business Day** means any date except Saturday, Sunday or any other day on which commercial banks in Austin, Texas, are authorized by law to be closed for business.

1.01.10 **Case** means this chapter 12 bankruptcy case in this Bankruptcy Court.

1.01.11 **Claim** means (i) any right to payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.01.12 **Claimant** means any person or entity having or asserting a Claim in this case.

1.01.13 **Class** or **Classes** mean all of the holders of Claims or Interests that the Debtors have designated pursuant to 11 U.S.C. § 1123(a)(1) as having substantially similar characteristics as described in Article IV of this Plan.

1.01.14 **Closings** means the closings described in the contracts attached hereto as Exhibits A and B which shall take place not later than November 1, 2013. The closing of the Travis County sale shall be known as the Travis County Closing. The closing of the Richard G.

2

**EXHIBIT 1**



**Exhibit B**

Antolik sale shall be known as the Antolik Closing.

      1.01.15      **Confirmation** means the entry by the Bankruptcy Court of a Confirmation Order confirming this Plan.

      1.01.16      **Confirmation Date** means the date on which the Confirmation Order is entered.

      1.01.17      **Confirmation Order** means the Order of the Court confirming the Plan pursuant to 11 U.S.C. § 1225.

      1.01.18      **Contested** when used with respect to a Claim means a Claim against the Debtors that (a) is listed in the Debtors' Schedules of Assets and Liabilities as disputed, contingent or unliquidated; (b) is the subject of a pending action in a forum other than the Bankruptcy Court unless such Claim has been determined by Final Order in such other forum and Allowed by Final Order of the Bankruptcy Court; or (c) has had or is subject to an objection being timely filed and has not been denied by Final Order. To the extent an objection related to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the Objection.

      1.01.19      **Creditor** shall have the meaning specified by 11 U.S.C. § 101(9) of the Code.

      1.01.20.      **Cure Claim** means the amount necessary to cure any default or arrearage, together with the amount necessary to compensate for damages suffered as a result of such default or arrearage, on an unexpired lease or executory contract which has been assumed pursuant to 11 U.S.C. § 365.

      1.01.21      **Debtor** means Cheval Manor, Inc., Debtor in the above-captioned chapter 12 Case.

      1.01.22      **Disputed Claim** means any Claim as to which the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by Final Order.

      1.01.23      **Effective Date** means the first day of the first full month after the Confirmation Order becomes a Final Order.

      1.01.24.      **Estate** means the estate created pursuant to 11 U.S.C. § 541 with respect to the Debtor.

      1.01.25      **Equity Interest** means an equity security, as defined in 11 U.S.C. §101(16), including but not limited to all common stock, preferred stock, stock options and warrants, all rights associated therewith, and all Claims arising from or relating to such Equity Interest, including but not limited to Claims for rescission.

3

**EXHIBIT 1**



**Exhibit B**

1.01.26     **Fee Claim** means a Claim under 11 U.S.C. § 330 or 503 for allowance of compensation and reimbursement of expenses to professionals in the Debtors' Case.

1.01.27     **Filed** means delivered to the Clerk of the Bankruptcy Court.

1.01.28     **Final Order** means an Order or judgment entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties as to which the time to appeal has expired and as to which a stay pending appeal has not been granted.

1.01.29     **General Unsecured Claim** means an Unsecured Claim that is not entitled to priority under 11 U.S.C. § 507(a).

1.01.30     **Impaired** means the treatment of an Allowed Claim pursuant to the Plan *unless*, with respect to such Claim, either (a) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after occurrence of a default, the Debtor (i) cures any default that occurred before or after the commencement of the Case on the Petition Date, other than default of the kind specified in 11 U.S.C. § 365(b)(2), (ii) reinstates the maturity of such Claim as such maturity existed before such default, (iii) compensates the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) does not otherwise alter the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim; or (c) the Plan provides that on the Effective Date the holder of such claim receives, on account of such Claim, cash equal to the Allowed Amount of such Claim.

1.01.31     **Lien** shall mean a contractual or statutory lien against an interest of the Debtor in real or personal property.

1.01.32.    **Market Rate of Interest** means an interest rate sufficient to provide the present value of a claim pursuant to 11 U.S.C. §1225(a)(5). A Market Rate of Interest shall be 4.25% unless the parties agree on another rate or the Court determines otherwise with regard to a specific Class of Claims.

1.01.33     **Oversecured Claim** means a Claim which is secured by property which is valued at more than the amount of the Claim. An Oversecured Claim shall be entitled to receive post-petition interest at the non-default contract rate and may also receive post-petition fees and costs if authorized by a contract.

1.01.34     **Person** means an individual, partnership, or corporation, but does not include a governmental unit.

1.01.35.    **Petition Date** means February 7, 2012, the date on which the Debtors filed their petitions for relief in this Case.

4

**EXHIBIT 1**

**Exhibit B**

1.01.36.     **Plan** means this Plan of Reorganization, as it may be amended, modified or supplemented by the Debtor from time to time as permitted herein and by the Bankruptcy Court.

1.01.37     **Pre-petition** means prior to the Petition Date.

1.01.38     **Priority Creditor** means a Creditor whose Claim is entitled to priority under 11 U.S.C. § 507.

1.01.39     **Pro-Rata** means proportionately, based on the percentage that the amount of an Allowed Claim within a particular Class bears to the aggregate amount of all Allowed Claims in such Class.

1.01.40     **Property of the Estate** means all property in which the Debtor holds a legal or an equitable interest, including all property described in 11 U.S.C. § 541.

1.01.41     **Rejection Claim** means any Claim arising pursuant to 11 U.S.C. § 502(g) by reason of rejection by the Debtor of an executory contract or unexpired lease pursuant to 11 U.S.C. § 365.

1.01.42     **Reorganized Debtor** means the Debtor-in-Possession after the Effective Date of the Plan.

1.01.43     **Secured Claim** means any Claim secured by a lien, security interest, or other charge or interest, in property in which the Debtor has an interest to the extent of the value thereof as determined in accordance with 11 U.S.C. § 506(a).

1.01.44     **Secured Creditor** or **Secured Claimant** means any Claimant holding a Secured Claim

1.01.45     **Voidable Transfer** means all transfers voidable under 11 U.S.C. §§ 544, 545, 547, 548, 549 and/or 550 or any other state or federal transfer.

1.02     **Number and Gender of Words.** Whenever the singular number is used, it shall include the plural, and the plural shall include the singular, as appropriate to the context. Words of any gender shall include each other gender where appropriate.

1.03     **Terms Defined in the Bankruptcy Code.** Capitalized terms not specifically defined in Section 1.01 of the Plan shall have the definitions given those terms, if applicable, in the Bankruptcy Code.

1.04     **Headings.** The headings and captions used in the Plan are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Plan nor affect the meaning thereof.

1.05     **Time Computation.** In computing any time prescribed herein the provision of

5

**EXHIBIT 1**



**Exhibit B**

Fed. R. Bankr. P. 9006(a) shall apply.

## ARTICLE II
### CONCEPT OF PLAN

2.01    **Generally.**  The Plan is a plan of reorganization for Cheval Manor, Inc    The Debtor has previously filed Joint Plans with Antolik.    However, this Plan relates solely to Cheval Manor, Inc. and not to Antolik.    The Plan is primarily based upon sale of the Debtor's real property free and clear of liens.

## ARTICLE III
### PROVISIONS APPLICABLE TO ALL CLAIMS

3.01    **Treatment of Claims.**  This Plan is intended to resolve all Claims against the Debtor and/or property of the Debtor of whatever character, whether contingent or liquidated, or whether allowed by the Bankruptcy Court pursuant to 11 U.S.C. § 502(a).  However, only Allowed Claims will receive treatment afforded by the Plan.  The Plan is designed to insure that Claimants shall receive at least as much pursuant to this Plan as they would receive in a liquidation pursuant to chapter 7 of the Bankruptcy Code.

3.02    **Allowed Claims.**  To receive a distribution under the Plan, a Creditor must have an Allowed Claim.

3.03.    **Amount of Claims.**  No claims will be allowed unless the creditor files a proof of claim.  If a creditor files a Proof of Claim, then the amount stated in the Proof of Claim shall control unless a party in interest files an objection to the Claim.  If a party in interest files an objection to a Proof of Claim or a scheduled claim, then the amount determined by the Court in a Final Order shall control.

3.04.    **Allowance of Post-Petition Interest, Fees and Costs.**  Unless otherwise provided, a Claim shall not be entitled to post-petition interest, fees or costs.  An Oversecured Claim shall be entitled to interest at the non-default contract or statutory rate from the date of the Petition until the Confirmation Date.  An Oversecured Claim arising under a contract shall be entitled to post-petition fees and costs if the contract so provides and if an application for allowance of post-petition fees and costs is timely filed and approved by the Court by a Final Order.  A Claim may be determined to be an Oversecured Claim if so designated by the Plan or if determined by the Court by a Final Order.

3.05.    **Filing of Claims Arising From Rejection of Unexpired Leases or Executory Contracts.**  Any claims arising from the rejection of unexpired leases or executory contracts shall be filed by the date specified in the order rejecting such lease or contract.  If no date is specified, the date for filing a rejection claim shall be deemed to be the later of twenty-eight (28) days after the Effective Date or twenty-eight (28) days after entry of the order rejecting the lease or contract.

6

**EXHIBIT 1**



## Exhibit B

3.06    **Filing of Administrative Claims.** Any requests for allowance of Administrative Expense Claims shall be filed within twenty-eight (28) days after the Effective Date or shall be barred.

3.07    **Cure Claims.** Any Cure Claims shall be filed within twenty-eight (28) days after the Effective Date or shall be barred unless otherwise agreed to by the parties.

3.08    **Claims Arising from Avoidable Transfers.** A person who is found to have received a voidable transfer shall have twenty-eight (28) days following the date from which the order ruling that such transfer is avoidable or approving the settlement of a suit on an avoidable transfer becomes a Final Order in which to file a Claim in the amount of the settlement or the avoided transfer, which is less.

3.09.    **Filing of Requests for Post-Petition Fees or Costs.** Any requests for allowance of post-petition fees or costs pursuant to 11 U.S.C. § 506(b) shall be filed within twenty-eight (28) days after the Effective Date or shall be barred.

3.10    **Objections to Claims.** Any party authorized by the Bankruptcy Code may object to the allowance of a Pre-Petition Claim at any time prior to forty-two (42) days after the Effective Date or twenty-eight (28) days after such claim is filed, which is later. Any Proof of Claim filed after the bar date(s) set by the Court shall be of no force and effect and shall be deemed disallowed. All Contested Claims shall be litigated to Final Order; *provided, however,* that the Debtor may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court.

3.11    **Distributions on Disputed Claims.** No distributions under this Plan shall be made to the holder of a Claim that is in dispute, unless and until such Claim becomes an Allowed Claim. When and if a disputed Claim becomes an Allowed Claim, Debtor shall at the next scheduled distribution under the Plan to the Class of Creditors into which the Claim falls pay the newly Allowed Claim a sum sufficient to bring that Claimant *in pari passu* with the other Claimants in the Class. If a Claim is disputed in whole or in part because the Debtor asserts a right of offset against such Claim or recoupment against the holder of such Claim, then, if and to the extent the Claim giving rise to the offset or recoupment is sustained by Final Order, the Claim in dispute shall be reduced or eliminated and, if applicable, the holder of such Claim shall be required to pay the amount of such offset or recoupment, less the amount of the Allowed Claim. In addition, any party authorized by the Bankruptcy Code may request that the Court estimate any contingent, disputed or unliquidated Claim pursuant to 11 U.S.C. § 502(c) at any time.

**EXHIBIT 1**



**Exhibit B**

## ARTICLE IV
### CLASSIFICATION AND TREATMENT OF CLASSES UNDER THE PLAN

**Administrative and Priority Claims**

#### 4.01    Class 1—Administrative Expense Claims

4.01.01.         Administrative claims consist of expenses incurred during the Chapter 11 proceeding prior to confirmation which are incurred during Debtor's bankruptcy case. Most administrative expense claims consist of claims by professionals employed by the Bankruptcy Estate. The Debtor is aware of the following Class 1 Administrative Claims:

| | |
|---|---|
| Barron & Newburger, P.C. | Attorneys |
| Chapter 12 Trustee | Statutory Fees |

The amounts payable to Barron & Newburger, P.C. represent professional fees incurred during the bankruptcy and must be approved by the court. As of February 28, 2013, the fees incurred but unpaid are as follows:   $12,881.80

The amount payable to the Chapter 12 Trustee is a required fee for chapter 12 debtors.

4.01.02         No Administrative Expense Claims other than expenses payable in the ordinary course of business shall be allowed except pursuant to Court order; provided however, that the Chapter 12 Trustee shall receive fees as provided below.

4.01.03         The attorney's fees of Barron & Newburger, P.C. allowed by the Court shall be paid by the Chapter 12 trustee as provided in Article V.

4.01.04         The chapter 12 trustee shall be entitled to the percentage fee set by the United States Trustee on the amounts paid pursuant to this plan in the following regards:

    a.  The Trustee shall accrue the percentage fee on the adequate protection payments to be made to Amplify Federal Credit Union after entry of this Order but prior to consummation of the sale to Richard Antolik or assigns. Amplify shall provide the amount of the adequate protection payments made to Amplify Federal Credit Union after entry of this Order but prior to consummation of the sale to Richard Antolik or assigns

    b.  Out of the sales proceeds from the sale to Richard Antolik or assigns, the Chapter 12 trustee shall be paid the percentage fee on the adequate protection payments described in subparagraph (a) above and the amount of the sales proceeds in excess of payments to Amplify Federal Credit Union and closing costs.

    c.  The Trustee shall be paid the percentage fee on the $2,500.00 payments described in paragraph 5.02.03 below.

8

## EXHIBIT 1



## Exhibit B

### 4.02 Class 2—Secured Claim of Amplify Federal Credit Union

4.02.01  Class 4 consists of the Allowed Secured Claim of Amplify Federal Credit Union. The Debtor has scheduled the Class 2 creditor as holding a claim in the amount of $1,107,424.23. The Class 2 creditor has filed a proof of claim in the amount of $1,127,368.48. The Class 2 creditor is secured by the Debtor's real property which is subject to contracts for sale in the collective amount of $1,350,000.

4.02.02  The Class 2 creditor shall retain its liens pending Closings of the Real Property. In the event that both Closings shall fail to occur by November 1, 2013, the automatic stay shall lift and the Class 2 creditor may exercise its rights under applicable nonbankruptcy law.

4.02.03  The Class 2 creditor shall be treated as oversecured and may file an amended proof of claim for allowance of post-petition interest, fees and charges. The Debtor may object to such amended claim as provided for in this plan.

4.02.04  Prior to the Closings of the sales of the Real Property, the Debtor shall continue to make direct payments to the Class 2 creditor in the amount of $7,431.38 per month. All post-petition payments made by the Debtor shall be applied to the indebtedness owed to the Class 2 creditor according to the terms of the note evidencing the indebtedness owed to Class 2 creditor. At the Closing, the remaining indebtedness owed to the Class 2 creditor pursuant to the terms of the note will be paid in full. In the event that the Debtor shall fail to make any such monthly payment by the 10th day of the month, beginning with the April 10, 2013 payment, the stay shall automatically lift without further order of the court and the Class 2 creditor may exercise its rights under applicable nonbankruptcy law.

4.02.05  The Class 2 creditor shall be paid the remaining amount of its Allowed Claim at the Closing.

### 4.03 Class 3—Secured Claim of Travis County

4.03.01  Class 3 consists of the Secured Claim of Travis County. The Debtor has scheduled the claim of Travis County in the amount of $25,747.34. The claim arises from 2011 ad valorem taxes. The Class 5 creditor has filed a proof of claim in the amount of $53,283.12 for years 2011 and 2012. The Class 3 claim is secured by the Debtor's real estate.

4.03.02  The Class 3 creditor shall retain its liens pending sale of the Debtor's real property free and clear of liens. Nothwithstanding the sale free and clear of liens, the sale shall be subject to the ad valorem taxes owing for the tax year 2013.

4.03.03  The Class 3 claim shall accrue interest at the statutory rate of 12% per annum.

9

**EXHIBIT 1**



**Exhibit B**

4.03.04     The Class 3 creditor shall be paid the amount of its Allowed Claim at the Closing, including post-petition interest.

### 4.04     Class 4—Unsecured Creditors

4.04.01     Class 4 consists of the unsecured creditors of Cheval Manor, Inc. The following chart summarizes the creditors scheduled by the Debtor and those who have filed proofs of claim to date:

| Creditor | Schedules | Proof of Claim | Disputed? | Allowed Amount |
|---|---|---|---|---|
| Dennis Jasek | $346,495.67 | $347,714.45 | Yes | $347,714.45 |
| Eleanor Boatright | $90,000.00 | | | $0 |
| Horse Gazette | $545.00 | | | $0 |
| John Greening | $29,800.00 $10,000.00 | | | $0 |
| RMM Online Advertising | $2,020.72 | | | $0 |

4.04.02     Pursuant to Bankruptcy Rule 3002(a), only creditors that file timely proofs of claim will receive a distribution under this Plan. The bar date for filing claims in this case was June 11, 2012.

4.04.03     The only creditor to file an unsecured claim in this case was Dennis Jasek.

4.04.04     Dennis Jasek shall receive payment in the amount of $100,000.00 on or before September 1, 2014 to be paid as follows:

    a. Dennis Jasek shall receive the net sales proceeds from the sale of the Debtor's real property to Richard Antolik or assigns after payment of closing costs, chapter 12 trustee's commissions, ad valorem taxes to Travis County and the Allowed Claim of Amplify Federal Credit Union.

    b. To the extent that the payment provided above shall not be sufficient to pay Dennis Jasek the sum of $100,000, the remaining balance of such payment shall be made from the payments of $2,500.00 provided for in paragraph 5.02.03 below.

    c. The Debtor and Dennis Jasek shall submit a motion for compromise of controversy providing for the satisfaction and release of the judgment held by Dennis Jasek against all parties in return for payment of $100,000 by September 1, 2014 as provided for herein.

### 4.05     Class 5—Equity Interests.

4.05.01     Class 5 consists of the equity interests of Dennis Antolik in Cheval Manor, Inc.

10

## EXHIBIT 1



## Exhibit B

4.05.02    The Class 5 interest holder shall retain his interest.

4.05.03    Class 5 is not impaired.

## ARTICLE V
### MEANS FOR IMPLEMENTATION OF PLAN

5.01    **Implementation of the Plan.** The Plan will be implemented pursuant to 11 U.S.C. § 1222 through sale of the Debtor's real property and payments of disposable income.

5.02    **Sources of Funds for Implementation of the Plan.**

5.02.01    **Sales of Real Property**

5.02.01.01    The Debtor shall sell its real and personal property as follows:

a.  The Debtor shall sell approximately 21 acres of its real property to Travis County for $370,000.00 pursuant to the Contract of Purchase and Sale dated July 1, 2013, a true and correct copy of which is attached hereto as Exhibit A ("Travis County Sale"). The Travis County Sale shall close by November 1, 2013 ("Travis County Closing").

b.  The Debtor shall sell its remaining real and personal property in the amount of approximately 88 acres to Richard Antolik or assigns for $980,000 pursuant to the Farm and Ranch Contract dated August 8, 2013, a true and correct copy of which is attached hereto as Exhibit B ("Richard Antolik Sale"). The Richard Antolik Sale shall close by November 1, 2013. ("Richard Antolik Closing").

5.02.01.02    The proceeds from the Travis County Closing and the Richard Antolik Closing shall be distributed in the order set forth below. The proceeds from the first sale to close shall be applied so far as they may go. The proceeds from the second sale to close shall be applied first to closing costs and then to the Chapter 12 trustee as set forth below and thereafter in the order set forth below to the extent not paid from the first sale to close.

a.  First to Debtor's closing costs. Victor Antolik shall waive any claim to commissions in connection with the sale if its closes under this Plan but not otherwise. For purposes of calculating tax pro-rations, the 2013 taxes shall be calculated based upon the sales price rather than the 2012 Travis Central Appraisal District value. The Debtor shall pay its prorated share of the 2013 taxes directly to Travis County on or before January 31, 2014 and such amount shall not be deducted from the sales proceeds.

b.  Second, to the Chapter 12 trustee in payment of the percentage fee as provided in paragraph 4.01.04 above.

c.  Third, to the Class 3 ad valorem tax claims of Travis County for 2011 and 2012, including post-petition interest.

d.  Fourth, to the Class 2 claim of Amplify Federal Credit Union. In the event

11

**EXHIBIT 1**



**Exhibit B**

that the Debtor and Amplify Federal Credit Union agree as to the amount of the Allowed Claim of Amplify Federal Credit Union, the title company shall be authorized to disburse such amount to Amplify Federal Credit Union. If the Debtor and Amplify Federal Credit Union disagree as to any amounts claimed by Amplify Federal Credit Union, then the undisputed amount shall be disbursed to Amplify Federal Credit Union and the disputed portion of its Allowed Claim plus an amount agreed by Debtor and Amplify Federal Credit Union for reasonable attorneys' fees for determining the proper distribution of the disputed amount shall be held by the title company pending further court order.

e. Fifth, to the Allowed Claims of Barron & Newburger, P.C. and Dennis Jasek (up to the amount of $100,000.00) on a pro rata basis.

f. Sixth, any remaining funds shall be paid to the Debtor.

### 5.02.02 Lease of Real Property

In connection with the sale of the real property, the purchaser shall execute a lease to the Debtor for such property at a rental rate not to exceed $4,800.00 per month in the form of the attached Exhibit C.

### 5.02.03 Payment to Chapter 12 Trustee

In the event that the proceeds from sale of the Debtor's real property are not sufficient to pay the attorney's fees allowed to Barron & Newburger, P.C. and to pay Dennis Jasek the sum of $100,000.00, then the Debtor shall make payments of $2,500.00 per month to the Chapter 12 Trustee beginning 30 days after the Closing Date and continuing until September 1, 2014. All remaining amounts owed to Barron & Newburger, P.C. and Dennis Jasek under the plan shall be paid by September 1, 2014. Such amounts shall be paid from the Debtor's continuing operation of its business pursuant to the lease described above. Such amounts shall be secured by a first lien on Debtor's personal property not conveyed to Richard Antolik and/or assigns, and by personal property acquired by Debtor after the closing of the sale to Richard Antolik and/or assigns. The Chapter 12 trustee shall distribute such amounts, after deducting the percentage fee in equal shares to Barron & Newburger, P.C. and Dennis Jasek.

### 5.03 Litigation Claims.

5.03.01 The Debtor, Antolik and Dennis Jasek shall each retain their own respective claims for malpractice against any of their prior counsel. The malpractice claims of the Debtor and Antolik against Gray & Becker are specifically preserved and retained.

5.03.02 If any amounts are recovered prior to payment of all claims provided for under this Plan, then the proceeds shall be paid to the Chapter 12 Trustee for distribution pursuant to the Plan. If recovered subsequent to discharge, the proceeds shall be paid to the Debtor.

12

**EXHIBIT 1**



**Exhibit B**

## ARTICLE VI
## LIQUIDATION ANALYSIS

6.01 The Plan provides for payment of all Allowed Claims in full or as agreed to by the creditor. As a result, the Plan satisfies the Chapter 7 liquidation analysis.

## ARTICLE VII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.01 **Reservation of Rights.** Debtor shall have the right to assume or reject, pursuant to 11 U.S.C. § 365, prior to the Confirmation Date, any executory contract or unexpired lease of non-residential real property (to the extent permitted under the Bankruptcy Code).

7.02 **Assumption of Executory Contracts and Unexpired Leases.** Debtor shall assume, pursuant to 11 U.S.C. § 1222(b)(6), the following Unexpired Leases of Non-Residential Real Property and Executory Contracts: Real estate contracts listed in paragraph 5.02.01.01.

7.03 **Rejection of Executory Contracts and Unexpired Leases.** Debtor shall reject, pursuant to 11 U.S.C. § 1222(b)(6), the following Unexpired Leases of Non-Residential Real Property and Executory Contracts: All contracts and leases not listed in paragraph 7.02 above.

7.04 **Bar Date for Claims Based on Rejection.** If the rejection of any executory contract or an unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or their properties or agents, successors or assigns unless a Proof of Claim is filed with the Court and served by the Debtor in the time period set forth in Section 3.05.

7.05 **Limitation on Claims Based on Rejection.** Any Rejection Claim based upon the rejection of an unexpired lease of real property either prior to the Confirmation Date or upon the entry of the Confirmation Order shall be limited in according with 11 U.S.C. §502(b)(6) and state law mitigation requirements. Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor of any objection to such Claim, if asserted.

## ARTICLE VIII
## PROVISIONS FOR THE RETENTION, ENFORCEMENT, SETTLEMENT, OR ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR AND THE ESTATE INCLUDING PREFERENCES AND CONVEYANCES

8.01 **Avoidance Actions.** There are three types of actions established by the Bankruptcy Code for the benefit of debtors: actions to recover avoidable preferences under 11 U.S.C. § 547, actions to recover fraudulent conveyances under U.S.C. § 548 and actions to recover unauthorized post-petition transfers under U.S.C. § 549.

13

## EXHIBIT 1



## Exhibit B

8.01.01 **Preferences.** Section 547 allows a Debtor-in-Possession to recover "voidable preferences"—*to wit*, payments made within ninety (90) days prior to bankruptcy (or within one (1) year if made to an insider) on an antecedent debt while the Debtor is insolvent which allows a creditor to recover more than it would have if the payment had not been made and the Debtors' assets were liquidated under Chapter 7. Certain payments are protected from recovery as preferences. These include payments made in the ordinary course of business or upon ordinary business terms and payments representing a substantially contemporaneous exchange. The Debtor does not intend to pursue any such claims.

8.01.02 **Fraudulent Conveyances and Post-Petition Transfers Made Without Court Approval.** Section 548 allows a Debtor-in-Possession to recover certain a transfers made within one year of Petition Date while the Debtor was insolvent which either was made with fraudulent intent or was made without receiving reasonably equivalent value. Section 549 allows a Debtor-in-Possession to recover post-petition transfers which were made without court approval. The Debtor is not aware of any such claims and does not intend to pursue such claims.

8.02 **Other Claims.** Dennis Jasek recovered a judgment against the Debtors in the amount of approximately $347,000. The Debtors believe that their counsel may have committed malpractice in connection with the defense of the suit brought by Jasek by, among other things:

- Failing to plead and/or assert a defense of repudation/anticipatory breach
- Failure to challenge a double recovery
- Failure to file a timely appeal.

As discussed above, the Debtors will engage counsel to investigate whether there are viable claims and to pursue such claims if counsel can be engaged on a contingent fee basis

## ARTICLE IX
### EFFECT OF CONFIRMATION

9.01 **Discharge.** Pursuant to 11 U.S.C. §§ 524 and 1228, Debtor shall be discharged from its debts upon the completion of payments under this Plan.

9.02. **Status of Property of the Estate After Confirmation.** Confirmation of the Plan shall vest the Property of the Estate in the reorganized Debtor free and clear of all claims and liens except as expressly provided in the Plan.

9.03. **Binding Nature of Plan.** Pursuant to 11 U.S.C. § 1227(a), the provisions of the confirmed Plan shall bind the Debtor and its Creditors and the holders of its Equity Securities existing as of the Effective Date, whether or not the Claim or Equity Interest is impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted the Plan. The distributions provided for Claimants shall not be subject to any Claim by another creditor or

14

**EXHIBIT 1**



**Exhibit B**

interest holder by reason of any assertion of a contractual right of subordination.

## ARTICLE X
### MODIFICATION OF PLAN

10.01 **Modification to the Plan Prior to Confirmation.** In accordance with 11 U.S.C. § 1223, Debtors may be modify or amend the Plan prior to the Confirmation Date, provided that notice and an opportunity for hearing are given to any affected party and the Court finds that the proposed modification or correction does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted the modification in writing.

10.02 **Modification of the Plan After Confirmation.** In accordance with 11 U.S.C. §1229, the Plan may be modified after confirmation but before completion of payments under the Plan at the request of the Debtor, the Chapter 12. Trustee or the holder of an allowed unsecured claim to increase or reduce the amount of payments, to increase or reduce the time period for payments or to alter the distribution to a particular creditor based upon payments outside of the Plan.

## ARTICLE XI
### DEFAULT AND OTHER RELATED PROVISIONS

In the event of a default by the Debtor, creditors may request relief from the Court under 11 U.S.C. §1208 or, if appropriate, may seek relief from the automatic stay. In the event that any creditor takes actions contrary to this Plan, the Debtor may seek appropriate relief from the Bankruptcy Court.

## ARTICLE XII
### RETENTION OF JURISDICTION

Notwithstanding confirmation of the Plan or the Effective Date having occurred, the Court will retain jurisdiction for the following purposes:

12.01 **Allowance of Claims.** To hear and determine the allowability of all Claims upon objections to such Claims.

12.02 **Proceedings Related to Executory Contracts and Unexpired Leases.** To act with respect to proceedings regarding the assumption of any executory contract or unexpired lease of the Debtor pursuant to 11 U.S.C. §§ 365 the Code and Article VI of the Plan.

12.03 **Plan Interpretation.** To resolve controversies and disputes regarding the interpretation of the Plan.

12.04 **Plan Implementation.** To implement and enforced the provisions of the Plan and enter orders in aid of confirmation and implementation of the Plan.

15

## EXHIBIT 1



# Exhibit B

12.05 **Plan Modification.** To modify the Plan pursuant to 11 U.S.C. § 1229 and applicable Bankruptcy Rules.

12.06 **Adjudication of Controversies.** To adjudicate such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court against the Debtor.

12.07 **Injunctive Relief.** To issue any injunction or to other relief as appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunction or other relief issued under the Plan or in the Confirmation Order.

12.08 **Interpleader Action.** To entertain Interpleader actions concerning assets to be distributed or other assets of the Estate.

12.09 **Correct Minor Defects.** To correct any defect, cure any omission or reconcile any inconsistency or ambiguity in the Plan, the Confirmation Order or any document executed or to be executed in connection therewith, as may be necessary to carry out the purposes and intent of the Plan, provided that the rights of any holder or an Allowed Claim are not materially and adversely affected thereby.

12.10 **Authorization of Fees and Expense.** To review and authorize payment of professional fees incurred prior to the Effective Date.

12.11 **Post-Confirmation Orders Regarding Confirmation.** To enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified, or vacated.

12.12 **Final Decree.** To enter a final decree closing the Case pursuant to Fed. R. Bankr. P. 3022.

12.13 **Discharge Order.** To enter an order discharging Debtors after they have completed their plan payments or otherwise provided for in 11 U.S.C. § 1228.

12.14 **Reopening.** The Court will also retain jurisdiction as set forth above if the case is closed and then reopened.

## ARTICLE XIII
### MISCELLANEOUS PROVISIONS

13.01 **Due Authorization by Creditors.** Each and every Claimant who elects to participate in the distributions provided herein warrants that it is authorized to accept in consideration of its Claim commitments, agreements or understandings express or implied, that may defeat or modify the rights conveyed or obligations undertaken by it under this Plan.

16

**EXHIBIT 1**



**Exhibit B**

13.02  **Entire Agreement.**  The Plan, as described herein, the Confirmation Order, and all other documents and instruments to effectuate the Plan provided for herein, constitute the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes all prior discussions and documents.

13.03  **Governing Law.**  Unless a rule or law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the internal laws of the State of Texas shall govern the construction and implementation of the plan and any agreements, documents, and instruments executed in connection with the plan, without regard to conflicts of law.

13.04  **Post-Confirmation Noticing.**  Subsequent to the Confirmation Date, the Debtor shall not be required to give notice to any creditor whose claim has been disallowed. Except for the Application for Final Decree, if a party is required to give notice in connection with a notice, pleading or application, such notice shall be deemed sufficient if it is sent to: (a) the Debtor; (b) the Chapter 12 Trustee; (c) all Secured Creditors; and (d) unsecured creditors requesting notice.

17

**EXHIBIT 1**



**Exhibit B**

Respectfully submitted,

CHEVAL MANOR, INC.

By: _____
**DENNIS ANTOLIK, PRESIDENT**

**BARRON & NEWBURGER, P.C.**
1212 Guadalupe, Suite 104
Austin, Texas 78701
(512) 476-9103 Ext. 220
(512) 476-9253 (Facsimile)

By:    /s/Stephen W. Sather
       Barbara M. Barron
       State Bar No. 01817300
       Stephen W. Sather
       State Bar No. 17657520

ATTORNEYS FOR DEBTOR-IN-POSSESSION

18

**EXHIBIT 1**



**Exhibit B**

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the above document was served by United States Mail, first class, postage prepaid on the 13th day of September 2013, upon the parties listed below and on the attached matrix.

Ray Hendren
Chapter 12 Trustee
3410 Far West Blvd., Suite 200
Austin, TX 78731

C. Daniel Roberts
Roberts & Associates
1602 East Cesar Chavez
Austin, TX 78702

William T. Peckham
1104 Nueces Street, Suite 104
Austin, TX 78701

Kay Brock
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

/s/Stephen W. Sather
Stephen W. Sather

19

**EXHIBIT 1**



**Exhibit B**

Label Matrix for local noticing
0542-1
Case 12-10269
Western District of Texas
Austin
Tue Feb 7 16:34:28 CST 2012

Cheval Manor, Inc.
13628 Gregg Manor Rd.
Manor, TX 78653-3301

U.S. BANKRUPTCY COURT
903 SAN JACINTO, SUITE 322
AUSTIN, TX 78701-2450

Amplify Federal Credit Union
PO Box 85300
Austin, TX 78708-5300

David Anderson
13628 Gregg Manor Rd., Apt. A
Manor, TX 78653-3301

Dennis Jasek
P.O. Box 198
Manor, TX 78653-0198

Dennis M. Antolik
13628 Gregg Manor Road
Manor, Texas 78653-3301

Horse Gazette
9214 Victory Pass
San Antonio, TX 78240-4028

Jim Ewbank
1210 Nueces St., Suite 200
Austin, TX 78701-1733

John Greening
6900 Ligustrum Cove
Austin, TX 78750-8352

RMM Online Advertising
9101 Burnet Rd.
Austin, TX 78758-5254

Rick Antolik
6001 Tonkawa Trail
Georgetown, TX 78628-1225

Travis County
P.O. Box 1748
Austin, Texas 78767-1748

United States Trustee - AU12
United States Trustee
903 San Jacinto Blvd, Suite 230
Austin, TX 78701-2450

Barbara M. Barron
Barron & Newburger, P.C.
1212 Guadalupe, #104
Austin, TX 78701-1801

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Debbie Werkenthin

(u)Francine Quinn

(u)Jenise Chipman

(u)Judy Hatton

(u)Karen Marberger

(u)Martha Bagley

(u)Rita Sighlfoot

(u)Rob Klein

(u)Susan & Ross Bates

(u)Terri Wilson

(u)Wena Poon

End of Label Matrix
Mailable recipients 14
Bypassed recipients
Total



**EXHIBIT 1**

**Exhibit B**

TRAVIS COUNTY
PURCHASE CONTRACT

| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

THIS CONTRACT OF SALE is made by and between Cheval Manor, Inc., hereinafter referred to as SELLER, and TRAVIS COUNTY, TEXAS, hereinafter referred to as BUYER, for the consideration and upon and subject to the terms, provisions, and conditions hereinafter set forth.

### SECTION I - PURCHASE AND SALE

The SELLER hereby agrees to sell and convey to BUYER and BUYER agrees to purchase that interest in real property situated in Travis County, Texas, together with all improvements and fixtures, privileges, and appurtenances pertaining thereto, hereinafter collectively called PROPERTY, described as follows:

An approximately 21 acre piece, parcel, or portion of land, more or less, out of a larger tract of approximately 109.23 acres of land out of the Marquita Castro Survey No. 50, Abstract 160 in Travis County, Texas, being a portion of that same property described in Deed dated August 11, 1995 and recorded under Doc. # 125030159, and as described in a Modification of Deed of Trust dated May 13, 2011 and recorded under Doc. #2011079690 of the real property records of Travis County, Texas; and lying and being situated in the County of Travis, State of Texas, and as shown in Exhibit "A" which is attached hereto and incorporated herein as if set out at length.

### SECTION II - CONSIDERATION

BUYER agrees to buy and SELLER agrees to sell the PROPERTY for Three Hundred, Seventy Thousand, and No/100 Dollars ($370,000.00), with an allocation of this total compensation agreed to by both parties in the amount of $120,000 for all improvements including fencing and gate(s), and $250,000 as consideration for the purchase of land.

### SECTION III - COMMITMENT FOR TITLE INSURANCE AND SURVEY

BUYER shall obtain a Commitment for Title Insurance (the "Commitment") and legible copies of all recorded instruments affecting the property and recited as exceptions in the Commitment. BUYER shall obtain at BUYER'S sole cost, a survey of the PROPERTY

1

**EXHIBIT 1**

DMA



# Exhibit B

("Survey"). If BUYER has an objection to items disclosed in such Commitment or Survey, SELLER shall cure the same by date of closing. BUYER may waive any item in the Commitment or Survey and complete the purchase.

The SELLER shall perform, observe, and comply with all of the covenants, agreements, and conditions required by this agreement prior to or as of the closing.

## SECTION IV - REPRESENTATIONS AND WARRANTIES OF SELLER

The SELLER hereby represents and warrants to BUYER now, through closing and surviving closing, the following:

A. No one resides on or uses any portion of the PROPERTY as lessees, tenants at sufferance, or trespassers;

B. SELLER is the fee simple owner of the title to the PROPERTY and is duly authorized and empowered to sell said PROPERTY;

C. SELLER has paid all taxes, charges, debts, and other assessments due by the SELLER with respect to the PROPERTY;

D. There will be no unrecorded liens, mortgages, loans, Uniform Commercial Code liens, or other encumbrances against any of the PROPERTY which will not be satisfied out of the Sales Price; and

E. SELLER shall not further encumber, or allow the encumbrance of, the title to the PROPERTY or modify the terms or conditions of any existing encumbrances, if any, without written consent of BUYER.

If any representation above is untrue, SELLER shall remedy the deficiency prior to closing. Should SELLER not remedy the deficiency prior to closing, the SELLER shall be in default.

## SECTION IV - CLOSING

The parties will finalize the transaction by closing on or before 90 days after the date of this agreement, which date is hereinafter referred to as the Closing Date. This date may be extended upon confirmation by the parties.

A. At the closing, SELLER shall deliver to BUYER the following:

1. A duly executed and acknowledged General Warranty Deed in a

2



**EXHIBIT 1**

**Exhibit B**

form and substance as the Deed attached as Exhibit "B" and incorporated herein as if set out at length, conveying good and indefeasible title in fee simple to all of the Property, free and clear of any and all liens, encumbrances, conditions, easements, assessments, reservations and restrictions, except as permitted herein below and/or approved by BUYER in writing prior to closing.

2. An Owner's Policy of Title Insurance (the "Title Policy"), with premium cost to be paid by the BUYER, issued by Independence Title Insurance Company (Laura Brookshire, escrow officer, Arboretum Office) in the full amount of the Sales Price, dated as of the closing, insuring BUYER'S contractual interest to the PROPERTY to be good and indefeasible subject only to those title exceptions contained in the standard, printed form allowed by the State Department of Insurance, however;

    a. the exception as to restrictive covenants shall be endorsed "None of Record," unless waived by BUYER before closing.

    b. the exception as to the lien for taxes shall be limited to the year of closing and shall be endorsed "Not Yet Due and Payable."

3. Evidence of its capacity and authority for the closing of this transaction.

4. All signed releases, affidavits, and other necessary documents to close this transaction.

5. Possession of the PROPERTY.

6. Evidence that all general real estate taxes for the then current year relating to the Property (if purchased in fee) and interest on any existing indebtedness prorated to the day of closing have been paid.

7. Evidence that all special taxes or assessments to the Closing Date shall be paid by Seller.

B. The SELLER shall pay all cost of releasing existing loans, liens or other encumbrances, his attorney's fees and all other expenses stipulated to be paid by the SELLER under other provisions of this Contract.

C. At the closing, BUYER shall perform the following:

1. Pay, by check, the purchase price.
2. Sign any documents a buyer would normally sign to close a similar transaction.

3

**EXHIBIT 1**



**Exhibit B**

**EXHIBIT A**

## SECTION VI - BREACH BY SELLER

In the event that the SELLER shall fail to fully and timely perform any of its obligations hereunder or shall fail to consummate the sale of the property for any reason, except the BUYER'S default, the BUYER may enforce specific performance of this agreement, bring suit for damages against the SELLER, or seek any other remedy provided by law.

## SECTION VII - BREACH BY BUYER

In the event that the BUYER should fail to consummate the purchase of the property, leaving the BUYER in default and the SELLER not being in default hereunder, the SELLER shall have the right to bring suit for damages against the BUYER.

## SECTION VIII - MEDIATION

When mediation is acceptable to both parties in resolving a dispute arising under this Contract, the parties agree to use the Dispute Resolution Center of Austin, Texas as the provider of mediators for mediation as described in Section 154.023 of the Texas Civil Practice and Remedies Code. Unless both parties are satisfied with the result of the mediation, the mediation will not constitute a final and binding resolution of the dispute. All communications within the scope of the mediation shall remain confidential as described in Section 154.073 of the Texas Civil Practice and Remedies Code, unless both parties agree, in writing, to waive the confidentiality.

## SECTION IX - MISCELLANEOUS

1. Survival of Covenants. Any of the representations, warranties, covenants, and agreements of the parties pertaining to a period of time following the closing of the transactions contemplated hereby shall survive the closing and shall not be merged therein.

2. Notice. Any notice to be given hereunder by either party to the other shall be in writing and may be effected by personal delivery or registered or certified mail, return receipt requested, addressed to the proper party, at the following address:

   SELLER:     Cheval Manor, Inc.
               c/o Mr. Dennis Antolik
               13628 Gregg Manor Road
               Manor, TX 78653 – 3301

   BUYER:      Travis County, Texas

4



**EXHIBIT 1**

**Exhibit B**

c/o Steve, Manilla, P.E., County Executive
Transportation and Natural Resources
  Attn: Greg Chico
P. O. Box 1748
Austin, Texas 78767

COPY TO: The Honorable David Escamilla
  (or his successor in office)
Travis County Attorney
P. O. Box 1748
Austin, Texas 78767

3. Texas Law to Apply. This Contract shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Travis County, Texas.

4. Parties Bound. This Contract shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors, and assigns where permitted by this Contract.

5. Legal Construction. In case any one or more of the provisions contained in this Contract shall for any reason be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Contract shall be construed as if such invalid, illegal, or unenforceable provisions had never been contained herein.

6. Entire Agreement

  A. This agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter thereof and contains all of the covenants and agreements between the parties with respect to said matter. The Parties have agreed to additional provisions attached as Exhibit "C".

  B. No modification concerning this instrument shall be of any force or effect, excepting a subsequent modification in writing signed by the party to be charged. No official, representative, agent, or employee of Travis County, Texas, has any authority to modify this Contract except pursuant to express authority to do so granted by the Commissioners Court of Travis County, Texas.

7. Time of Essence. Time is of the essence of this Contract.

5

**EXHIBIT 1**



**Exhibit B**

**EXHIBIT A**

8.     Gender.  Words of any gender used in this Contract shall be held and construed to include any other gender and words in the singular number shall be held to include the plural and vice versa, unless the Contract requires otherwise.

9.     Condemnation.  BUYER and SELLER agree that said real property is being conveyed to the County under the imminence of condemnation, as that term is used in the United States Internal Revenue Code.

IN WITNESS WHEREOF, the Parties hereunto, acting by and through their duly authorized officers or on their own behalf have caused this Contract to be signed on the day and year below written.  The later day and year below written will be the effective date upon which all duties under this Contract shall begin.

SELLER:  Cheval Manor, Inc.

Date: _7/11/2013_                         By: _____
                                                    Signature of Authorized Representative

                                          Printed Name: _Dennis Michael Antolik_

                                          Title: _President Cheval Manor, Inc_
                                          _Subject To Approval of_
                                          _Bankruptcy Court_

BUYER:  TRAVIS COUNTY, TEXAS

Date: _7-16-13_                           By: _Samuel T. Biscoe_
                                                    Samuel T. Biscoe, Travis County Judge

6



**EXHIBIT 1**

**Exhibit B**

EXHIBIT "A"

Approximately 21 acres, more or less, of land, being a part, parcel or portion of the larger

approximately 109.23 acre tract of land, more or less, out of the Marquita Castro Survey No. 50,

Abstract No. 160, in Travis County, Texas, and as depicted in the sketch attached hereto.  Final

legal description with metes and bounds (field notes) to be inserted herein upon completion of

Survey of the PROPERTY, and before closing of the transaction as set forth by this Purchase

Contract.

7



**EXHIBIT 1**

**Exhibit B**

**EXHIBIT A**

(Exhibit "A"; Page 2 of 3)

SKETCH SHOWING THE

\*\*\*

APPROX. 21 ACRE TRACT – COMPRISING ALL THE LAND AREA CONTAINED

WITHIN AND A PART OF THE SELLER'S APPROXIMATELY 109.23 ACRE "PARENT,"

WITH SUCH APPROXIMATELY 21 ACRE TRACT BEING ALL LAND AREA THAT IS

LOCATED ON THE WEST SIDE OF GILLELAND CREEK –

\*\*\*

TO BE LOCATED / INSERTED ON FOLLOWING PAGE

8

**EXHIBIT 1**



**Exhibit B**



EXHIBIT 1

**Exhibit B**

**EXHIBIT A**

EXHIBIT "B"

GENERAL WARRANTY DEED

STATE OF TEXAS § 
§    KNOW ALL PERSONS BY THESE PRESENTS: 
COUNTY OF TRAVIS §

That _____, of the County of _____, State of _____, hereinafter referred to as "GRANTOR," whether one or more, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other valuable consideration to the undersigned paid by Travis County, a political subdivision of the State of Texas, whose mailing address is P. O. Box 1748, Austin, Texas 78767, hereinafter referred to as "GRANTEE," the receipt of which is hereby acknowledged, has GRANTED, SOLD, and CONVEYED and by these presents does GRANT, SELL, and CONVEY unto the said Travis County, Texas, all of the following real property in Travis County, Texas, to-wit:

    That certain tract of land situated in Travis County and being more particularly described by metes and bounds in Exhibit "_" which is attached hereto and made a part hereof.

TO HAVE AND TO HOLD the above described premises, together with all and singular rights and appurtenances thereto in any way belonging, unto the said GRANTEE and assigns forever; and GRANTOR does hereby bind itself, its representatives, successors, and assigns to WARRANT AND DEFEND FOREVER, all and singular, the said premises unto the said GRANTEE and its assigns against every person whomsoever lawfully claiming or to claim the same or any part hereof.

    EXECUTED this _____ day of _____, 2013.

By: _____

Printed Name: _____

Title (if any): _____

9



**EXHIBIT 1**

**Exhibit B**

ACKNOWLEDGMENT

STATE OF TEXAS       §
             §
COUNTY OF TRAVIS     §

This instrument was acknowledged before me on the _____ day of _____, 2013, by _____, in the capacity of_____ _____, personally known to me or on the basis of legally sufficient identification for the purposes and consideration stated herein.

          _____
          Notary Public in and for
          The State of Texas

          _____
          Name (typed or printed)
          My Commission expires: _____

Mailing Address of Grantee:

    Travis County, Texas
    c/o Transportation and Natural Resources Department
    P.O. Box 1748
    Austin, TX 78767
     attn: Greg Chico

10

**EXHIBIT 1**



**Exhibit B**

EXHIBIT "C"

ADDITIONAL PROVISIONS

I. SPECIAL CONSIDERATION: FENCES

SELLER acknowledges that the amount of the Purchase Price includes full and complete compensation – allocated at a portion of One Hundred, Twenty Thousand and No/100 Dollars ($120,000), for SELLER'S installation of the fencing and gates (if any) along or near the boundary of the PROPERTY, on SELLER'S remaining property.

SELLER agrees to install any fencing and gates on SELLER'S remaining, abutting property, and acknowledges, agrees, and affirms that the compensation included in Section II of this Purchase Contract (Consideration), represents and encompasses adequate, full, just, and complete consideration for SELLER to install any fencing and gate(s), at SELLER'S sole discretion.

II. BUYER'S USE OF AND SELLER'S ACCESS TO PROPERTY

BUYER is purchasing the PROPERTY as part of BUYER'S 2011 Eastern Creek Open Space Bond Program. Purchase of the PROPERTY by BUYER is to be funded using monies allocated for expenditures supported by public bonds, with the sale of such bonds approved by voters of Travis County, Texas for acquisition of parkland to develop an area of undeveloped natural greenway along Gilleland Creek, with the centerline of said creek to serve as the eastern boundary of the PROPERTY.

As part of the conveyance of land under this Purchase Contract, BUYER agrees that SELLER and SELLER'S heirs and successors shall be entitled to use and enjoyment of the PROPERTY in all manners and forms as permitted by the BUYER for the general public, with SELLER'S use and access to the PROPRTY not to be restricted in any manner other than any restrictions or limitations that may be imposed on the general public's use and access. As such, SELLER may enter onto and use the PROPERTY for recreational purposes to include equestrian activities of a non commercial nature, and particularly on or along any future equestrian oriented trail that may be constructed by BUYER. Notwithstanding the foregoing, with the exception of emergency vehicles, no motorized vehicles may enter onto the PROPERTY, and removal of trees or other vegetation from the PROPERTY is expressly prohibited.

11



**EXHIBIT 1**

**Exhibit B**

8.    Gender. Words of any gender used in this Contract shall be held and construed to include any other gender and words in the singular number shall be held to include the plural and vice versa, unless the Contract requires otherwise.

9.    Condemnation. BUYER and SELLER agree that said real property is being conveyed to the County under the imminence of condemnation, as that term is used in the United States Internal Revenue Code.

IN WITNESS WHEREOF, the Parties hereunto, acting by and through their duly authorized officers or on their own behalf have caused this Contract to be signed on the day and year below written. The later day and year below written will be the effective date upon which all duties under this Contract shall begin.

SELLER: Cheval Manor, Inc.

Date: 7/1/2013                          By: _____
                                             Signature of Authorized Representative

                                        Printed Name: Dennis Michael Antolik

                                        Title: President Cheval Manor, Inc
                                        Subject to Approval of
                                        Bankruptcy Court

BUYER: TRAVIS COUNTY, TEXAS

Date: 7-12-13                           By: _____
                                             Samuel T. Biscoe, Travis County Judge

6



**EXHIBIT 1**

**Exhibit B**

**FARM AND RANCH CONTRACT**

1. **PARTIES:** The parties to this contract are _____ Cheval Manor Inc. _____

   (Seller) and _____ Richard Antolik and or assigns _____ (Buyer). Seller agrees to sell and convey to Buyer and Buyer agrees to buy from Seller the Property defined below.

2. **PROPERTY:** The land, improvements, accessories and crops are collectively referred to as the "Property".

   A. LAND: The land situated in the County of _____ Travis _____ , Texas, described as follows: _____

   or as described on attached exhibit, also known as 13628 Gregg Manor, Manor, Tx  78653

   (address/zip code), together with all rights, privileges, and appurtenances pertaining thereto, including but not limited to: water rights, claims, permits, strips and gores, easements, and cooperative or association memberships.

   B. IMPROVEMENTS:

   (1) FARM and RANCH IMPROVEMENTS: The following **permanently installed and built-in items,** if any: windmills, tanks, barns, pens, fences, gates, sheds, outbuildings, and corrals.

   (2) RESIDENTIAL IMPROVEMENTS: The house, garage, and all other fixtures and improvements attached to the above-described real property, including without limitation, the following **permanently installed and built-in items,** if any: all equipment and appliances, valances, screens, shutters, awnings, wall-to-wall carpeting, mirrors, ceiling fans, attic fans, mail boxes, television antennas and satellite dish system and equipment, mounts and brackets for televisions and speakers, heating and air-conditioning units, security and fire detection equipment, wiring, plumbing and lighting fixtures, chandeliers, water softener system, kitchen equipment, garage door openers, cleaning equipment, shrubbery, landscaping, outdoor cooking equipment, and all other property owned by Seller and attached to the above described real property.

   C. ACCESSORIES:

   (1) FARM AND RANCH ACCESSORIES: The following described related accessories: (check boxes of conveyed accessories)  ☐ portable buildings  ☐ hunting blinds  ☐ game feeders  ☒ livestock feeders and troughs  ☒ irrigation equipment  ☒ fuel tanks  ☐ submersible pumps  ☐ pressure tanks  ☐ corrals  ☒ gates  ☐ chutes  ☐ other: _____

   (2) RESIDENTIAL ACCESSORIES: The following described related accessories, if any: window air conditioning units, stove, fireplace screens, curtains and rods, blinds, window shades, draperies and rods, door keys, mailbox keys, above ground pool, swimming pool equipment and maintenance accessories, artificial fireplace logs, and controls for: (i) satellite dish systems, (ii) garages, (iii) entry gates, and (iv) other improvements and accessories.

   D. CROPS: Unless otherwise agreed in writing, Seller has the right to harvest all growing crops until delivery of possession of the Property.

   E. EXCLUSIONS: The following improvements, accessories, and crops will be retained by Seller and must be removed prior to delivery of possession: _____

   F. RESERVATIONS: Any reservation for oil, gas, or other minerals is described on the attached TREC addendum. Seller reserves the following water, timber, or other interests: _____

3. **SALES PRICE:**

   A. Cash portion of Sales Price payable by Buyer at closing ................ $ _____ 980,000.00

   B. Sum of all financing described below (excluding any loan funding fee or mortgage insurance premium)............................. $ _____

   C. Sales Price (Sum of A and B) ....................................... $ _____ 980,000.00

   D. The Sales Price ☐ will ☒ will not be adjusted based on the survey required by Paragraph 6C. If the Sales Price is adjusted, the Sales Price will be calculated on the basis of $ _____ per acre. If the Sales Price is adjusted by more than 10%, either party may terminate this contract by providing written notice to the other party within _____ days after the terminating party receives the survey. If neither party terminates this contract or if the variance is 10% or less, the adjustment will be made to the amount in  ☐ 3A  ☐ 3B  ☐ proportionately to 3A and 3B.

4. **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)

   ☐ A. THIRD PARTY FINANCING: One or more third party mortgage loans in the total amount of $ _____ (excluding any loan funding fee or mortgage insurance premium).

TAR 1701    Initialed for identification by Buyer _____ _____ and Seller *DmA* _____    TREC NO. 25-9

**EXHIBIT 1**

**Exhibit B**

Contract Concerning _____13626 Gregg Manor Road_____
_____Manor, Texas 78653_____ Page 2 of 9 12-05-2011
(Address of Property)

(1) Property Approval: If the Property does not satisfy the lenders' underwriting requirements for the loan(s) (including, but not limited to appraisal, insurability and lender required repairs), Buyer may terminate this contract by giving notice to Seller prior to closing and the earnest money will be refunded to Buyer.

(2) Credit Approval: (Check one box only)
- ☐ (a) This contract is subject to Buyer being approved for the financing described in the attached Third Party Financing Addendum for Credit Approval.
- ☐ (b) This contract is not subject to Buyer being approved for financing and does not involve FHA or VA financing.

☐ B. ASSUMPTION: The assumption of the unpaid principal balance of one or more promissory notes described in the attached TREC Loan Assumption Addendum.

☐ C. SELLER FINANCING: A promissory note from Buyer to Seller of $ _____, secured by vendor's and deed of trust liens, and containing the terms and conditions described in the attached TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

5. **EARNEST MONEY:** Upon execution of this contract by all parties, Buyer shall deposit $500.00 as earnest money with _____Wally Tinley and Associates_____ as escrow agent, at _____8235 Shoal Creek Blvd. Austin, Texas 78757_____ (address). Buyer shall deposit additional earnest money of $ _____ with escrow agent within _____N/A_____ days after the effective date of this contract. If Buyer fails to deposit the earnest money as required by this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**

A. TITLE POLICY: Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of title insurance (Title Policy) issued by: _____Wally Tingley & Associates_____ (Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:
- (1) The standard printed exception for standby fees, taxes and assessments.
- (2) Liens created as part of the financing described in Paragraph 4.
- (3) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
- (4) The standard printed exception as to marital rights.
- (5) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
- (6) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the exception amended to read, "shortages in area".

B. COMMITMENT: Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier. If, due to factors beyond Seller's control, the Commitment and Exception Documents are not delivered within the time required, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

C. SURVEY: The survey must be made by a registered professional land surveyor acceptable to the Title Company and Buyer's lender(s). (Check one box only):
- ☐ (1) Within _____ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (T-47 Affidavit). **If Seller fails to furnish the existing survey or affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date.** The existing survey ☐ will ☐ will not be recertified to a date subsequent to the effective date of this contract at the expense of ☐ Buyer ☐ Seller. If the existing survey is not approved by the Title Company or Buyer's lender (s), a new survey will be obtained at the expense of ☐ Buyer ☐ Seller no later than 3 days prior to Closing Date.
- ☒ (2) Within _____30_____ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.
- ☐ (3) Within _____ days after the effective date of this contract, Seller, at Seller's expense shall furnish a new survey to Buyer.
- ☐ (4) No survey is required.

D. OBJECTIONS: Buyer may object in writing to (i) defects, exceptions, or encumbrances to title disclosed on the survey other than items 6A(1) through (5) above; or disclosed in the

TAR 1701    Initialed for identification by Buyer _____ and Seller _DMT_ _____    TREC NO. 25-9

## EXHIBIT 1

## Exhibit B

**EXHIBIT B**

Contract Concerning _____ 13628 Gregg Manor Road
Manor, Texas 78653 _____ Page 3 of 9  12-05-2011
(Address of Property)

Commitment other than items 6A(1) through (6) above; (ii) any portion of the Property lying in a special flood hazard area (Zone V or A) as shown on the current Federal Emergency Management Agency map; or (iii) any exceptions which prohibit the following use or activity:

_____

Buyer must object the earlier of (i) the Closing Date or (ii) _____ days after Buyer receives the Commitment, Exception Documents, and the survey. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived by Buyer. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. **EXCEPTION DOCUMENTS:** Prior to the execution of the contract, Seller has provided Buyer with copies of the Exception Documents listed below or on the attached exhibit. Matters reflected in the Exception Documents listed below or on the attached exhibit will be permitted exceptions in the Title Policy and will not be a basis for objection to title:

| Document | Date | Recording Reference |
|----------|------|---------------------|
|          |      |                     |
|          |      |                     |
|          |      |                     |
|          |      |                     |
|          |      |                     |

F. **SURFACE LEASES:** Prior to the execution of the contract, Seller has provided Buyer with copies of written leases and given notice of oral leases (Leases) listed below or on the attached exhibit. The following Leases will be permitted exceptions in the Title Policy and will not be a basis for objection to title: _____

G. **TITLE NOTICES:**

(1) **ABSTRACT OR TITLE POLICY:** Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) **STATUTORY TAX DISTRICTS:** If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(3) **TIDE WATERS:** If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

(4) **ANNEXATION:** If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(5) **PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER:** Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to determine if the property is in a certificated area and contact the utility service provider to

TAR 1701    Initialed for identification by Buyer _____ and Seller _DMk_ _____    TREC NO. 25-9

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    gregg manor farm

**EXHIBIT 1**

**Exhibit B**

Contract Concerning _____ 15628 Gregg Manor Road
Manor, Texas 78653
(Address of Property)

determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(6) PUBLIC IMPROVEMENT DISTRICTS: If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

(7) TEXAS AGRICULTURAL DEVELOPMENT DISTRICT: The Property ☐ is ☐ is not located in a Texas Agricultural Development District. For additional information contact the Texas Department of Agriculture.

(8) TRANSFER FEES: If the Property is subject to a private transfer fee obligation, §5.205, Property Code, requires Seller to notify Buyer as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

## 7. PROPERTY CONDITION:

A. ACCESS, INSPECTIONS AND UTILITIES: Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller at Seller's expense shall immediately cause existing utilities to be turned on and shall keep the utilities on during the time this contract is in effect.
**NOTICE:** Buyer should determine the availability of utilities to the Property suitable to satisfy Buyer's needs.

B. SELLER'S DISCLOSURE NOTICE PURSUANT TO §5.008, TEXAS PROPERTY CODE (Notice): (Check one box only)
   ☐ (1) Buyer has received the Notice
   ☐ (2) Buyer has not received the Notice. Within _____ days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer may terminate this contract at any time prior to the closing and the earnest money will be refunded to Buyer. If Seller delivers the Notice, Buyer may terminate this contract for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs, and the earnest money will be refunded to Buyer.
   ☒ (3) The Texas Property Code does not require this Seller to furnish the Notice.

C. SELLER'S DISCLOSURE OF LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS is required by Federal law for a residential dwelling constructed prior to 1978.

D. ACCEPTANCE OF PROPERTY CONDITION: (Check one box only)
   ☒ (1) Buyer accepts the Property in its present condition.
   ☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments: _____
   _____ .
   (Do not insert general phrases, such as " subject to inspections," that do not identify specific repairs.)
   NOTICE TO BUYER AND SELLER: Buyer's agreement to accept the Property in its present condition under Paragraph 7D(1) or (2) does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

E. COMPLETION OF REPAIRS: Unless otherwise agreed in writing, Seller shall complete all agreed repairs prior to the Closing Date. All required permits must be obtained, and repairs must be performed by persons who are licensed or otherwise permitted by law to provide such repairs. At Buyer's election, any transferable warranties received by Seller with respect to the repairs will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed repairs prior to the Closing Date, Buyer may exercise remedies under Paragraph 15 or extend the Closing Date up to 15 days if necessary for Seller to complete repairs.

F. LENDER REQUIRED REPAIRS AND TREATMENTS: Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs, which includes treatment for wood destroying insects. If the parties do not agree to pay for the lender required repairs or treatments, this contract will terminate and the earnest money will be refunded to Buyer. If the cost of lender required repairs and treatments exceeds 5% of the Sales Price, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

G. ENVIRONMENTAL MATTERS: Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards, or the presence of a threatened

TAR 1701  Initialed for identification by Buyer _____ _____ and Seller _2m4_ _____    TREC NO. 25-9

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    gregg manor farm

**EXHIBIT 1**

**Exhibit B**

**EXHIBIT B**

Contract Concerning _____ 13628 Gregg Manor Road
Manor, Texas 78653 _____
(Address of Property)

or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

H. **SELLER'S DISCLOSURES:** Except as otherwise disclosed in this contract, Seller has no knowledge of the following:

(1) any flooding of the Property which has had a material adverse effect on the use of the Property;

(2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;

(3) any environmental hazards or conditions materially affecting the Property;

(4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;

(5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or

(6) any threatened or endangered species or their habitat affecting the Property.

I. **RESIDENTIAL SERVICE CONTRACTS:** Buyer may purchase a residential service contract from a residential service company licensed by TREC. If Buyer purchases a residential service contract, Seller shall reimburse Buyer at closing for the cost of the residential service contract in an amount not exceeding $ _____ . Buyer should review any residential service contract for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

J. **GOVERNMENT PROGRAMS:** The Property is subject to the government programs listed below or on the attached exhibit: _____

Seller shall provide Buyer with copies of all governmental program agreements. Any allocation or proration of payment under governmental programs is made by separate agreement between the parties which will survive closing.

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:**

A. The closing of the sale will be on or before _____ November 1, 2013 _____ , _____ , or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.

B. At closing:

(1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6, an assignment of Leases, and furnish tax statements or certificates showing no delinquent taxes on the Property.

(2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.

(3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents reasonably required for the closing of the sale and the issuance of the Title Policy.

(4) There will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing the payment of any loans assumed by Buyer and assumed loans will not be in default.

(5) If the Property is subject to a lease, Seller shall (i) deliver to Buyer the lease(s) and the move-in condition form signed by the tenant, if any, and (ii) transfer security deposits (as defined under §92.102, Property Code), if any, to Buyer. In such an event, Buyer shall deliver to the tenant a signed statement acknowledging that the Buyer has received the security deposit and is responsible for the return of the security deposit, and specifying the exact dollar amount of the security deposit.

10. **POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition, ordinary wear and tear excepted: ☒ upon closing and funding ☐ according to a temporary residential lease form promulgated by TREC or other written lease required by the parties. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written lease will establish a tenancy at sufferance relationship between the parties. **Consult your insurance agent prior to change of ownership and possession because insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.**

11. **SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum or other form has been promulgated by TREC for mandatory use.)
Buyer will agree to a mutual leaseback of property to Seller.

TAR 1701   Initialed for identification by Buyer _____ and Seller _____ _____    TREC NO. 25-9

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

gregg manor farm

**EXHIBIT 1**

**Exhibit B**

12-10269-tmd Doc#89 Filed 09/03/13 Entered 09/03/13 13:47:28 Main Document Pg 41 of
Contract Concerning _____ Gregg Manor Road _____
Manor, Texas 78653
(Address of Property)
**EXHIBIT B**
Page 6 of 9 12-05-2011

## 12. SETTLEMENT AND OTHER EXPENSES:
A. The following expenses must be paid at or prior to closing:
(1) Expenses payable by Seller (Seller's Expenses):
   (a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.
   (b) Seller shall also pay an amount not to exceed $ _____ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Land Board or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.
(2) Expenses payable by Buyer (Buyer's Expenses) Appraisal fees; loan application fees; adjusted origination charges; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; loan title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan, Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender; and other expenses payable by Buyer under this contract.
B. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Land Board or other governmental loan program regulations.

## 13. PRORATIONS AND ROLLBACK TAXES:
A. PRORATIONS: Taxes for the current year, interest, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer shall pay taxes for the current year. Rentals which are unknown at time of closing will be prorated between Buyer and Seller when they become known.
B. ROLLBACK TAXES: If this sale or Buyer's use of the Property after closing results in the assessment of additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Buyer. If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property claimed by Seller results in Assessments for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

## 14. CASUALTY LOSS:
If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer, (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

## 15. DEFAULT:
If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

## 16. MEDIATION:
It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☒ will ☐ will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

TAR 1701 Initialed for identification by Buyer _____ _____ and Seller 𝒟𝑀𝐴 _____ TREC NO. 25-9

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com
gregg manor farm

**EXHIBIT 1**

**Exhibit B**

Contract Concerning _____
13628 Gregg Manor Road
Manor, Texas 78653
(Address of Property)

Page 7 of 9  12-05-2011

**17. ATTORNEY'S FEES:** A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

**18. ESCROW:**

A. **ESCROW:** The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.

B. **EXPENSES:** At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may: (i) require a written release of liability of the escrow agent from all parties, (ii) require payment of unpaid expenses incurred on behalf of a party, and (iii) only deduct from the earnest money the amount of unpaid expenses incurred on behalf of the party receiving the earnest money.

C. **DEMAND:** Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

D. **DAMAGES:** Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.

E. **NOTICES:** Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** All covenants, representations and warranties in this contract survive closing. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

**20. FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

**21. NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

| To Buyer at: | To Seller at: |
|---|---|
| _____ | _Cheval Manor Inc_ |
| _____ | _13628 GREGG MANOR ROAD_ |
| _____ | _MANOR TEXAS 78653_ |
| Telephone: _____ | Telephone: _512-626-1243_ |
| Facsimile: _____ | Facsimile: _512-278-0761_ |
| E-mail: _____ | E-mail: _austin polo @ gmail.com_ |

TAR 1701   Initialed for identification by Buyer _____ and Seller _DMN_   TREC NO. 25-9

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   gregg manor farm

**EXHIBIT 1**

**Exhibit B**

Contract Concerning _____ 13628 Gregg Manor Road

Manor, Texas 78653

(Address of Property)

**EXHIBIT B**

Page 9 of 9  12-05-2011

## RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker _____ of the total Sales Price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

Other Broker: | Listing Broker:

By: _____ | By: _____

## BROKER INFORMATION AND AGREEMENT FOR PAYMENT OF BROKERS' FEES

| Other Broker | License No. | Listing or Principal Broker | License No. |

| Licensed Supervisor of Associate | Telephone | Licensed Supervisor of Associate | Telephone |

| Associate | | Associate | |

| Address | | Address | |

| City | State | Zip | City | State | Zip |

| Telephone | Facsimile | Telephone | Facsimile |

| E-mail | | E-mail | |

represents ☐ Buyer only as Buyer's agent
    ☐ Seller as Listing Broker's subagent

represents ☐ Seller only
    ☐ Buyer only
    ☐ Seller and Buyer as an intermediary

Upon closing of the sale by Seller to Buyer of the Property described in the contract to which this fee agreement is attached: (a) ☐ Seller ☐ Buyer will pay Listing/Principal Broker ☐ a cash fee of $ _____ or ☐ _____ % of the total Sales Price; and (b) ☐ Seller ☐ Buyer will pay Other Broker ☐ a cash fee of $ _____ or ☐ _____ % of the total Sales Price. Seller/Buyer authorizes and directs Escrow Agent to pay the brokers from the proceeds at closing.

Brokers' fees are negotiable. Brokers' fees or the sharing of fees between brokers are not fixed, controlled, recommended, suggested or maintained by the Texas Real Estate Commission.

Seller _____ Pres Cheval Mayor, Inc | Buyer _____

Seller _____ | Buyer _____

Do not sign if there is a separate written agreement for payment of Brokers' fees.

## OPTION FEE RECEIPT

Receipt of $ _____ (Option Fee) in the form of _____ is acknowledged.

Seller or Listing Broker _____ | Date _____

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☐ Contract and ☐ $ _____ Earnest Money in the form of _____ is acknowledged.

Escrow Agent: _____ | Date: _____

By: _____

     Email Address _____

Address _____ | Telephone: _____

City _____ State _____ Zip _____ | Facsimile: _____

TAR 1701

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

TREC NO. 25-9

gregg manor farm

**EXHIBIT 1**

**Exhibit B**

TEXAS ASSOCIATION OF REALTORS®
## COMMERCIAL CONTRACT FINANCING ADDENDUM

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

### ADDENDUM TO COMMERCIAL CONTRACT BETWEEN THE UNDERSIGNED PARTIES CONCERNING THE PROPERTY AT

13628 Gregg Manor Road

The portion of the Sales Price not payable in cash will be paid as follows: *(Check all that apply.)*

☑ A. THIRD PARTY FINANCING:

    (1) The contract is contingent upon Buyer obtaining a third party loan(s) secured by the Property in the amount of $ _980,000_ for not less than _20_ years with the initial interest rate not to exceed _5_ % per annum and payments calculated on an amortization period of no less than _20_ years.

    (2) Buyer will apply for the third party loan(s) described in Paragraph A(1) promptly after the effective date. If Buyer cannot obtain the loan(s), Buyer may give Seller written notice within _____ days after the effective date and the contract will terminate and the earnest money, less any independent consideration under Paragraph 7B(1) of the contract, will be refunded to Buyer. **If Buyer does not give such notice within the time required, this contract will no longer be subject to the contingency described in this Paragraph A.**

    (3) Each note to be executed under this addendum is to be secured by vendor's and deed of trust liens.

☐ B. ASSUMPTION:

    (1) Buyer will assume the unpaid principal balance of the existing promissory note secured by the Property payable to _____ dated _____ which balance at closing will be $ _____ .

    (2) Buyer's initial payment will be the first payment due after closing. Buyer's assumption of the existing note includes all obligations imposed by the deed of trust securing the note, recorded in _____ *(recording reference)* in the real property records of the county where the Property is located.

    (3) If the unpaid principal balance of the assumed loan as of the date of closing varies from the loan balance stated in Paragraph B(1), the cash payable at closing will be adjusted by the net amount of any variance; provided, if the total principal balance of the assumed loan varies in an amount greater than $ _____ at closing, either party may terminate this contract and the earnest money will be refunded to Buyer unless either party elects to eliminate the excess in the variance by an appropriate adjustment at closing.

    (4) Buyer may terminate the contract and the earnest money, less any independent consideration under Paragraph 7B(1) of the contract, will be refunded to Buyer if the note holder on assumption requires:
        (a) Buyer to pay an assumption fee in excess of $ _____ and Seller declines to pay such excess;
        (b) an increase in the interest rate to more than _____ %; or
        (c) any other modification of the loan documents.

    (5) Unless Seller is released of liability on any assumed note, Seller requires a vendor's lien and deed of trust to secure assumption, which will be automatically released on execution and delivery of a release by the note holder.

(TAR-1931) 1-26-10    Initialed for Identification by Seller: _JML_ , _____, and Buyer:_____ , _____    Page 1 of 4

Signature Realty 13628 Gregg Manor Road Manor, TX 78653
Phone: 210.535.8803    Fax: .    Victor Antolik    gregg manor farm
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

## EXHIBIT 1

## Exhibit B

**EXHIBIT B**

Commercial Contract Financing Addendum concerning _____ <u>13628 Gregg Manor Road</u>

(6) If assumption approval is required by the note holder, Buyer will apply for assumption approval within _____ days after the effective date of the contract and will make every reasonable effort to obtain assumption approval. If Buyer cannot obtain assumption approval, Buyer may give Seller written notice within _____ days after the effective date and the contract will terminate and the earnest money, less any independent consideration under Paragraph 7B(1) of the contract, will be refunded to Buyer. **If Buyer does not give such notice within the time required and Buyer does not close because Buyer is not able to assume the existing note, Buyer will be in default.**

☐ C. SELLER FINANCING:

(1) At closing, Buyer will execute and deliver a promissory note (the note) from Buyer to Seller in the amount of $ _____ , bearing _____ % interest per annum. Matured, unpaid amounts will bear interest at the maximum rate of interest allowed by law.

(2) The note will be payable as follows:

☐ (a) In one payment, due _____ after the date of the note, with interest payable: ☐ (i) monthly ☐ (ii) _____ .

☐ (b) In installments of $ _____ ☐ including interest ☐ plus interest beginning _____ after the date of the note and continuing at ☐ monthly ☐ _____ intervals thereafter for _____ when the entire balance of the note will be due and payable.

☐ (c) Interest only in ☐ monthly ☐ _____ installments for the first _____ years and thereafter in installments of $ _____ ☐ including interest ☐ plus interest beginning _____ after the date of the note and continuing at ☐ monthly ☐ _____ intervals thereafter for _____ when the entire balance of the note will be due and payable.

(3) The note will be secured by vendor's and deed of trust liens and an assignment of leases payable at the placed designated by Seller.

(4) The note will provide that if Buyer fails to timely pay an installment within 10 days after the installment is due, Buyer will pay a late fee equal to 5% of the installment not paid.

(5) The note ☐ will ☐ will not provide for liability (personal or corporate) against the maker in the event of default.

(6) The note may be prepaid in whole or in part at any time without penalty. Any prepayments are to be applied to the payment of the installments of principal last maturing and interest will immediately cease on the prepaid principal.

(7) The lien securing payment of the note will be inferior to any lien securing any superior note described in this addendum. If an owner's policy of title insurance is furnished, Buyer, at Buyer's expense, will furnish Seller with a mortgagee title policy in the amount of the note at closing.

(8) If all or any part of the Property is sold or conveyed without Seller's prior written consent, Seller, at Seller's option, may declare the outstanding principal balance of the note, plus accrued interest, immediately due and payable. Any of the following is not a sale or conveyance of the Property:
(a) the creation of a subordinate lien;
(b) a sale under a subordinate lien;
(c) a deed under threat or order of condemnation;
(d) a conveyance solely between the parties; or
(e) the passage of title by reason of death of a maker or operation of law.

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com

**EXHIBIT 1**

**Exhibit B**

Commercial Contract Financing Addendum concerning _____ 13628 Gregg Manor Road

(9) <u>Deposits for Taxes and Insurance</u>: Together with the principal and interest installments, Buyer ☐ will ☐ will not deposit with Seller a pro rata part of the estimated annual ad valorem taxes on the Property and a pro rata part of the estimated annual insurance premiums for the improvements on the Property.

    (a) If Buyer deposits taxes and insurance deposits with Seller, Buyer agrees that the taxes and insurance deposits are only estimates and may be insufficient to pay total taxes and insurance premiums. Buyer agrees to pay any deficiency within 30 days after Seller notifies Buyer of any deficiency. Buyer's failure to pay the deficiency is a default under the deed of trust.

    (b) If any superior lien holder on the Property collects payments for taxes and insurance, any requirement to deposit taxes and insurance deposits with Seller under this addendum is inoperative so long as payments are being made to the superior lien holder.

(10) Any event that constitutes a default under any superior lien constitutes a default under the deed of trust securing the note.

(11) The note will include a provision for reasonable attorney's fees for any collection action.

(12) Unless the parties agree otherwise, the form of the note and loan documents will be as found in the current edition of the State Bar of Texas Real Estate Forms Manual without any additional clauses.

☐ D.   <u>CREDIT APPROVAL ON ASSUMPTION OR SELLER FINANCING</u>:

    (1) To establish Buyer's creditworthiness for assumption approval or seller financing, Buyer will deliver to Seller the following information (Buyer's documentation) within _____ days after the effective date of the contract:
    ☐ (a) verification of employment, including salary;
    ☐ (b) verification of funds on deposit in financial institutions;
    ☐ (c) current financial statement;
    ☐ (d) credit report;
    ☐ (e) tax returns for the following years _____ ;
    ☐ (f) _____
           _____

    (2) If Buyer does not timely deliver Buyer's documentation or Seller determines, in Seller's sole discretion, that Buyer's creditworthiness is not acceptable, Seller may terminate the contract by giving written notice to Buyer not later than _____ days after the date Buyer must deliver Buyer's documentation under Paragraph D(1) and the earnest money, less any independent consideration under Paragraph 7B(1) of the contract, will be refunded to Buyer. If Seller does not timely terminate the contract under this paragraph, Seller will be deemed to have accepted Buyer's credit.

☐ E.   <u>SPECIAL PROVISIONS</u>:

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com      gregg manor farm

**EXHIBIT 1**

**Exhibit B**

Commercial Contract Financing Addendum concerning _____ 13628 Gregg Manor Road _____

DMA

Seller: <u>Richard Antolik and or assigns</u>

By: _____

By (signature): _____
Printed Name: _____
Title: _____

By: _____

By (signature): _____
Printed Name: _____
Title: _____

Buyer: <u>Cheval Manor</u> Inc <u>or Dennis Antolik</u>

By: _____ Pres Cheval Manor Inc

By (signature): Cheval Manor Inc
Printed Name: Dennis Antolik
Title: President

By: _____

By (signature): _____
Printed Name: _____
Title: _____

(TAR-1931) 1-26-10

Page 4 of 4

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

gregg manor farm

**EXHIBIT 1**

**Exhibit B**

**EXHIBIT B**

Contract Concerning _____
13628 Gregg Manor Road
Manor, Texas 78653
(Address of Property)
_____ Page 8 of 9  12-05-2011

**22. AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

☑ Third Party Financing Addendum for Credit Approval

☐ Seller Financing Addendum

☐ Addendum for Property Subject to Mandatory Membership in a Property Owners Association

☐ Buyer's Temporary Residential Lease

☐ Loan Assumption Addendum

☐ Addendum for Sale of Other Property by Buyer

☐ Addendum for Reservation of Oil, Gas and Other Minerals

☐ Addendum for "Back-Up" Contract

☐ Addendum for Coastal Area Property

☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum

☐ Seller's Temporary Residential Lease

☐ Short Sale Addendum

☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway

☐ Addendum for Seller's Disclosure of Information on Lead-based Paint and Lead-based Paint Hazards as Required by Federal Law

☐ Other (list): _____

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $ _____ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _____ days after the effective date of this contract (Option Period). If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee to Seller within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☐ will  ☐ will not be credited to the Sales Price at closing. **Time is of the essence for this paragraph and strict compliance with the time for performance is required.**

**24. CONSULT AN ATTORNEY:** TREC rules prohibit real estate licensees from giving legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's Attorney is: _____

Seller's Attorney is: _____

Telephone: _____

Telephone: _____

Facsimile: _____

Facsimile: _____

E-mail: _____

E-mail: _____

EXECUTED the ___8___ day of ___AuGusT___ , ___2013___ (EFFECTIVE DATE).
(BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

_____
Buyer

_____
Buyer

Cheval Manor Inc
Seller By, _____ Pres

Seller
Subject To Bankruptcy Court Approval

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, (512) 936-3000 (http://www.trec.texas.gov) TREC NO. 25-9. This form replaces TREC NO. 25-8.

TAR 1701

TREC NO. 25-9

gregg manor farm



**EXHIBIT 1**

**Exhibit B**

Approved by the Texas Real Estate Commission for Voluntary Use

10-10-11

*Texas law requires all real estate licensees to give the following information about brokerage services to prospective buyers, tenants, sellers and landlords.*

# Information About Brokerage Services

Before working with a real estate broker, you should know that the duties of a broker depend on whom the broker represents. If you are a prospective seller or landlord (owner) or a prospective buyer or tenant (buyer), you should know that the broker who lists the property for sale or lease is the owner's agent. A broker who acts as a subagent represents the owner in cooperation with the listing broker. A broker who acts as a buyer's agent represents the buyer. A broker may act as an intermediary between the parties if the parties consent in writing. A broker can assist you in locating a property, preparing a contract or lease, or obtaining financing without representing you. A broker is obligated by law to treat you honestly.

## IF THE BROKER REPRESENTS THE OWNER:

The broker becomes the owner's agent by entering into an agreement with the owner, usually through a written - listing agreement, or by agreeing to act as a subagent by accepting an offer of subagency from the listing broker. A subagent may work in a different real estate office. A listing broker or subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first. The buyer should not tell the owner's agent anything the buyer would not want the owner to know because an owner's agent must disclose to the owner any material information known to the agent.

## IF THE BROKER REPRESENTS THE BUYER:

The broker becomes the buyer's agent by entering into an agreement to represent the buyer, usually through a written buyer representation agreement. A buyer's agent can assist the owner but does not represent the owner and must place the interests of the buyer first. The owner should not tell a buyer's agent anything the owner would not want the buyer to know because a buyer's agent must disclose to the buyer any material information known to the agent.

## IF THE BROKER ACTS AS AN INTERMEDIARY:

A broker may act as an intermediary between the parties if the broker complies with The Texas Real Estate License Act. The broker must obtain the written consent of each party to the transaction to act as an intermediary. The written consent must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. The broker is required to treat each party honestly and fairly and to comply with The Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:

(1) shall treat all parties honestly;

(2) may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;

(3) may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and

(4) may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by The Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.

With the parties' consent, a broker acting as an intermediary between the parties may appoint a person who is licensed under The Texas Real Estate License Act and associated with the broker to communicate with and carry out instructions of one party and another person who is licensed under that Act and associated with the broker to communicate with and carry out instructions of the other party.

**If you choose to have a broker represent you,** you should enter into a written agreement with the broker that clearly establishes the broker's obligations and your obligations. The agreement should state how and by whom the broker will be paid. You have the right to choose the type of representation, if any, you wish to receive. Your payment of a fee to a broker does not necessarily establish that the broker represents you. If you have any questions regarding the duties and responsibilities of the broker, you should resolve those questions before proceeding.

Real estate licensee asks that you acknowledge receipt of this information about brokerage services for the licensee's records.

_____  Seller

Buyer, Seller, Landlord or Tenant                     Date     8/8/13

Texas Real Estate Brokers and Salespersons are licensed and regulated by the Texas Real Estate Commission (TREC). If you have a question or complaint regarding a real estate licensee, you should contact TREC at P.O. Box 12188, Austin, Texas 78711-2188 , 512-936-3000 (http://www.trec.texas.gov)

(TAR-2501) 10-10-11

Signature Realty 13628 Gregg Manor Road Manor, TX 78653

TREC No. OP-K

Phone: 210.535.8803      Fax: .           Victor Antolik

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                  gregg manor fa



## EXHIBIT 1

## Exhibit B

**EXHIBIT C**

## COMMERCIAL LEASE

**PARTIES:** The parties to this lease are:

TENANT:    **DENNIS MICHAEL ANTOLIK**

LANDLORD: **RICHARD ANTOLIK OR ASSIGNS**

**LEASED PREMISES:**

Landlord leases to Tenant the following described real property, known as the "leased premises," along with all its improvements:

> Approximately 88 acres of land out of the Marguerite Castro Survey No. 50, Abstract No. 160, Travis County, Texas, and being locally known as 13628 Gregg Manor Road, Manor, Texas 78653.

1.    **TERM:**

The term of this lease is 60 months commencing on:

Commencement Date:       November 1, 2013, or such earlier time as Landlord acquires fee simple title to the Leased Premises.

Expiration Date:       Five years after Commencement Date

Delay of Occupancy: If Tenant is unable to occupy the leased premises on the Commencement Date because of ability or inability of Landlord to obtain fee simple title to the Leased Premises, then Landlord will not be liable for Tenant for such delay. The Commencement Date will be extended automatically until December 31, 2013, and in the event Landlord is not able to acquire fee simple title by that date, then either party may terminate this Lease.

Unless the parties agree otherwise, Tenant is responsible for obtaining a certificate of occupancy for the leased premises if required by a governmental body.

2.    **RENT AND EXPENSES**

A.    Base Monthly Rent: On or before the first day of each month during this lease, Tenant will pay Landlord base monthly rent as follows:

from Commencement Date to Expiration Date: $4,800.00

Page 1 of 15



**EXHIBIT 1**



**Exhibit B**

B.    First Full Month's Rent: The first full base monthly rent is due on or before the
      Commencement Date.

C.    Prorated Rent: If the Commencement Date if on a day other than the first day of a
      month, Tenant will pay Landlord as prorated rent, an amount equal to the base
      monthly rent multiplied by the following fraction: the number of days from the
      Commencement Date to the first day of the following month divided by the
      number of days in the month in which this lease commences. The prorated rent is
      due on or before the Commencement Date.

D.    Additional Rent: In addition to and at the same time as the base monthly rent and
      prorated rent, as additional rent Tenant will pay Landlord $1/12^{th}$ of the amount
      estimated by Landlord as the current years real property ad valorem taxes
      assessed against the Leased Premises, including all general and special
      assessments and surcharges.

E.    Method of Payment: Tenant must pay all rent timely without demand, deduction,
      or offset, except as permitted by law or this lease. If Tenant fails to timely pay
      any amounts due under this lease or if any check of Tenant is returned to
      Landlord by the institution on which it was drawn, Landlord after providing
      written notice to Tenant may require Tenant to pay subsequent amounts that
      become due under this lease in certified funds. This paragraph does not limit
      Landlord from seeking other remedies under this Lease for Tenant's failure to
      make timely payments with good funds.

F.    Late Charges: If Landlord does not actually receive a rent payment at the
      designated place of payment within five (5) days after the date it is due, Tenant
      will pay Landlord a late charge equal to five percent (5%) of the amount
      associated with the collection of rent and Landlord's acceptance of a late charge
      does not waive Landlord's right to exercise remedies under Paragraph 20.

G.    Returned Checks: Tenant will pay $25.00 for each check Tenant tenders to
      Landlord which is returned by the institution on which it is drawn for any reason,
      plus any late charges until Landlord receives payment.

3.   **SECURITY DEPOSIT:**

No Security Deposit is required in connection with this Lease.

4.   **TAXES:** Unless otherwise agreed by parties, Landlord will pay all real property ad
     valorem taxes assessed against the leased premises, subject to Tenant's payment of
     Additional Rent.

5.   **UTILITIES:**

Page 2 of 15

**EXHIBIT 1**



**Exhibit B**

1.   Tenant will be responsible for all utility charges to the Leased Premises, including any connection charges.

2.   Tenant will pay the charges directly to the utility service provider. Tenant may select the utility service provider except that if Tenant selects the provider any access or alterations to the Property or leased premises necessary for the utilities may be made only with Landlord's prior consent, which Landlord will not unreasonably withhold. If Landlord incurs any liability for utility or connection charges for which Tenant is responsible to pay and Landlord pays such amount, Tenant will immediately upon written notice from Landlord reimburse Landlord such amount.

3.   Notice: Tenant should determine if all necessary utilities are available to the leased premises and are adequate for Tenant's intended use.

## 6.   INSURANCE:

A.   During all times this lease is in effect, Tenant must, at Tenant's expense, maintain in full force and effect from an insurer authorized to operate in Texas:

   (1)   public liability insurance in an amount not less than $2,000,000.00 on an occurrence basis naming Landlord as an additional insured; and

   (2)   personal property damage insurance for Tenant's business operations and contents on the lease premises in an amount sufficient to replace such contents after a casualty loss.

   (3)   Commercial Equine Liability Coverage, with extended coverage for care, custody and control, in the amount of $1,000,000.00.

B.   Before the Commencement Date, Tenant must provide Landlord with a copy of the insurance certificates evidencing the required coverage. If the insurance coverage changes in any manner or degree at any time this lease is in effect, Tenant must, not later than ten (10) days after the change, provide Landlord a copy of an insurance certificate evidencing the change.

C.   If Tenant fails to maintain the required insurance in full force and effect at all times this lease is in effect, Landlord may:

   (1)   purchase insurance that will provide Landlord the same coverage as the required insurance and Tenant must immediately reimburse Landlord for such expense; or



Page 3 of 15



## EXHIBIT 1

## Exhibit B

      (2)     exercise Landlord's remedies under Paragraph 16.

D.    Unless the parties agree otherwise, Landlord will, at Tenant's expense, maintain in full force and effect insurance for fire and extended coverage in an amount to cover the reasonable replacement cost of the improvements of the Property and public liability insurance in an amount that Landlord Determines reasonable and appropriate. Landlord shall provide Tenant notice of the insurance premium and Tenant shall pay to Landlord the amount of the premium within 10 days of the date of the notice.

E.    If there is an increase in Landlord's insurance premiums for the leased premises or Property or its contents that is caused by Tenant, Tenant's use of the leased premises, or any improvements made by or for Tenant, Tenant will, for each year this lease is in effect, pay Landlord the increase immediately after Landlord notifies Tenant of the increase. Any charge to Tenant under this Paragraph will be equal to the actual amount of the increase in Landlord's insurance premium.

## 7. USE AND HOURS:

A.    Tenant may use the leased premises for the following purpose and no other: Polo club, residential rental units, events facility and full service equestrian facility, including boarding lessons and horse training.

B.    Unless otherwise specified in this lease, Tenant will operate and conduct its business in the leased premises during business hours that are typical of the industry in which Tenant represents it operates.

## 8. LEGAL COMPLIANCE:

A.    Tenant may not use or permit any part of the leased premises to be used for:

      (1)     any activity which is a nuisance or is offensive, noisy, or dangerous;

      (2)     any activity that interferes with any other tenant's normal business operations or Landlord's management of the Property;

      (3)     any activity that violates any applicable law, regulation, zoning ordinance, restrictive covenant, governmental order, owners' association rules, tenants' association rules, Landlord's rules or regulations, or this lease;

      (4)     any hazardous activity that would require any insurance premium on the Property or leased premises to increase or that would void any such insurance;

Page 4 of 15



**EXHIBIT 1**

**Exhibit B**

**EXHIBIT C**

> (5)     any activity that violates any applicable federal, state, or local law, including but not limited to those laws related to air quality, water quality, hazardous materials, wastewater, waste disposal, air emissions, or other environmental matters;
>
> (6)     the permanent or temporary storage of any hazardous material.

B.     "Hazardous material" means any pollutant, toxic substance, hazardous waste, hazardous material, hazardous substance, solvent, or oil as defined by any federal, state, or local environmental law, regulation, ordinance, or rule existing as of the date of this lease or later enacted.

C.     Landlord does not represent or warrant that the leased premises or Property conform to applicable restrictions, zoning ordinances, setback lines, parking requirements, impervious ground cover ratio requirements, and other matters that may relate to Tenant's intended use. **Tenant must satisfy itself that the leased premises may be used as Tenant intends by independently investigating all matters related to the use of the leased premises or Property. Tenant agrees that it is not relying on any warranty or representation made by Landlord, Landlord's agent, or any broker concerning the use of the leased premises or Property.**

9.     **SIGNS:**

A.     Tenant may not post or paint any signs at, on, or about the leased premises or Property without Landlord's written consent. Landlord may remove any unauthorized sign, and Tenant will promptly reimburse Landlord for its cost to remove any unauthorized sign.

B.     Any authorized sign must comply with all laws, restrictions, zoning ordinances, and any governmental order relating to signs on the leased premises or Property. Landlord may temporarily remove any authorized sign to complete repairs or alterations to the leased premises or the Property.

C.     By providing written notice to Tenant before this lease ends, Landlord may require Tenant, upon move-out and at Tenant's expense, to remove, without damage to the Property or leased premises, any or all signs that were placed on the Property or leased premises by or at the request of Tenant. Any signs that Landlord does not require Tenant to remove and that are fixtures, become the property of the Landlord and must be surrendered to Landlord at the time this lease ends.

10.     **ACCESS BY LANDLORD:**

RHA                                             Page 5 of 15



**EXHIBIT 1**

**Exhibit B**

A.    During Tenant's normal business hours Landlord may enter the leased premises for any reasonable purpose, including but not limited to purposes for repairs, maintenance, alterations, and showing the leased premises to prospective tenants or purchasers. Landlord may access the leased premises after Tenant's normal business hours if: (1) entry is made with Tenant's permission; or (2) entry is necessary to complete emergency repairs. Landlord will not unreasonably interfere with Tenant's business operations with accessing the leased premises.

B.    During the last 90 days of this lease, Landlord may place a "For Lease" or similarly worded sign in the leased premises.

11.    **MOVE-IN CONDITIONS**: Tenant has inspected the leased premises and accepts it in its present "as-is" condition unless expressly noted otherwise in this lease. **Landlord and any agent have made no express or implied warranties as to the condition or permitted use of the leased premises or Property.**

12.    **MOVE-OUT CONDITION AND FORFEITURE OF TENANT'S PERSONAL PROPERTY:**

A.    At the time this lease ends, Tenant will surrender the leased premises in the same condition as when received, except for normal wear and tear. Tenant will leave the leased premises in a clean condition free of all trash, debris, personal property, hazardous materials, and environmental contaminants.

B.    If Tenant leaves any personal property in the leased premises after Tenant surrenders possession of the leased premises, Landlord may: (1) require Tenant, at Tenant's expense, to remove the personal property by providing written notice to Tenant; or (2) retain such personal property as forfeited property to Landlord.

C.    "Surrender" means vacating the leased premises and returning all keys and access devices to Landlord. "Normal wear and tear" means deterioration that occurs without negligence, carelessness, accident, or abuse.

D.    By providing written notice to Tenant before this lease ends, Landlord may require Tenant, upon move-out and at Tenant's expense, to remove, without damage to the Property or leased premises, any or all fixtures that Landlord does not require Tenant to remove become the property of the Landlord and must be surrendered to Landlord at the time this lease ends.

13.    **MAINTENANCE AND REPAIRS:**

A.    Cleaning: Tenant must keep the leased premises clean and sanitary and promptly dispose of all garbage in appropriate receptacles.



**EXHIBIT 1**



**Exhibit B**

**EXHIBIT C**

B. Repairs of Conditions Caused by a Party: Each party must promptly repair a condition in need of repair that is caused, either intentionally or negligently, by that party or party's guests, patrons, invitees, contractors or permitted subtenants.

C. Repair and Maintenance Responsibility: Except as provided, the party designated below, at its expense, is responsible to maintain and repair the following specified items in the leased premises. The specified items must be maintained in clean and good operable condition. If a governmental regulation or order requires a modification to any of the specified items, the party designated to maintain the item must complete and pay the expense of the modification. The specified items include and relate only to real property in the leased premises. Tenant is responsible for the repair and maintenance of its personal property. *(Check all that apply.)*

|  |  | NA | Landlord | Tenant |
|---|---|---|---|---|
| (1) | Foundation and exterior walls, roof, and other structural components | | | x |
| (2) | Glass and Windows | | | x |
| (3) | Fire protection equipment and fire sprinkler systems | | | |
| (4) | Exterior & overhead doors, including closure devices, molding locks, and hardware | | | x |
| (5) | Grounds maintenance, including landscaping and ground sprinklers | | | x |
| (6) | Interior doors, including closure devices, frames, molding, locks, and hardware | | | x |
| (7) | Parking areas and walks | | | x |
| (8) | Plumbing systems, drainage systems, electrical systems, ballast and lamp replacement, and mechanical systems, except those specifically designed otherwise | | | x |
| (9) | Heating Ventilation and Air Conditioning (HVAC) systems | | | x |
| (10) | Signs and lighting: | | | |
| | (a) Pylon | | | x |
| | (a) Facia | x | | |
| | (b) Monument | x | | |





Page 7 of 15

**EXHIBIT 1**

**Exhibit B**

**EXHIBIT C**

| | | | |
|---|---|---|---|
| (c)      Door/Suite | _____ | _____ | __x__ |
| (11) Extermination and pest control, excluding wood-destroying insect | _____ | _____ | __x__ |
| (12) Storage yards and storage buildings | _____ | _____ | __x__ |
| (13) Wood-destroying insect treatment and repairs | _____ | _____ | __x__ |
| (14) Cranes and related systems | _____ | _____ | _____ |
| (15) All other items and systems | _____ | _____ | __x__ |

D.    Repair Persons. Repairs must be completed by trained, qualified, and insured repair persons.

E.    HVAC Service Contract: Tenant is required to maintain, at its expense, a regularly scheduled maintenance and service contract for the HVAC system. The maintenance and service contract must be purchased from a HVAC maintenance company that regularly provides such contracts to similar properties. If Tenant fails to maintain a required HVAC maintenance and service contract in effect at all times during this lease, Landlord may do so and charge Tenant the expense of such a maintenance and service contract or exercise Landlord's remedies under Paragraph 20.

F.    Failure to Repair: If Tenant fails to repair or maintain an item for which Tenant is responsible within ten (10) days after Landlord provides Tenant written notice of the needed repair or maintenance, Landlord may: (1) repair or maintain the item, without liability for any damage or loss to Tenant, and Tenant must immediately reimburse Landlord for the cost to repair or maintain; or (2) exercise Landlord's remedies under Paragraph 20.

## 14.    ALTERATIONS:

A.    Tenant may not alter, improve, or add to the Property or the leased premises without Landlord's written consent. Landlord will not unreasonably withhold consent for the Tenant to make reasonable non-structural alterations, modifications, or improvements to the leased premises.

B.    Tenant may not alter any locks or any security devices on the Property or the leased premises without Landlord's consent. If Landlord authorizes the changing, addition, or rekeying of any locks or other security devices, Tenant must immediately deliver the new keys and access devices to Landlord.

C.    If a governmental order requires alteration or modification to the leased premises,

Page 8 of 15

**EXHIBIT 1**



## Exhibit B

the party obligated to maintain and repair the item to be modified or altered as designated in Paragraph 15 will, at its expense, modify or alter the item in compliance with the order.

D. Any alterations, improvements, fixtures or additions to the Property or leased premises installed by either party during the term of this lease will become Landlord's property and must be surrendered to Landlord at the time this lease ends, except for those fixtures Landlord requires Tenant to remove under Paragraph 11 or 14 or if the parties agree otherwise in writing.

15. **LIENS:** Tenant may not do anything that will cause the title of the Property or leased premises to be encumbered in any way. If Tenant causes a lien to be filed against the Property or leased premises, Tenant will within twenty (20) days after receipt of Landlord's demand: (1) pay the lien and have the lien released of record; or (2) take action to discharge the lien. Tenant will provide Landlord a copy of any release Tenant obtains pursuant to this paragraph.

16. **LIABILITY: To the extent permitted by law, Landlord is NOT responsible to Tenant or Tenant's employees, patrons, guests, or invitees for any damages, injuries, or losses to person or property caused by:**

   A. **An act, omission, or neglect of: Tenant; Tenant's agent; Tenant's guest; Tenant's employees; Tenant's patrons; Tenant's invitees; or any other tenant on the Property;**

   B. **Fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, riot, strike, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, environmental contaminants, or other occurrences or casualty losses.**

17. **INDEMNITY: Each party will indemnify and hold the other party harmless from any property damage, personal injury, suits, actions, liabilities, damages, cost of repairs or service to the leased premises or Property, or any other loss caused, negligently or otherwise, by that party or that party's employees, patrons, guests, or invitees.**

18. **DEFAULT:**

   A. If Landlord fails to comply with this lease within thirty (30) days after Tenant notifies Landlord of Landlord's failure to comply, Landlord will be in default and Tenant may seek any remedy provided by law. If, however, Landlord's non-compliance reasonably requires more than thirty (30) days to cure, Landlord will not be in default if the cure is commenced within the thirty (30) day period and is diligently pursued.

Page 9 of 15



**EXHIBIT 1**



**Exhibit B**

B.     If Landlord does not actually receive at the place designated for payment and rent due under this lease within five (5) days after it is due, Tenant will be in default. If Tenant fails to comply with this lease for any other reason within ten (10) days after Landlord notifies Tenant of its failure to comply, Tenant will be in default.

C.     If Tenant is in default, Landlord may: (i) terminate Tenant's right to occupy the leased premises by providing Tenant with at least 3 days written notice; and (ii) accelerate all rents which are payable during the remainder of this lease or any renewal period without notice or demand. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by using commercially reasonable means. If Tenant is in default, Tenant will be liable for:

1.     and lost rent;
2.     Landlord's cost of reletting the leased premises, including brokerage fees, advertising fees, and other fees necessary to relet the leased premises;
3.     repairs to the leased premises for use beyond normal wear and tear;
4.     all Landlord's costs associated with eviction of Tenant, such as attorney's fees, court costs, and prejudgement interest;
5.     all Landlord's costs associated with collection of rent such as collection fees, late charges, and returned check charges;
6.     cost of removing any of Tenant's equipment or fixtures left on the leased premises or Property;
7.     cost to remove any trash, debris, personal property, hazardous materials, or environmental contaminants left by Tenant or Tenant's employees, patrons, guests, or invitees in the leased premises or Property;
8.     cost to replace any unreturned keys or access devices to the leased premises, parking areas, or Property;
9.     any other recovery to which Landlord may be entitled under this lease or under law.

19.     **ABANDONMENT, INTERRUPTION OF UTILITIES, REMOVAL OF PROPERTY AND LOCKOUT:** Chapter 93 of the Texas Property Code governs the rights and obligations of the parties with regard to: (a) abandonment of the leased premises; (b) interruption of utilities; (c) removal of Tenant's property; and (d) "lock-out" of the Tenant.

20.     **HOLDOVER:** If Tenant fails to vacate the leased premises at the time this lease ends, Tenant will become a tenant-at-will and must vacate the leased premises immediately upon receipt of demand from Landlord. No holding over by Tenant, with or without the consent of Landlord, will extend this lease. Tenant will indemnify Landlord and any prospective tenants for any and all damages caused by the holdover. Rent for any holdover period will be 2 times the base monthly rent plus any additional rent calculated on a daily basis and will be immediately due and payable daily without notice or demand.

Page 10 of 15

**EXHIBIT 1**



**Exhibit B**

21. **LANDLORD'S LIEN AND SECURITY INTEREST.** To secure Tenant's performance under this lease, **Tenant grants to Landlord a lien and security interest against all of Tenant's nonexempt personal property that is in the leased premises or Property.** This lease is a security agreement for the purposes of the Uniform Commercial Code. Landlord may file a copy of this lease as a financing statement.

22. **ASSIGNMENT AND SUBLETTING:** Landlord may assign this lease to any subsequent owner of the Property. Tenant may not assign this lease or sublet any part of the leased premises without Landlord's written consent. An assignment of this lease or subletting of the leased premises without Landlord's written consent is voidable by Landlord. If Tenant assigns this lease or sublets any part of the leased premises, Tenant will remain liable for all of Tenant's obligations under this lease regardless if the assignment or sublease is made with or without the consent of Landlord.

23. **SUBORDINATION:**

    A.  This lease and Tenant's leasehold interest are and will be subject, subordinate and inferior to:
        1.  any lien, encumbrance, or ground lease now or hereafter placed on the leased premises or the Property that Landlord authorizes;
        2.  all advances made under any such lien, encumbrance, or ground lease;
        3.  the interest payable on any such lien or encumbrance;
        4.  any and all renewals and extensions of any such lien, encumbrance, or ground lease;
        5.  any restrictive covenant affecting the leased premises or the Property; and
        6.  the rights of any owners' association affecting the leased premises or Property.

    B.  Tenant must, on demand, execute a subordination, attornment, and non-disturbance agreement that Landlord may request that Tenant execute, provided that such agreement is made on the condition that this lease and Tenant's rights under this lease are recognized by the lien-holder.

24. **ESTOPPEL CERTIFICATES:** Within ten (10) days after receipt of a written request from Landlord, Tenant will execute and deliver to Landlord an estoppel certificate that identifies:

    A.  Any breach of the lease;
    B.  The then current rent payment and rent schedule;
    C.  The date the next rent payment is due;
    D.  Any advance rent payments;
    E.  The amount of the security deposit;
    F.  Any claims for any offsets;

Page 11 of 15

**EXHIBIT 1**



**Exhibit B**

G. The then current term of the lease;

H. Any renewal options;

I. Tenant's possession and acceptance of the leased premises and improvements;

J. Any ownership interest by Tenant; and

K. Any other information reasonably requested in the certificate.

### 25. CASUALTY LOSS:

A. Tenant must immediately notify Landlord of any casualty loss in the leased premises. Within twenty (20) days after receipt of Tenant's notice of a casualty loss, Landlord will notify Tenant if the leased premises are less than or more than 50% unusable, on a per square foot basis, and if Landlord can substantially restore the leased premises within one-hundred twenty (120) days after Tenant notifies Landlord of the casualty loss.

B. If the leased premises are less than 50% unusable and Landlord can substantially restore the leased premises within one-hundred twenty (120) days after Tenant notifies Landlord of the casualty, Landlord will restore the leased premises to substantially the same condition as before the casualty. If Landlord fails to substantially restore within the time required, Tenant may terminate this lease.

C. If the leased premises are more than 50% unusable and Landlord can substantially restore the leased premises within one-hundred twenty (120) days after Tenant notifies Landlord of the casualty, Landlord may (1) terminate this lease; or (2) restore the leased premises to substantially the same condition as before the casualty. If Landlord chooses to restore and does not substantially restore the leased premises within the time required, Tenant may terminate this lease.

D. If Landlord notifies Tenant that Landlord cannot substantially restore the leased premises within one-hundred twenty (120) days after Tenant notifies Landlord of the casualty loss, Landlord may: (1) choose not to restore and terminate this lease; or (2) choose to restore, notify the Tenant of the estimated time to restore, and give Tenant the option to terminate this lease by notifying Landlord within ten (10) days.

E. If this lease does not terminate because of a casualty loss, rent will be reduced from the date Tenant notifies Landlord of the casualty loss to the date the leased premises are substantially restored by an amount proportionate to the extent the leased premises are unusable.

### 26. CONDEMNATION: If after a condemnation or purchase in lieu of condemnation the leased premises are totally unusable for the purposes stated in this lease, this lease will terminate. If after a condemnation or purchase in lieu of condemnation the leased premises or Property are partially unusable for the purposes of this lease, this lease will

Page 12 of 15

**EXHIBIT 1**



**Exhibit B**

**EXHIBIT C**

continue and rent will be reduced in an amount proportionate to the extent the leased premises are unusable. Any condemnation award or proceeds in lieu of condemnation are the property of Landlord and Tenant has no claim to such proceeds or award. Tenant may seek compensation from the condemning authority for its moving expenses and damages to Tenant's personal property.

27. **ATTORNEY'S FEES:** Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgement interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party.

28. **REPRESENTATIONS:** Tenant's statements in this lease and any application for rental are material representations relied upon by Landlord. Each party signing this lease represents that he or she is of legal age to enter into a binding contract and is authorized to sign the lease. If Tenant makes any misrepresentations in this lease or in any application for rental, Tenant is in default. Landlord is not aware of any material defect on the Property that would affect the health and safety of an ordinary person or any environmental hazard on or affecting the Property that would affect the health or safety of an ordinary person, except: _____

_____

_____

29. **NOTICES:** All notices under this lease must be in writing and are effective when hand-delivered, sent by mail, or sent by facsimile transmission to:

    **Tenant** at the leased premises.

    **Landlord** at:  c/o Ric Antolik
           Address:    6001 Tonkawa Drive
                     Georgetown, TX 78628
           Phone: (512) 750-0400 Fax: _____

30. **SPECIAL PROVISIONS:**

31. **AGREEMENT OF PARTIES:**

Page 13 of 15

**EXHIBIT 1**



**Exhibit B**

A.    Entire Agreement: This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

B.    Binding Effect: This lease is binding upon and inures to the benefit of the parties and their respective heirs, executors, administrators, successors, and permitted assigns.

C.    Joint and Several: All Tenants are jointly and severally liable for all provisions of this lease. Any act or notice to, or refund to, or signature of, any on or more of the Tenants regarding any term of this lease, its renewal, or its termination is binding on all Tenants.

D.    Controlling Law: The laws of the State of Texas govern the interpretation, performance, and enforcement of this lease.

E.    Severable Clauses: If any clause in this lease is found invalid or unenforceable by a court of law, the remainder of this lease will not be affected and all other provisions of this lease will remain valid and enforceable.

F.    Waiver: Landlord's delay, waiver, or non-enforcement of acceleration, contractual or statutory lien, rental due date, or any other right will not be deemed a waiver of any other or subsequent breech by Tenant or any other term in this lease.

G.    Quiet Enjoyment: Provided that Tenant is not in default of this lease, Landlord covenants that Tenant will enjoy possession and use of the leased premises free from material interference.

H.    Force Majeure: If Landlord's performance of a term in this lease is delayed by strike, lock-out, shortage of material, governmental restriction, riot, flood, or any cause outside Landlord's control, the time for Landlord's performance will be abated until after the delay.

I.    Time: Time is of the essence. The parties require strict compliance with the times for performance.

**READ THIS LEASE CAREFULLY.** If you do not understand the effect of this Lease, consult your attorney BEFORE signing.

Tenant:

DENNIS MICHAEL ANTOLIK



Page 14 of 15



**EXHIBIT 1**

**Exhibit B**

**EXHIBIT C**

Landlord:

RICHARD ANTOLIK

**EXHIBIT 1**



**Exhibit B**

*[

## UNANIMOUS WRITTEN CONSENT
## OF MEMBERS OF
## VICTORY CHEVAL HOLDINGS, LLC
## A LIMITED LIABILITY COMPANY

The undersigned, Members of Victory Cheval Holdings, LLC ("Company"), in accordance with the Company Agreement, hereby adopt the following written consent.

WHEREAS, the Members signing this consent are the holders of all of the shares entitled to vote at the Company's meetings and on the following resolutions; and

WHEREAS, the undersigned desire to execute a written consent in lieu of formally holding a Members' meeting and agree that the adoption of the following resolutions shall be valid and have the same force and effect as though such resolutions had been adopted at a formal Members' meeting; therefore, be it:

RESOLVED, that Company should purchase the property known locally as 13628 Gregg Manor (Property), for $980,000.00 and on such terms as set out in that certain valid contract for purchase in escrow at Chicago Title, 8235 Shoal Creek Blvd, Austin, Texas 78757.

RESOLVED, Company should borrow the sum required to purchase the Property from the Members, in the individual amounts and on the terms set out in Loan Documents to be executed as part of the closing of the purchase of the Property. Said loans will be secured by liens on the property securing the loans to the benefit made by the individual Members.

RESOLVED, that this written consent shall have the same force and effect as a formal Members' meeting for all purposes.

The undersigned direct that this written consent may be executed in multiple counterparts, all of which shall be considered originals and that this written consent, including multiple counterparts, be filed with the minutes of the proceedings of the Company.

DATED to be effective on December 21, 2013.

Garrett Jennings

Vic Antolik

DEPOSITION
EXHIBIT
9
DB 12-29-14
Plaintiff 0475

PENGAD 800-631-6989

**EXHIBIT 2**

# Exhibit B



## Texas Association of Realtors®
## COMMERCIAL CONTRACT AMENDMENT

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

### AMENDMENT TO COMMERCIAL CONTRACT BETWEEN THE UNDERSIGNED BUYER AND SELLER CONCERNING THE PROPERTY AT

_13628 Gregg Manor, Manor 78653_

Effective _____, Seller and Buyer amend the contract as follows: *(Check all applicable boxes.)*

☐ A. <u>Sales Price</u>: The sales price in Paragraph 3 of the contract is changed to:

Cash portion payable by Buyer at closing .............................. $ _____

Sum of all financing described in the contract .......................... $ _____

Sales price (sum of cash portion and sum of all financing) ................ $ _____

☐ B. <u>Property Description</u>: The Property's legal description in Paragraph 2A of the contract is changed to:

☐ C. <u>Repairs</u>: Buyer accepts the Property in its present condition except that Seller, at Seller's expense, will complete the following before closing:

EXHIBIT
D

(TAR-1932) 1-26-10          Initialed for Identification by Seller: _____ and Buyer: _____          Page 1 of 2

Texas Home Source 8235 Shoal Creek Austin, TX 78757
Phone: (293)480-8200     Fax:                    Terri Martin                                    Untitled
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

## EXHIBIT 3



# Exhibit B

Amendment to Commercial Contract concerning *13628 Gregg Manor, Manor Tx 78653*

☐ D. **Extension of Feasibility Period:** For nominal consideration, the receipt of which Seller acknowledges, and the consideration described under (1) or (2) below, if any, Buyer's right to terminate under Paragraph 7B of the contract is extended until 11:59 p.m. on _____ .

    ☐ (1) The independent consideration for Buyer's right to terminate that will be deducted from the earnest money if Buyer terminates the contract under Paragraph 7B(1) is increased to a total amount of $ _____ . *(Insert an amount greater than the amount in Paragraph 7B(1) of the contract.)*

    ☐ (2) Buyer has paid Seller additional consideration of $ _____ for the extension. This additional consideration ☐ will ☐ will not be credited to the sales price upon the closing of the sale.

☐ E. **Closing:** The closing date in Paragraph 10A of the contract is changed to _____ .

☐ F. **Expenses:** At closing Seller will pay the first $ _____ of Buyer's expenses under Paragraph 13 of the contract.

☐ G. **Waiver of Right to Terminate:** Upon final acceptance of this Amendment, Buyer waives the right to terminate under Paragraph 7B of the contract.

☒ H. **Other Modifications:**

This Contract has Been Assigned to Victory Cheval Holdings, LLC.

Seller: *Cheval Manor, Inc*

By: *Dennis Antolik*

By (signature): _____

Printed Name: _____

Title: *President*

By: _____

By (signature): _____

Printed Name: _____

Title: _____

Buyer: _____

By: *Vic Antolik*

By (signature): _____

Printed Name: _____

Title: *Member, ~~Chevel~~ Victory Cheval Holdings, LLC*

By: _____

By (signature): _____

Printed Name: _____

Title: _____

(TAR-1932) 1-26-10                        Page 2 of 2

**EXHIBIT 3**

**Exhibit B**

## Corporate Resolution

**Date:** December 27, 2013

**Company:** Victory Cheval Holdings, LLC

**Date of Adoption:** December 27, 2013

We, the Members of the Company, a Texas Limited Liability Company, certify that we have custody of the records of the Company and that we are authorized to execute and deliver this certificate of resolutions on behalf of the Company. We further certify as follows:

1. The resolutions below were duly adopted on the Date of Adoption. The meeting of the Members of the Company was called and held in accordance with law and the regulations of the Company, and a quorum was present. The resolutions have not been amended, modified, or rescinded and are now in full force and effect.

    a. The purchase of the property located at 13628 Gregg Manor, Manor, Texas 78653, being 109.437 ACRES of land being out of and a portion of the M. Castro Survey No. 50, in Travis County, Texas, and being the same tract of land conveyed in the deed recorded in Volume 12503, Page 159, of the Real Property Records of Travis County, Texas. Said 109.437 acres being more particularly described by metes and bounds in Exhibit "A", attached hereto. SAVE AND EXCEPT that 20.89 acres of land, being the same tract of land to be conveyed to Travis County, said 20.89 acres being more particularly described in Exhibit "B" attached hereto.

    b. Member Vic Antolik has been authorized to execute the closing documents in behalf of the Company at Chicago Title, 8235 Shoal Creek Blvd, Austin, Tx 78757 (Tingley & Associates.

2. I further certify that the Company is duly organized and existing under the laws of the state of Texas, is qualified to do business here, and is in good standing; that no proceeding is pending for the forfeiture of the certificate of formation of the Company or for the dissolution, voluntary or involuntary, of the Company; that there is no provision of the regulations or certificate of formation of the Company limiting the powers of the members or managers of the Company to adopt the resolutions referred to above and that the resolutions are in conformity with the provisions of the regulations and the certificate of formation of the Company; and that the following persons constitute all of the Members of the Company:

1. Garrett Jennings
2. Vic Antolik



**EXHIBIT 4**

Plaintiff 0515

**Exhibit B**

Garrett Jennings
Member

_____
Vic Antolik
Member

STATE OF _Hawaii_                )

COUNTY OF _Honolulu_             )

This instrument was acknowledged before me on _December 31_, 2013, by Garrett Jennings, in behalf of Victory Cheval Holdings, LLC.

Notary Public, State of ~~Texas~~ _Hawaii_
My commission expires: _June 02, 2017_
(Notary Certification on reverse)

STATE OF TEXAS                  )

COUNTY OF TRAVIS                )

This instrument was acknowledged before me on _____, 2013, by Vic Antolik, in behalf of Victory Cheval Holdings, LLC.

_____
Notary Public, State of Texas
My commission expires: _____

**EXHIBIT 4**

Plaintiff 0516

**Exhibit B**

## Corporate Resolution

**Date:** December 27, 2013

**Company:** Victory Cheval Holdings, LLC

**Date of Adoption:** December 27, 2013

We, the Members of the Company, a Texas Limited Liability Company, certify that we have custody of the records of the Company and that we are authorized to execute and deliver this certificate of resolutions on behalf of the Company. We further certify as follows:

1. The resolutions below were duly adopted on the Date of Adoption. The meeting of the Members of the Company was called and held in accordance with law and the regulations of the Company, and a quorum was present. The resolutions have not been amended, modified, or rescinded and are now in full force and effect.

    a. The purchase of the property located at 13628 Gregg Manor, Manor, Texas 78653, being 109.437 ACRES of land being out of and a portion of the M. Castro Survey No. 50, in Travis County, Texas, and being the same tract of land conveyed in the deed recorded in Volume 12503, Page 159, of the Real Property Records of Travis County, Texas. Said 109.437 acres being more particularly described by metes and bounds in Exhibit "A", attached hereto. SAVE AND EXCEPT that 20.89 acres of land, being the same tract of land to be conveyed to Travis County, said 20.89 acres being more particularly described in Exhibit "B" attached hereto.

    b. Members Garrett Jennings and Vic Antolik agree to amend the Member ownership percentages to 50% each upon the completion of refinancing and resulting payment in full of the two (2) purchase money notes payable to the each of them in their respective amounts.

2. I further certify that the Company is duly organized and existing under the laws of the state of Texas, is qualified to do business here, and is in good standing; that no proceeding is pending for the forfeiture of the certificate of formation of the Company or for the dissolution, voluntary or involuntary, of the Company; that there is no provision of the regulations or certificate of formation of the Company limiting the powers of the members or managers of the Company to adopt the resolutions referred to above and that the resolutions are in conformity with the provisions of the regulations and the certificate of formation of the Company; and that the following persons constitute all of the Members of the Company:

1. Garrett Jennings
2. Vic Antolik

**EXHIBIT 5**



# Exhibit B

Garrett Jennings
Member

Vic Antolik
Member

STATE OF  TEXAS          )

COUNTY OF TRAVIS         )

     Before me,_____, on this day personally appeared Garrett Jennings, proved to me through _____ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that Garrett Jennings  executed the same as the act of Victory Cheval Holdings, LLC , a Texas limited liability company, as its Member, for the purposes and consideration therein expressed.

     Given under my hand and seal of office this _____ day of _____, 2013.

_____
Notary Public, State of Texas
My commission expires: _____

STATE OF  TEXAS          )

COUNTY OF TRAVIS         )

     Before me,_____, on this day personally appeared Garrett Jennings, proved to me through _____ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that Garrett Jennings  executed the same as the act of Victory Cheval Holdings, LLC , a Texas limited liability company, as its Member, for the purposes and consideration therein expressed.

     Given under my hand and seal of office this _____ day of _____, 2013.

_____
Notary Public, State of Texas
My commission expires: _____

**EXHIBIT 5**



**Exhibit B**

# KEMP W. GORTHEY

*Attorney At Law*

*604 West 12th Street*
*Austin, Texas 78701-1718*
*kempgorthey@austin.rr.com*

*Tel: (512) 236-8007*

*Fax: (512) 479-6417*

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on ___7/27/2015___

VELVA L. PRICE
DISTRICT CLERK
By Deputy:

April 7, 2015

Dennis Antolik
Victor Antolik and
All Persons Residing at
13628 Gregg Manor Road
Manor, Texas 78653

Via Certified Mail
Return Receipt Requested
and First Class Mail

Re: 13628 Gregg Manor Road, Manor, Texas 78653

Dear Sirs and Madams:

Please be advised that, effective Monday, April 13, 2015, Castle Crown Management, LLC, and Victory Cheval Holdings, LLC, will no longer pay the utility service at the residence located at the referenced address and will terminate the utility service in their names.

The service is provided by Blue Bonnet Electric.

This correspondence is sent on behalf of the management company, Castle Crown Management, LLC, and the owner of the property, Victory Cheval Holdings, LLC, and is without waiver of any and all claims and rights that either entity may have, including, without limitation, the claim that Dennis Antolik, Victor Antolik and all other occupants of the premises have no legal right to possession or use of the property.

Sincerely,

*Kemp Gorthey*

*Warren Wills*

KG/ch

cc: Mark Taylor
Holmann, Taube & Summers

Via e-mail: MarkT@hts-law.com

cc: Donald R. Taylor
Taylor, Dunham & Rodriguez, LLP

Via e-mail: dtaylor@taylordunham.com



**EXHIBIT 6**

**Exhibit B**

D-1-GN-14-002607

| VICTORY CHEVAL HOLDINGS, LLC | § | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| DENNIS ANTOLIK and | § | |
| VICTOR ANTOLIK, | § | |
| Defendants | § | |
| | § | |
| CHEVAL MANOR, INC. dba AUSTIN | § | TRAVIS COUNTY, TEXAS |
| POLO CLUB, DENNIS ANTOLIK and | § | |
| VICTOR ANTOLIK | § | |
| Counter-Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | |
| VICTORY CHEVAL HOLDINGS, LLC, | § | |
| GARRETT JENNINGS, CASTLE | § | |
| CROWN MANAGEMENT, LLC | § | |
| Counter-Defendants | § | 250th JUDICIAL DISTRICT |

## RESPONSE TO REQUEST FOR APPOINTMENT OF A RECEIVER

Victory Cheval Holdings, LLC, Garrett Jennings and Castle Crown Management, LLC ("Respondents"), respond to Victor Antolik's Request to Appoint a Receiver as follows:

### Factual and Procedural Background

In 2012 and 2013, Garrett Jennings ("Garrett") purchased three apartment complexes in central Texas using Victor Antolik ("Victor") as his broker. In 2013, Victor told Garrett about the possibility of buying the property at issue in this case, an 88 acre tract of land in eastern Travis County near the northwest corner of US 290 and SH 130 (the toll road). The property was owned by Cheval Manor, Inc. ("Cheval Manor"), which was owned 100% by Victor's brother, Dennis Antolik ("Dennis").

Cheval Manor was in bankruptcy and the property was about to be foreclosed. In a hurried up closing due to the pending foreclosure, Victory Cheval Holdings, LLC ("VCH") was formed and purchased the property for $980,000. Victor contributed $100,000, Garrett contributed $828,000,



# Exhibit C

and Dennis provided approximately $63,000 in "credits", consisting of purported advanced rent payments and security deposits, liability for which was assumed by the buyer, VCH, to make up the balance of the purchase price[1]. Garrett was the 51% managing member of VCH with the sole management authority for VCH. Victor was a 49% member with no management authority for VCH. Victor handled the closing on behalf of VCH.

The bankruptcy order confirming Cheval Manor's plan of reorganization authorized sale of the property. It also included a provision providing for the buyer of the property to lease the property back to the debtor, Cheval Manor. Attached to the order was a proposed form of lease between that was between Richard Antolik (brother of Victor and Dennis) as landlord, and Dennis (not the debtor, Cheval Manor) as tenant, providing for lease payments of $4,800 a month for 5 years, with the tenant to pay all expenses of the property, including taxes, insurance, utilities, maintenance, etc. Also attached to the order was a form of a real estate contract, again with Richard Antolik as buyer, providing "Buyer will agree to a mutual leaseback of property to Seller." Nevertheless, at the closing, there was no lease presented for execution or executed. To this day, no lease has ever been executed (or tendered for execution) by VCH. Garrett relied upon his broker, Victor, to handle the transaction, including the closing, and was unaware of any requirement to lease the property back to the debtor.[2]

---

[1] In an open and obvious attempt at "double dipping", Victor and Dennis would later claim that these credits also constituted prepaid rent under the purported lease, thus getting not only a credit on the purchase price of $63,000 but also a credit for $63,000 in prepaid rent.

[2] It is undisputed that a lease was never executed. The issue of whether a lease should be ordered executed by order of specific performance of this Court is not an issue that Respondents believe is relevant to Victor's motion to appoint a receiver or his application for temporary injunction. Nevertheless, VCH notes that it would defend against any such claim of specific performance based, upon, among other things, the doctrines of merger (the agreement to enter into a "mutual leaseback" was not performed or otherwise effectuated at the closing, so that it is "merged" into the deed and no longer enforceable) and waiver (Cheval Manor failed to secure execution of a lease or to comply with any of the obligations of the tenant under the form of lease, including paying rent, ad valorem taxes, insurance or utilities), and Cheval Manor's fraud in claiming the "credits" against the purchase price also constituted credits against lease payments.

2



**Exhibit C**

The closing was at the end of December 2013. In January, Garrett began management of the property through his wholly-owned management company, Castle Crown Management, LLC (the "Castle Crown"). Castle Crown began paying all of the expenses of the property, including past due insurance premiums, taxes, utilities, maintenance, etc., began making improvements to the property, and began collecting revenue from the property, which consisted of fees paid by persons who boarded their horses and used the facilities for their horses.

At the time of the closing, Dennis was living in an approximately 6,000 square foot house on the property. His brother, Victor, was also apparently living there from time to time. Garrett kept Dennis on as part of the transition and worked with him in making initial improvements to the property and bringing in persons to provide on-site management of the property.

At the end of the first month (January 2014), Garrett sent an email to Dennis, saying that Dennis and Victor would need to start paying rent for living at the house and would have to start paying boarding fees for their horses at the property. Garrett also began to send Victor monthly statements of operations, including a statement for 49% of the deficit. Garrett and Victor discussed these statements and negotiated certain items that Victor would not have to pay. Victor then paid his 49% share for the first two months.

At some point in late spring 2014, Garrett was attempting to contact Dennis to follow up on his request that Dennis and Victor start paying rent for the house and boarding fees for their horses, and generally to square up management issues, but was not able to find or communicate with Victor or Dennis, so he hired an attorney, Warren Wills, to attempt to do so. Dennis, apparently realizing that the "free rent" and free money from Garrett to pay for the deferred maintenance and expenses of the property was about to end, sent out a letter in July 2014, claiming *for the first* time a right to lease the property and demanding that Castle Crown and Garrett vacate the property and that all users of the property start paying his company. This was the first time any mention had ever been made about any alleged right to lease the property.

On July 30, 2014, Garrett filed this lawsuit, asking for a TRO and temporary injunction to,

3



**Exhibit C**

among other things, remove Dennis and Victor and their animals from the property. A TRO was issued. At the temporary injunction hearing, the parties agreed on a settlement under which Garrett would buy out Victor's and Dennis' interest for an agreed amount of money. The settlement, however, was not read into the record because the parties wanted to keep the amount of the payment of confidential. Within a few days thereafter Victor and Dennis fired their prior attorneys, Modesett Williams, retained current counsel, and reneged on the agreement. Respondents believe Modesett Williams was fired because they refused to reduce percentage of the settlement amount they would otherwise receive under a contingency fee arrangement.

On September 14, 2014, the seller/debtor, Cheval Manor, filed an adversary proceeding in the Bankruptcy Court seeking an order requiring that VCH lease the property to Cheval Manor. After expedited discovery and filings of stipulated facts, the Bankruptcy Judge, Tony Davis, conducted a hearing and ruled on March 11, 2015 that the Court was going to abstain from exercising jurisdiction in the matter. In his ruling stating the basis for his decision, Judge Davis referred to the fact that the Debtor had not secured an executed lease at the closing and had waited so long to pursue its claims that it should have a lease.

On March 12, 2015, VCH and Castle Crown filed an eviction proceeding in the Justice Court, Precinct 1, which was tried before a jury on May 11, 2015. The jury returned a verdict in favor of the Defendants, and judgment was entered on the verdict on May 22, 2015. That judgment is now on appeal to the Travis County Court at Law, where VCH and Castle Crown have filed a Motion for Summary Judgment.[3]

---

[3] Victor apparently intends to argue that he should be entitled to a receivership or that Respondents should be removed from the current status of co-possession of the property based upon the judgment of the Justice Court. This is totally baseless argument. The judgment of the Justice Court is on appeal and is, therefore, not final. It expressly states that no writ of possession may be issued based upon the judgment. Furthermore, Rule 510.8(d)(3), Tex. R. Civ. P., specifically states that a writ of possession will not issue if an appeal is taken from a judgment in an eviction case. Finally, the judgment does not award the Antoliks any affirmative relief (nor did they claim any). It only orders that the Antoliks may "remain" in possession of the property. It does not purport to affect the status quo. It does not award Victor or Dennis *exclusive* possession of the property or otherwise in any way affect the right of the owner of the property, VCH, and its management company, Castle Crown, to continue operation of a business on the property.



4

**Exhibit C**

Victor now seeks to remove Castle Crown and Garrett from management of the property, either through appointment of a receiver or through a temporary injunction. Victor apparently seeks to appoint either himself as the person in charge of day-to-day management, or a receiver or a "property management company" (who will then presumably allow Victor or Dennis to be the person in charge of day-to-day management).

## Applicable Law

Receivership is one of the harshest remedies at law. *Davenport v. Wood Motor Co.*, 107 S.W.2d 1093, 1093 (Tex. Civ. App. Austin 1937); *Krumnow v. Krumnow*, 174 S.W.3d 820, 828 (Tex. App. Waco 2005) ("Receivership is an extraordinarily harsh remedy and one that courts are particularly loathe to utilize."). It is warranted "only if the evidence shows a threat of serious injury to the applicant." *Benefield v. State*, 266 S.W.3d 25, 31 (Tex. App. 2008). The remedy must be "cautiously applied, and - receivers should not be appointed except on a clear showing that the applicant's rights imperatively demand it." *Davis v. Hudgins*, 225 S.W. 73, 77 (Tex. Civ. App. Dallas 1920). "The requirement of demonstrable inadequacy of alternative remedies is consistent with the general principle that appointment of receiver is a harsh remedy." *Balias v. Balias, Inc.*, 748 S.W.2d 253, 257 (Tex. App. 1988), writ denied (July 13, 1988).

Victor asks that the Court appoint a receiver of the property under several statutes. Each requires proof of certain elements to justify appointment of a receiver. There is no evidence to establish these elements.

## Section 64.001(a)(3), Tex. Civ. Prac. & Rem. Code

Section 64.001(a)(3) authorizes appointment of a receiver "in an action between partners or others jointly owning or interested in any property or fund." Section 64.001(b) provides that, as a requirement to appointment of a receiver under subsection (3), "[t]he property or fund must be in danger of being lost, removed, or materially injured." There is no evidence that the Cheval Manor property is in danger of being lost, removed, or materially injured as a result of the actions of Respondents. There is, however, evidence that the property is being materially injured by the

5



**Exhibit C**

Antoliks.

## Section 64.001(a)(5), Tex. Civ. Prac. & Rem. Code

Section 64.001(a)(5) authorizes appointment of a receiver for a corporation that is insolvent, in eminent danger of insolvency, has been dissolved, or has forfeited its corporate rights. VCH is not insolvent or in imminent danger of insolvency, nor has it been dissolved or forfeited its corporate rights.

## Section 64.001(a)(6), Tex. Civ. Prac. & Rem. Code

Section 64.001(a)(6) authorizes appointment of a receiver in any other case in which a receiver may be appointed under rules of equity. Appointment of a receiver under this subsection requires pleading and proof that the entity over which a receivership is sought to be appointed is insolvent. *Hawkins v. Twin Montana, Inc.*, 810 S.W.2d 441, 444 (Tex.App.-Ft. Worth 1991, no writ). There is no evidence of insolvency.

## Section 11.403, Tex. Bus. Org. Code

Subject to the requirements in subsection (b), a court may appoint a receiver under Section 11.403 in an action between partners or others jointly owning or interested in a property; or in which receivers for specific property have been previously appointed by courts of equity.

The requirements under subsection (b) are:

(1)     the property is in danger of being lost, removed, or materially injured;

(2)     circumstances exist that are considered by the court to necessitate the appointment of a receiver to conserve the property and avoid damage to interested parties;

(3)     all other requirements of law are complied with; and

(4)     the court determines that other available legal and equitable remedies are inadequate.

Again, there is no evidence that the property is in danger of being lost, removed, or materially injured as a result of the actions of Respondents, while there is ample evidence that the property is being materially injured by the Antoliks.

6



## Exhibit C

## Section 11.404, Tex. Bus. Org. Code

Subject to requirements in (b), the material elements of proof to support appointment of a receiver under Section 11.404 are that the entity is insolvent or in imminent danger of insolvency; the governing persons of the entity are deadlocked in the management of the entity's affairs, the owners or members of the entity are unable to break the deadlock, and irreparable injury to the entity is being suffered or is threatened because of the deadlock; the actions of the governing persons of the entity are illegal, oppressive, or fraudulent; or the property of the entity is being misapplied or wasted.

The requirements under subsection (b) are:

(1)     Circumstances exist that are considered by the court to necessitate the appointment of a receiver to conserve the property and business of the domestic entity and avoid damage to interested parties;

(2)     All other requirements of law are complied with; and

(3)     The court determines that all other available legal and equitable remedies, including the appointment of a receiver for specific property of the domestic entity under Section 11.402(a), are inadequate.

The sole managing member of VCH is Garrett. Therefore, there is no deadlock in management. Further, there is no evidence that VCH is insolvent or in imminent danger of insolvency, that irreparable injury to VCH is being suffered, that the actions of Respondents are illegal, oppressive or fraudulent, or that its property is being misapplied or wasted.

### Summary

There is no basis for appointment of a receiver. Any harm that is being suffered by VCH or to the property is the result of actions (including what Respondents respectfully submit are deliberate actions to sabotage the property) by Victor and Dennis, not actions of Respondents. Receivership is an equitable remedy and the overwhelming evidence of unclean hands on the part of the Antoliks clearly precludes any equitable relief.

7



# Exhibit C

The property has been managed as well as it can be under difficult circumstances. Victor and Dennis are essentially squatters on the property, living rent free in the house where Victor maintains cages and runs a dog boarding operation that has resulted in cancellation of insurance for the property. Dennis keeps over a dozen horses on the property (also rent free). He lets them run free throughout the property, which has resulted in damage to the property and to persons on the property. For example, after the heavy rains in May, he let them run free over the polo fields, resulting in enormous ruts and gouges that will cost tens of thousands of dollars to repair. Garrett has poured over $200,000 of his own money into the property and has taken nothing out of the property. The evidence will show that a majority of the horse boarders at the property will leave if either Victor or Dennis is put in charge of the property.

Victor's application is a tactical ploy to attempt to put pressure on Garrett to come back to the settlement table and pay more than what Victor and Dennis walked away from last summer. Nothing material has changed since this suit was filed. Nothing has happened that now requires removal of management. Victor's application should be denied.

WHEREFORE, Respondents respectfully pray that the Court deny Victor's request for a receiver. Respondents further pray for general relief.

Respectfully submitted,

/s/ Kemp Gorthey
KEMP W. GORTHEY
State Bar No. 08221275
Kendall L. Bryant
State Bar No. 24058660
**THE GORTHEY LAW FIRM**
604 West 12th Street
Austin, Texas 78701
Tele: 512/236-8007
Fax: 512/479-6417
Email: kempgorthey@austin.rr.com
ATTORNEY FOR GARRETT JENNINGS AND CASTLE CROWN PROPERTIES MANAGEMENT, LLC



8

**Exhibit C**

and

PEYTON N. SMITH
Attorney in Charge
State Bar #: 18664350
Eric Moskowitz
State Bar #: 24089904
Brian L. King
State Bar #24055776
**REED & SCANDINO LLP**
301 Congress Avenue, Suite 1250
Austin, Texas 78701
Tel: 512/474-2449
Fax: 512/474-2622
psmith@reedscardino.com
emoskowitdz@reedscardino.com
ATTORNEY FOR PLAINTIFF/COUNTER
DEFENDANT VICTORY CHEVAL
HOLDINGS, LLC

## CERTIFICATE OF SERVICE

By my signature above, I hereby certify that a true and correct copy of the above and foregoing Response to Request for Appointment of a Receiver was served on the following parties on June 19, 2015 as follows:

Donald R. Taylor                    Via e-mail
Isabelle M. Antongiorgi
Taylor, Dunham & Rodriguez, LLP
301 Congress Avenue, Suite 1050
Austin, Texas 78701
dtaylor@taylordunham.com
ima@taylordunham.com

Mark Taylor
Taube Summers Harrison Taylor Meinzer Brown LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
mtaylor@taubesummers.com

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on ___7/27/2015___

VELVA L. PRICE
DISTRICT CLERK
By Deputy:



9

**Exhibit C**

## AFFIDAVIT OF JOHN GREENING

THE STATE OF TEXAS    §
                      §
COUNTY OF TRAVIS      §

BEFORE ME, the undersigned authority, on this day personally appeared John Greening, who, being by me first duly sworn, deposed and stated:

1.    My name is John Greening. I am over 21 years old and I am competent in all respects to make this affidavit. I have personal knowledge of the facts and matters stated herein, and they are true and correct.

2.    For the past 3 years, Joe Trimble and I have collected from the persons who play polo at the Gregg Manor property "green fees" of $1,250 - 1,500 per person. We are in the process of collecting green fees for this coming polo season which begins September 1, 2015. We intend to use these funds to pay for repairs to the polo field caused by Dennis Antolik letting his horses (approximately 13) run free on the property after the torrential rains in late May soaked it and turned it into a bog. The horses roaming on the polo field in that condition caused holes and ruts to be made by the weight of the horses. We have mowed the field and have examined it and secured bids to repair it so that it will be ready for the polo season that begins September 1, 2015.

3.    Once the field is repaired, it will need to be maintained, which involves watering it. Unless it rains, it needs to be watered at least every 2-3 weeks. We do this by renting a pump at a cost of approximately $1,000 a week that takes about $700 per week worth of diesel to run. The green fees we collect would be used for this purpose.

4.    If we cannot assure the persons who pay the green fees that the green fees will be used to repair and maintain the polo field, we will not ask for them and they will not pay them. This will result in inability to use the property for polo for the first time in approximately twelve years. This would include loss of a major polo event, Victory Cup & YMBL "Boots & Pearls", scheduled for October 17, 2015, which is expected to draw an estimated 3,000 plus persons.

**Exhibit D**

5. As I stated in my Affidavit of June 14, 2015, a copy of which is attached, and as I testified at the hearing on June 22, 2015, I do not have any confidence in Dennis Antolik or his company, Cheval Manor, Inc., being able to manage the day-to-day boarding operation. If he is given control, I will withdraw my horses from the property and believe the other horse boarders, in particular Joe Trimble and his wife, Suzanne may also.

6. I will not pay money to keep my horses at the facility unless I know that the money will be used to feed and maintain them properly. I do not have confidence in the ability of Dennis Antolik/Cheval Manor, Inc., to do this. I say this based upon my experience having boarded horses at the facility since 2005. During the fall of 2013, in the months before the sale of the property, Dennis Antolik/Cheval Manor, Inc. was in charge and was low on funds, the horses were not given enough food to maintain a healthy weight. I supplemented my horses feed by putting 1,000 pound round bales into the paddock where only my horses were kept to ensure that they had enough food. Upon seeing the round bales, Dennis stopped feeding my horses completely.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

**Exhibit D**



_____
JOHN GREENING,                  AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME by JOHN GREENING on this ___24___ day of July, 2015, to certify which witness my hand and seal of office.



ALISSA LINN PARSLEY
My Commission Expires
November 15, 2016

_____
NOTARY PUBLIC, STATE OF TEXAS

**Exhibit D**

AFFIDAVIT OF JOHN GREENING

BEFORE ME, the undersigned authority, on this day personally appeared John Greening, who being by me first duly sworn, deposed and stated:

1.    My name is John Greening. I am over 21 years old and I am competent in all respects to make this affidavit. I have personal knowledge of the facts and matters stated herein, and they are true and correct.

2.    It came to my attention that the lawyers for Victor Antolik made statements this morning in Court concerning the status of my horse boarding at the property located at 13628 Gregg Manor Road, Manor, Texas ("the Property"). I have temporarily moved my horses to Elgin, Texas for 2 reasons: (1) I need to have several of them exercised and worked to be ready for the fall polo season; and (2) I have a lame horse that needs to be close to the Vet who lives in Elgin. When I moved the horses, I contacted Shay Pfiefer and informed her of the temporary status. As I told Shay Pfeifer at the time, I have paid full board for my horses for July and plan to continue paying boarding for August and beyond. I was never contacted by either Dennis or Victor Antolik about my intentions.

3.    It further came to my attention that the Court would not consider my June 22, 2015 email expressing the boarders' thoughts on who should be in control of the boarding operation because it was not given under oath. I provided this guidance only after the June 22, 2015 was concluded and the Court asked for the parties to work together to reach agreement. As stated in my email, I recommend the following interim solution:

1. Require Dennis Antolik to keep his horses contained in the NW pasture (where they are located today) and provide for the care and feeding of his horses only

2. Allow Shay Pfieffer to continue to provide for the care and feeding off the boarder horses - supplement Shay during the daytime hours with Javier & Vannessa Insua to clean-up the property and assist with acquisition of boarders. Javier Insua is a polo professional, horseman, trainer, who works for me. He will return to Austin on September 1, 2015 and can bring a number of paying boarders

**Exhibit D**

with him. In the interim his wife, Vanessa, can come to the property during the daytime when Shay is not on the property. Vanessa has worked with horses with Javier for the last 11 years and would be in a position to oversee all daytime activities. Shay would be there at night so there would be 24 hour coverage for the horses. Vanessa can also clean up and maintain the grounds while she is there. I believe this is the only option that will provide full 24 hour care for the horses on the Property.

3. Have Veterinarian DVM Jonathan Cohen come to the property every other week to do a quick assessment of the horses.

4. I have spoken to the two other boarders with horses on the Property, Joe Trimble and George Humphrey, and both expressed agreement with this solution. As the boarders paying boarding fees on the property, we feel this would be the best solution for the care of all the horses on the Property.

5. Further, as I testified at the hearing on June 22, 2015, I do not have any confidence in Dennis Antolik being able to manage the day to day boarding operation. If he is given control, I will withdraw my horses from the Property and believe the other boarders will do the same.

FURTHER AFFIANT SAITH NOT.

JOHN GREENING,         AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME by JOHN GREENING on this ____ day of July, 2015, to certify which witness my hand and seal of office.



CLINT PARSLEY
Notary Public, State of Texas
My Commission Expires
December 22, 2015

NOTARY PUBLIC, STATE OF TEXAS

**Exhibit D**

AFFIDAVIT OF PAULA ECKBERG

BEFORE ME, the undersigned authority, on this day personally appeared PAULA ECKBERG, who being by me first duly sworn, deposed and stated:

1.  My name is PAULA ECKBERG. I am over 21 years old and I am competent in all respects to make this affidavit. I have personal knowledge of the facts and matters stated herein, and they are true and correct.

2.  I am the Accounting Manager for Castle Crown Management, LLC, who manages the horse boarding operation at the property located at 13628 Gregg Manor Road, Manor, Texas. I am responsible for the collection and accounting of monies paid by persons to board horses at the property. Attached is a true and correct copy of the current Rent Roll reflecting the names of all persons who board horses at the facility, and the amount of monthly rent they pay.

FURTHER AFFIANT SAITH NOT.

_____
PAULA ECKBERG,                    AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME by PAULA ECKBERG on this _____ day of July, 2015, to certify which witness my hand and seal of office.



_____
NOTARY PUBLIC, STATE OF CALIFORNIA

C. VANDENBURG
COMM. # 2087538
NOTARY PUBLIC ● CALIFORNIA
VENTURA COUNTY
Comm. Exp. OCT. 25, 2018

**Exhibit E**

# Rent Roll

**Properties:** Victory Cheval Holdings, LLC - 13628 Gregg Manor Rd. Manor, TX 78653

**Units:** Active

**As of:** 07/14/2015

| Unit | Tenant | Status | Rent | Deposit | Move-in | Move-out |
|------|--------|--------|------|---------|---------|----------|
| Victory Cheval Holdings, LLC - 13628 Gregg Manor Rd. Manor, TX 78653 | | | | | | |
| Barn Apartment | Shay Pfeiffer | Current | 975.00 | 0.00 | 06/01/2014 | |
| Paddock 1 | | Vacant-Unrented | | 0.00 | | |
| Pasture 1 | | Vacant-Unrented | | 0.00 | | |
| Pasture 2 | April Lucas | Current | 325.00 | 0.00 | 01/01/2014 | |
| Pasture 3 | George Humphrey | Current | 900.00 | 0.00 | 05/01/2014 | |
| Pasture 4 | | Vacant-Unrented | | 0.00 | | |
| Pasture 5 | | Vacant-Unrented | | 0.00 | | |
| Pasture 6 | | Vacant-Unrented | | 0.00 | | |
| Pasture 7 | | Vacant-Unrented | | 0.00 | | |
| Private Pasture | John Greening | Current | 1,200.00 | 0.00 | 02/01/2014 | |
| Stall 1 | | Vacant-Unrented | | 0.00 | | |
| Stall 10 | | Vacant-Unrented | | 0.00 | | |
| Stall 16 | | Vacant-Unrented | | 0.00 | | |
| Stall 2 | | Vacant-Unrented | | 0.00 | | |
| Stall 3 | | Vacant-Unrented | | 0.00 | | |
| Stall 5 | | Vacant-Unrented | | 0.00 | | |
| Stall 6 | Suzanne Trimble | Current | 920.00 | 0.00 | 01/01/2014 | |
| Stall 8 | Suzanne Trimble | Current | 0.00 | 0.00 | 01/01/2014 | |
| 18 Units | | 33.3% Occupied | 4,320.00 | 0.00 | | |
| | | | | | | |
| Total 18 Units | | 33.3% Occupied | 4,320.00 | 0.00 | | |

# Exhibit E

<u>AFFIDAVIT OF GARRETT JENNINGS</u>

| | |
|---|---|
| THE STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF VENTURA | § |

BEFORE ME, the undersigned authority, on this day personally appeared Garrett Jennings, who, being by me first duly sworn, deposed and stated:

1.      My name is Garrett Jennings.  I am over 21 years old and I am competent in all respects to make this affidavit.  I have personal knowledge of the facts and matters stated herein, and they are true and correct.

2.      I am the Managing Member of Victory Cheval Holdings, LLC ("VCH") and the owner of Castle Crown Management, LLC. Attached as **Exhibit "A"** is the Unanimous Written Consent naming me as Managing Member.

3.      VCH is owned 51% by me as Managing Member and 49% by Victor Antolik as Member. A copy of the Company Agreement of VCH is attached as **Exhibit "B"**.

4.      I have read the factual allegations contained in (a) the "Factual and Procedural Background" section of the Response to Request for Appointment of Receiver filed herein as Exhibit C to Appellants' Motion to Stay Temporary Injunction and (b) paragraphs A through D of Appellants' Motion to Stay Temporary Injunction, and state on oath that they are true and correct.

5.      The property at issue in this case has been operating at a deficit since January 2014. The income from the horse boarders is not sufficient to pay the expenses associated with the boarding operations. I have had to contribute funds on a monthly basis in order for the operation to stay in business.

6.      There is not enough revenue from the boarding operations to pay the expenses described in paragraph C.3. of the Temporary Injunction.

7.      If the polo fields are not repaired before the start of the polo season, the business will be unable to open for the polo players, the event described in the Affidavit of John Greening will

**Exhibit F**

not be able to take place, and as a result, the business will be substantially harmed.

8. There is no immediate or irreparable harm to the business. The harm to the business was due to Mr. Antolik's horses damaging the polo fields and causing danger to people. Mr. Antolik has agreed to keep his horses confined in the pasture, therefore, any immediate or irreparable harm has been remedied.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**Exhibit F**

GARRETT JENNINGS,                              AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME by GARRETT JENNINGS on this
27th day of July, 2015, to certify which witness my hand and seal of office.

C. VANDENBURG
COMM. # 2087538
NOTARY PUBLIC • CALIFORNIA
VENTURA COUNTY
Comm. Exp. OCT. 25, 2018

NOTARY PUBLIC, STATE OF CALIFORNIA

**Exhibit F**

## UNANIMOUS WRITTEN CONSENT IN LIEU OF
## ORGANIZATIONAL MEETING OF MEMBERS OF
## VICTORY CHEVAL HOLDINGS, LLC
## A LIMITED LIABILITY COMPANY

The undersigned, being the Members named in Victory Cheval Holdings, LLC (hereinafter the "Company") Certificate of Formation filed with the Secretary of State of Texas, hereby adopts the following resolutions in lieu of an organizational meeting of the Members.

### CERTIFICATE OF FORMATION

RESOLVED, that the acknowledgment of filing issued by the Secretary of State of Texas, and the certified copy of the Certificate of Formation filed on November 22, 2013 are accepted and approved in all respects; and the Secretary is directed to place same in the Company record book.

### COMPANY AGREEMENT

RESOLVED, that the form of the company agreement for regulating and managing Company affairs submitted to the undersigned is approved and adopted as the Company Agreement of the Company.

RESOLVED, that the secretary is directed to place the Company Agreement in the Company record book, and maintain a copy of the Company Agreement at the Company's principal office.

### PRINCIPAL OFFICE

RESOLVED, that the Company's principal office be established and maintained at 13628 Gregg Manor, Manor, Texas 78653, and that meetings of the Members from time to time may be held either at the Company's principal office or at such other place as the Members may select.

### OFFICERS

RESOLVED, that the following persons were nominated to the office preceding their name:

| Office | Officeholder |
|---|---|
| Managing Member | Garrett Jennings |
| Member | Vic Antolik |

### MEMBERSHIP INTEREST CERTIFICATES

Plaintiff 0479

RESOLVED, that the specimen Membership interest certificate proposed for use as the Company's certificate for Membership interest is adopted as the Company's form of Membership Interest Certificate; and

RESOLVED FURTHER, that the specimen Membership Interest Certificate be appended to the minutes of the meeting.

## COMPANY RECORD BOOK

RESOLVED, that the Company, through its secretary, shall maintain and authenticate in the Company record book the appropriate business records, including but not limited to originals, copies or certified copies of the Company's Certificate of Formation, the Acknowledgment of Filing, the Company Agreement, the Membership Interest transfer ledger, minutes of the meetings and of other proceedings of the Memberss, Managers, and any committee established by the Managers; and

RESOLVED FURTHER, that the secretary is to maintain in the Company record book records pertaining to the issuance and transfer of Membership Interest in the Membership Interest Certificate stubs and Membership Interest transfer ledger respectively.

## MEMBERSHIP INTEREST ISSUED

RESOLVED, that the Members be, and hereby is, authorized to issue from time to time authorized Membership Interests of the Company for money paid, labor done, promissory note, or personal property or real estate or leases thereof actually acquired and upon such terms as the Members in the Members's discretion may determine; and

RESOLVED FURTHER, than an offer be issued to the following to purchase one hundred percent (100%) of the Membership Interest of the Company in the percentages and for the consideration indicated opposite each name:

| Members's Name | Members's Interest | Consideration |
|---|---|---|
| Garrett Jennings | 51% | $510.00 |
| Vic Antolik | 49% | $490.00 |

RESOLVED, that the Members is authorized to issue additional Membership Interest to appropriately qualified purchasers.

## COMMENCING BUSINESS

RESOLVED, that consideration has been received for the issuance of Membership Interest, and that the Company consequently is able to commence and transact business and to incur indebtedness.

Plaintiff 0480

Exhibit A
## Exhibit F

## ORGANIZATIONAL EXPENSES

RESOLVED, that the Company treasurer be and hereby is authorized to pay all charges and expenses incident to or arising out of the organization of and to reimburse any person who has made any disbursement therefor.

## BANK ACCOUNT

RESOLVED, that the treasurer be and hereby is authorized to open a bank account on the Company's behalf with any banks the Members deems appropriate.

## LICENSES AND PERMITS

RESOLVED, that Company officers are directed to obtain in the Company's name such other licenses and tax permits as may be required for the conduct of Company business by any federal, state, county, or municipal governmental statute, ordinance, or regulations, and are directed and authorized to do all things necessary or convenient to qualify to transact Company business in compliance with the laws and regulations of any appropriate federal, state, or municipal governmental authority.

## OTHER STATES

RESOLVED, that for the purpose of authorizing the Company to do business in any state, territory or dependency of the United States or any foreign country in which it is necessary or expedient for the Company to transact business, the proper Company officers are hereby authorized to appoint and substitute all necessary agents or attorneys for service of process, to designate and change the location of all necessary statutory offices and to make and file all necessary certificates, reports, powers of attorney and other instruments as may be required by the laws of such state, territory, dependency or country to authorize the Company to transact business therein.

## FISCAL YEAR

RESOLVED, that the Company fiscal year shall begin on January 1, and end on December 31, subject to change by resolution, as appropriate, at the discretion of the Members.

## CARRY ON BUSINESS

RESOLVED, that the signing of these minutes shall constitute full consent, confirmation, ratification, adoption and approval of the holding of the above meeting, the actions hereby taken, the resolutions herein adopted and waiver of notice of the meeting by the signatories.

Plaintiff 0481

Dated: December 3, 2013

Garrett Jennings

Vic Antolik

A true copy of each of the following papers referred to in the foregoing minutes is appended hereto:

Specimen Membership Interest Certificate

Plaintiff 0482

Exhibit A

**Exhibit F**

COMPANY AGREEMENT
OF
VICTORY CHEVAL HOLDINGS, LLC,
a Texas Limited Liability Company

This Company Agreement of **VICTORY CHEVAL HOLDINGS, LLC** is executed as of November 22, 2013 (the "Effective Date") by the persons who sign and are identified as "Members" in this Agreement.

## ARTICLE I
## DEFINITIONS

1.01 **Definitions.** As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or a portion of the Membership Interest of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

Plaintiff 0691

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Company" means VICTORY CHEVAL HOLDINGS, LLC, a Texas limited liability company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however, this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Internal Revenue Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

Plaintiff 0692

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any indebtedness to which the asset is subject when contributed.

"Percentage Interest" means the ratio in which the Members shall share profits and losses, as provided in this Agreement. The sum of the Members' Percentage Interests shall be one hundred percent (100%).

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Simple Majority" means one or more Members having among them more than fifty percent (50%) of the Percentage Interests of all Members.

"Super Majority" means one or more Members having among them more than sixty-six and sixty-seven hundredths percent (66.67%) of the Percentage Interests of all Members.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

Plaintiff 0693

Exhibit B
# Exhibit F

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02 **Name.** The name of the Company is "VICTORY CHEVAL HOLDINGS, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Members may select from time to time.

2.03 **Registered Office and Registered Agent.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Members may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Members may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Members may designate from time to time.

2.05 **Purposes.** The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06 **Powers.** The Company shall have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Members shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Members, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. Each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Plaintiff 0694

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Commitments, and Percentage Interests.** The persons listed on Exhibit A are hereby admitted to the Company as a Member, effective contemporaneously with the Effective Date of formation of the Company. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Commitment and its Percentage Interest. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member is acquiring an interest in the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. The Member will not transfer such interest in contravention of that act or any applicable state or federal securities laws.

3.02 **Additional Members.** Additional persons may be admitted to the Company as Additional Members on such terms and conditions as shall be determined by a Simple Majority of the Members. The terms of admission or issuance must specify the Percentage Interests and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties. The Members shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Members.

3.03 **Member Rights Specified in Agreement.** Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

Plaintiff 0695

3.05 **Liability to Third Parties.** No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.06 **Withdrawal.** A Member may withdraw from the Company with sixty (60) days notice to the Members of the Company, subject to winding up or termination as provided in Article XVI of this Agreement.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Contemporaneously with the execution of this Agreement, each Member shall make the initial Capital Contribution described for that Member in Exhibit A.

4.02 **No Further Contributions.** No Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Loans by Members.** If the Company does not have sufficient cash to pay its obligations, any Member that may agree to do so with the Members' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this paragraph constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of

**Plaintiff 0696**

expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

### 5.01  Allocations.

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Percentage Interests.

(b) All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this paragraph 5.01(c) were not in this Agreement.

Plaintiff 0697

5.02  Distributions.

(a) From time to time (but at least once each calendar quarter) the Members shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Members shall cause the Company to distribute to the Members, in accordance with their Percentage Interests, an amount in cash equal to that excess.

(b) From time to time the Members also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Percentage Interests and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

## ARTICLE VI
## MANAGEMENT

6.01  **Management by Members.**  The management of the Company is fully reserved to its Members in proportion to the Members' respective Percentage Interests, the Members shall have the sole and exclusive control of the management, business and affairs of the Company, and the Members shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the Company;

Plaintiff 0698

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in paragraph 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Members, to exercise any authority of the Members in the management, business and affairs of the Company.

6.02 **Restrictions.** Notwithstanding the provisions of paragraph 6.01 of this Agreement, the Members may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) possess Company property or assign rights in Company property, other than for a Company purpose; or

(e) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Conflicts of Interest.** Subject to the other express provisions of this Agreement, each Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member or officer the right to participate therein. The Company may transact business with any Member, officer or Affiliate thereof, provided the contract or transaction is fair to the Company as of the time it is authorized or ratified by Members.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information.** The Members acknowledge that, from time to time,

**Plaintiff 0699**

Exhibit B
# Exhibit F

they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member, except for disclosures (i) compelled by law (but the Member must notify the Members promptly of any request for that information, before disclosing it, if practicable), (ii) to advisers or representatives of the Member or persons to which that Member's Membership Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this paragraph, or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality.

7.02. **Specific Performance.** The Members acknowledge that breach of the provisions of paragraph 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of paragraph 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members if the holders of a Simple Majority are represented at the meeting in person or by proxy. With respect to any matter (including a Fundamental Business Transaction), other than a matter for which the affirmative vote of the holders of a specified portion of the Percentage Interests of all Members entitled to vote is required by the TBOC or this Agreement, the affirmative vote of a Simple Majority at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to paragraph 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

Plaintiff 0700

(d) An annual meeting of the Members for the transaction of other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Members shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the holders of at least ten percent of the Percentage Interests of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be given when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in paragraph 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Members declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

(h) Notice of meetings may be given to Members by facsimile or electronic message (e-mail).

8.02  Voting List.  The Members shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Percentage Interests held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this paragraph shall not affect the validity of any action taken at the meeting.

8.03  Proxies.  A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this paragraph. Proxies for use at any

**Plaintiff 0701**

meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Members, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Percentage Interests that are the subject of such proxy are to be voted with respect to such issue.

8.04 **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be designated by a Simple Majority of the Members. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.05 **Action by Unanimous Written Consent Without Meeting.**

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this paragraph, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Members. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Members. Every written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this paragraph. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Members. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Members.

**Plaintiff 0702**

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.06    **Action by Telephone Conference or Other Remote Communications Technology.**    Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other.    Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant.    Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.07    **Classes of Members; Voting.**    At an annual or special meeting called for that purpose, the Members may from time to time establish classes or groups of Members.    One or more of the Members' groups or classes may have certain expressed relative rights, powers, and duties, including voting rights, to be established at the time when the classes or groups are created, with seniority granted to one or more class or group as designated by the Members.

## ARTICLE IX
## OFFICERS

9.01    **Qualification.**    The Members may, from time to time, designate one or more persons to be officers of the Company.    No officer need be a resident of the State of Texas or a Member.    Any officers so designated shall have such authority and perform such duties as the Members may, from time to time, delegate to them.    The Members may assign titles to particular officers.    Unless the Members decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Members pursuant to this paragraph. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided.    Any vacancy occurring in any office of the Company may be filled by the Members. Any number of offices may be held by the one person.

9.02.    **Compensation.**    The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Members.    However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

Plaintiff 0703

9.03. **Resignation.** Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Members. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal.** Any officer may be removed as such, either with or without cause, by the Members whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

ARTICLE X

INDEMNIFICATION

10.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member of the Company or while a Member of the Company is or was serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under paragraph 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately

Plaintiff 0704

be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Members, may indemnify and advance or reimburse expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Members under this Article; and, the Company may indemnify and advance or reimburse expenses to persons who are not or were not officers, employees, or agents of the Company but who are or were serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Members under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or other person indemnified pursuant to paragraph 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Members or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a officer, employee or agent of the Company or is or was serving at the request of the Company as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement

**Plaintiff 0705**

with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01  **Tax Returns.**  The Members shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in paragraph 11.02 of this Agreement.  Each Member shall furnish to the Members all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02  **Tax Elections.**  The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of a Membership Interest as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Members may deem appropriate and in the best interest of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

11.03  **"Tax Matters Partner."**  A Simple Majority of the Members shall designate one Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code.  Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code.  Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth

**Plaintiff 0706**

Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Section 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members and each committee of the Members. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Members shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Members determine. The Members may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Members' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01 **Limited Right to Transfer.** No Member or Assignee shall make any Transfer of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with the consent of a Simple Majority of the Members; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*.

13.02 **Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Membership Interest of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

**Plaintiff 0707**

(b) In the event that the Members make additional contributions to the Company which the Membership Interest is held by an Assignee, the Assignor Member and its Assignee shall be jointly and severally liable for the corresponding contribution in connection with the Membership Interest held by Assignee. If the Assignor Member or Assignee does not make such contribution in accordance with the provisions of this Agreement, then the Assignor Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members increase their Membership Interest, the Membership Interest of the Assignee may be correspondingly reduced and no consent or other action on the part of such Assignee shall be required.

13.03 **Legal Opinion.** For the right of a Member to transfer a Membership Interest or any part thereof or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must receive an opinion from legal counsel acceptable to the Members that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Members, however, may waive the requirements of this paragraph.

13.04 **Admission as Substituted Member.** An Assignee has the right to be admitted to the Company as a Substituted Member with the Percentage Interest and the Capital Commitment so transferred to such person, in the event that:

(a) the Member making such Transfer grants the Assignee the right to be so admitted;

(b) such Transfer is consented to in accordance with paragraph 13.01 of this Agreement; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Members, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Percentage Interests and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Membership Interest of part thereof is transferred (which together must total the Percentage Interest and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05 **Transfer to Existing Member.** In the event of a Transfer to an existing Member, the existing Member shall be automatically deemed to be a Substituted Member.

13.06 **Third Party Offer.** In the event a Member desires to sell all or any portion of its

**Plaintiff 0708**

Membership Interest to another person (other than an existing Member), the selling Member shall first offer to sell the Membership Interest to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Membership Interest, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have fifteen (15) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Membership Interest upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Membership Interest, each of the purchasing Members shall purchase a portion of the Membership Interest that is proportional to that Member's Percentage Interest. If none of the other Members give notification within fifteen (15) days of an intention to purchase the Membership Interest, then the selling Member shall be permitted to sell the Membership Interest to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses.** The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in paragraph 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF MEMBERSHIP INTEREST

14.01 **Termination of Marital Relationship.**

(a) If the marital relationship of a Member is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Membership Interest (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Membership Interest or as a trustee of a trust holding such Membership Interest, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Membership Interest to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Membership Interest of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the

**Plaintiff 0709**

Membership Interest at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Membership Interest for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member.** Commencing upon the death of a Member, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Membership Interest at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of a Simple Majority of the surviving Members. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Membership Interest at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse and executors or administrators of the deceased Member) shall sell all of the deceased Member's Membership Interest to the Company and/or the other Members in accordance with the option or obligation established by this paragraph.

14.03 **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Members to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Membership Interest at Fair Value (determined as of the date that notice of the exercise of such option is given by the Members); provided, however, the exercise of said option shall require the approval of a Simple Majority of the other Members. In the event that notice of the exercise of such option is given by the Members to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its interest to the Company as provided by this Article.

14.04 **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Membership Interest under paragraph 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Membership Interests to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Membership Interest.

14.05 **Option by Other Members.** If the Company fails or declines to exercise an option to purchase a Membership Interest of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Membership Interest in such proportions as they mutually agree or in proportion to their respective Percentage Interests for the same price and upon the same terms available to the Company.

14.06 **Exercise of Option.** Any option to purchase a Membership Interest as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the

Plaintiff 0710

form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07  **Determination of Fair Value.**  The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Membership Interests pursuant to this Agreement.  In the event that the Fair Value of a Membership Interest is to be determined under this Agreement, the Members shall select a qualified independent appraiser to make such determination, and the Members shall make the books and records available to the appraiser for such purpose.  The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of a Membership Interest.

14.08  **Fees and Expenses of Appraiser.**  In the case of a purchase and sale of Membership Interest under paragraph 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company.  In the case of a purchase and sale of Membership Interest under paragraph 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company.  Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09  **Right to Withdraw Option.**  In the event that a Member has exercised an election to purchase a Membership Interest under this Agreement and Fair Value has been determined as provided by paragraph 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee.  In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Membership Interest (or portion thereof) in such proportions as they mutually agree or in proportion to their respective Percentage Interests.

14.10  Terms of Purchase.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Membership Interest.

(b) Payment of the purchase price for a Membership Interest may be made by the Company and/or the other Members as follows:  (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing.  Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in

**Plaintiff 0711**

advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Membership Interest will transfer the Membership Interest free and clear of any liens or encumbrances, other than those which may have been created to secure any indebtedness or obligations of the Company.

(d) In each event that a Membership Interest in the Company is purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Membership Interest in the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this paragraph.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies:

(a) taking such action (including, without limitation, court proceedings) as the Members may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement.

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by

Plaintiff 0712

the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Membership Interest, as more fully set forth in paragraph 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas;

(d) reducing the Defaulting Member's Membership Interest or other interest in the Company;

(e) subordination of the Defaulting Member's Membership Interest to the nondefaulting Member;

(f) a forced sale of the Defaulting Member's Membership Interest at Fair Value and upon the terms of purchase as provided in Article XIV;

(g) forfeiture of the Defaulting Member's Membership Interest; or

(h) exercising any other rights and remedies available at law or in equity.

15.02 **Security.** Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Defaulting Member under this Article, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Defaulting Member pursuant to paragraph 15.01(b) of this Agreement, a security interest in, and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. It is expressly agreed that

**Plaintiff 0713**

Exhibit B
# Exhibit F

the security interest created thereby shall be governed by Chapter 8 of the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Article. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Members or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Article. At the option of the Members or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

15.03 **Compromise or Release.** The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of a Simple Majority of the other Members. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.04 **Expulsion.** A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination.** The Company shall begin to wind up its affairs upon the first of the following to occur:

(a) the execution of an instrument approving the termination of the Company by a Simple Majority of the Members;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member agrees to cancel the event requiring winding up, to continue the Company and to become a Member, or to designate another person who agrees to become a Member, as of the date of termination of the membership of the last remaining Member;

Plaintiff 0714

(c) entry of a decree of judicial dissolution of the Company;

(d) the occurrence of a nonwaivable event under the terms of the TBOC which requires the Company to be terminated; or

(e) by the act of a Simple Majority of the Members, if no capital has been paid into the Company, and the Company has not otherwise commenced business.

16.02  **Business May Be Continued.**  Except as provided in paragraph 16.01(b) of this Agreement:

(a) an event that requires the winding up of the Company's business shall not terminate the Company if, no later than one year after the date of the event, the Members unanimously consent to cancel the event requiring winding up.

(b) the expiration of a period of duration that requires the winding up of the Company's business shall not terminate the Company if, no later than three years after the date the period of duration expires, the Members unanimously consent to amend the Company's Certificate of Formation and this Agreement to extend the Company's period of duration.

16.03  **Purchase of Former Member's Membership Interest.**  Upon an event requiring winding up as provided in 16.01 of this Agreement, the Company's books shall be closed upon the date of such event, so as to determine the Former Member's Membership Interest value on the date ending all of the Former Member's financial interest in the Company.  Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Membership Interest at Fair Value (as determined by paragraph 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement.

16.04  **Liquidation.**  As soon as possible following an event requiring termination of the Company, the Members shall act as liquidator or may appoint one or more Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Members.  The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

**Plaintiff 0715**

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in paragraph 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the company occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, ninety (90) days after the date of liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this paragraph. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Percentage Interests, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

Plaintiff 0716

Exhibit B
# Exhibit F

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Members (or such other person or persons as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** This Agreement may be amended or modified from time to time only with a written instrument executed by a Simple Majority of the Members.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification reducing a Member's Percentage Interest or increasing its Capital Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent.

(b) An amendment or modification reducing the required Percentage Interest or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Percentage Interest or other measure theretofore required.

(c) An amendment to establish the relative rights and preferences of the Membership Interests of any class or series may be made by a committee of Members, within the authority of Members or otherwise provided in the Certificate of Formation, the TBOC, or resolutions by Members forming the committee.

(d) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01 **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular.

18.02 **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by

**Plaintiff 0717**

Exhibit B
## Exhibit F

delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Members must be given to the Members at the following address:

> 2186 Eastman Avenue #109
> Ventura, CA 93003

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04 **Entire Agreement; Supersedes Other Agreements.** This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05 **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06 **Binding Effect.** Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07 **Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08 **Severability.** If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and

Plaintiff 0718

instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company, each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

18.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 **Compliance with Regulation D of the Securities Act of 1933.** THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MEMBERS (WHICH, IN THE DISCRETION OF THE MEMBERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 **Notice to Members.** By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 **Limitation of Liability.** Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer, accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure

**Plaintiff 0719**

contained in this paragraph.

**IN WITNESS HEREOF**, the Members have executed this Company Agreement, as of the Effective Date.

MEMBERS:

_____
Garrett Jennings

Date signed: _____

_____
Vie Antolik

Date Signed: _____

Exhibit B
# Exhibit F

## EXHIBIT A
### MEMBERS OF VICTORY CHEVAL HOLDINGS, LLC

| Member's Name and Address | Initial Capital Contribution | Capital Commitment | Percentage Interest |
|---|---|---|---|
| Garrett Jennings<br>Address Deleted | $510.00 | $510.00 | 51% |
| Vik Antolik<br>Address Deleted | $490.00 | $490.00 | 49% |

Plaintiff 0721

Exhibit B
## Exhibit F

# EXHIBIT G

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2015 APR -2 AM 9: 45
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | No. 1:14-CR-00282-LY |
| | ) | |
| DENNIS ANTOLIK, | ) | |
| | ) | |
| **Defendant** | ) | |

## PLEA AGREEMENT

The Defendant, both personally and through his undersigned counsel, and the United States Attorney for the Western District of Texas ("the government") enter into the following plea bargain agreement pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure:

### Defendant's Agreement to Plead Guilty

The Defendant agrees to plead guilty to Count Three of the Indictment, which charges the Defendant with Filing a False Individual Income Tax Return ("Form 1040"), for tax year 2005 in violation of 26 U.S.C. § 7206 (1).

### Punishment and Collateral Consequences

The Defendant understands that the offense to which he is pleading guilty carries the following penalties:

1.    Imprisonment for a term no longer than 3 years;

2.    A term of supervised release no longer than 1 year;

3.    A fine no greater than $100,000;

4.    An amount of restitution to be determined by the Court, which the Defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone; and

5.    A mandatory monetary assessment in the amount of $100.

Plea Agreement - Page 1

A true copy of the original. I certify.
Clerk, U.S. District Court

By_____
Deputy Clerk

The Defendant understands that, in addition to the punishments described above, his guilty plea and conviction may have other or collateral consequences. These consequences may adversely affect such things as the Defendant's right to possess firearms and right to vote, and the immigration status of a defendant who is not a U.S. Citizen. The Defendant has discussed with the Defendant's counsel the punishments and other consequences of pleading guilty, understands that not all of the consequences can be predicted or foreseen, and still wants to plead guilty.

The Defendant understands that the Court decides the punishment that will be imposed. The Court shall determine the sentence to be imposed in accordance with 18 U.S.C. § 3553(a), after considering the application of the Sentencing Guidelines. The Guidelines are advisory and not binding, although the Court is required to consider them. **Any prediction or estimate of the probable sentencing range or ultimate sentence that may be imposed, whether from the government, the Defendant's attorney, or the Probation Office, is not a promise, is not binding, and is not an inducement for the Defendant's guilty plea or waivers. The Defendant will not be permitted to withdraw his guilty plea because the sentence imposed differs from the sentence he expected or hoped for.**

The Court may accept or reject this agreement, and may defer this decision until it has reviewed the presentence report. If the Court accepts the agreement, but declines to follow the government's sentencing recommendations, the Defendant has no right to withdraw his guilty plea.

### Waiver of Rights

The Defendant understands that he has the following rights:

1.      The right to plead not guilty, or having already so pleaded, to persist in that plea;

2.      The right to a trial by jury;

3.      The rights at trial to confront and cross-examine adverse witnesses; to be protected from compelled self-incrimination (the right to remain silent); to testify and present evidence; and to compel the attendance of witnesses;

4.      The right to be represented by counsel and if necessary to have the court appoint counsel at public expenseBat trial and at every other stage of the proceeding.

The Defendant understands that, by pleading guilty, he waives and gives up: the right to plead not guilty, the right to a jury trial, and the rights to confront and cross-examine adverse witnesses, to remain silent, to testify and present witnesses, and to compel the attendance of witnesses at trial.

In addition to giving up the rights described above, the Defendant agrees to give up and waive the following:

Plea Agreement - Page 2

**Pretrial Motions:** The Defendant understands that he could raise a number of issues and challenges by pretrial motion, including motions to suppress evidence and to dismiss the charges. By entering into this agreement and pleading guilty, the Defendant agrees to give up any and all claims he has made or might have made by pretrial motion, and agrees to the dismissal of any motions that currently are pending.

**Discovery:**   The Defendant agrees to give up and waive any claims he may have now or may acquire later to any information possessed by the prosecution team that might be subject to disclosure under discovery rules, including the Federal Rules of Criminal Procedure, the *Jencks* Act, local court rules, and Court Orders, including information that might be considered exculpatory or impeaching under *Brady v. Maryland* and *Giglio v. United States*.

**Appeal:**   The Defendant agrees to waive and give up his right to appeal his conviction or sentence, except in a case in which the sentence imposed by the Court is greater than the maximum sentence authorized by statute.

**Collateral Attack:**   The Defendant agrees to waive and give up his right to challenge his conviction or sentence in a post-conviction collateral challenge, including but not limited to proceedings pursuant to 28 U.S.C. §§ 2241 and 2255; except that the Defendant does not waive his right to raise a challenge based on ineffective assistance of counsel or prosecutorial misconduct. The Defendant agrees that, if he asserts a claim of ineffective assistance of counsel, by doing so he will waive any claim of attorney-client privilege related to the assistance the Defendant claims to be ineffective.

**Attorney Fees:**   The Defendant stipulates and agrees that he is not entitled to and shall not seek from the United States any attorney fees he incurred in connection with this prosecution.

### Defendant's Agreement to Cooperate

Defendant agrees to make a good faith effort to pay any fine, forfeiture, or restitution ordered by the Court.

Before or after sentencing, the Defendant agrees to provide, upon request by the Court, the government, or the U.S. Probation Office, in whatever form they may request it, accurate and complete financial information, and to submit sworn statements and give depositions under oath concerning all assets and his ability to pay.

The Defendant also agrees to surrender and release any assets, money, or other property, whether or not derived from the commission of crimes, as well as any information about the assets, in order to satisfy any fine, forfeiture or restitution order entered by the Court.   This includes signing any waivers, consents, or releases required by third parties.

The Defendant agrees to identify any transfer of assets made for the purpose of evading or defeating financial obligations, and to refrain from making any such transfers.

If the Defendant agrees to restitution, or if the Court orders restitution, the Defendant agrees to the immediate sale of any properties he owns and agrees that the proceeds of those sales shall be applied to any order of restitution. The Defendant agrees to take any reasonable actions requested by the government to facilitate payment of restitution.

The Defendant agrees to cooperate with the government to identify, surrender, and forfeit any assets the Defendant obtained directly or indirectly from or used to facilitate illegal conduct.

The Defendant agrees to refrain from committing any additional crimes, and to comply with any conditions of release that the Court may impose.

This Plea Agreement does not require the Defendant to cooperate with law enforcement authorities in the investigation or prosecution of other criminal offenses. If the Defendant does cooperate by providing complete and truthful information about other criminal offenses, (a) the government will, at sentencing, inform the Court about the Defendant's cooperation; (b) whether to move at sentencing for a downward departure from the advisory Guideline range of imprisonment, pursuant to USSG § 5K1.1, based on the Defendant's cooperation, and the extent of any departure to be requested, will be within the government's sole and exclusive discretion; and (c) whether and to what extent to grant any such motion for downward departure will be within the sole and exclusive discretion of the Court.

### Government's Agreement

In exchange for the Defendant's agreement to plead guilty, waive the rights listed above, and cooperate as stated above, the government agrees to the following:

**Forbear Filing Charges:** The government shall not pursue additional charges against the Defendant that arise from the facts set out in the Factual Basis for Guilty Plea ("the Factual Basis"), which the government has filed as part of the record in this case, or any substantially similar facts about which the government knew or reasonably could have known prior to entering into this Plea Agreement, or which the Defendant discloses during his truthful debriefing or cooperation.

**Sentencing:** At sentencing, the government will recommend that the Court reduce the Defendant's offense level by three levels for acceptance of responsibility, pursuant to USSG § 2T1.1.

The above provisions notwithstanding, both the government and the Defendant reserve the rights to: (1) inform the U.S. Probation Office and the Court of all information relevant to determining sentence; (2) dispute facts relevant to sentencing; (3) seek resolution of disputed facts or factors in conference with opposing counsel and the U.S. Probation Office; (4) allocute at sentencing (consistent with promises by the government concerning recommended findings and punishment); and (5) request the Court to depart from the applicable supervisory guideline range based upon aggravating or mitigating factors.

## Breach of Agreement

If the Defendant violates or breaches any of the terms of this Plea Agreement, including his agreement to cooperate, the government will be released from its obligations under this agreement and in its sole discretion may do any or all of the following:

1.    Move to set aside the Defendant's guilty plea and proceed on charges previously filed and any additional charges;

2.    Use against the Defendant, at sentencing or in any prosecution, any statements or information provided by Defendant during the course of his cooperation;

3.    Seek additional charges based on false statements, perjury, obstruction of justice, or any other criminal acts committed by Defendant before or during his cooperation, including offenses the Defendant disclosed during his cooperation;

4.    Seek to revoke or modify conditions of release; and

5.    Decline to file a motion for a reduced sentence.

The Defendant's breach of this agreement will not entitle him to withdraw his guilty plea once he has entered it.   If the Defendant withdraws from this agreement, however, the government will be able to use the Factual Basis against the Defendant.   Specifically, the Government will be allowed to use the Factual Basis as evidence in the government's case in chief at the Defendant's trial, among other uses.   The Defendant agrees to, acknowledges, and adopts the facts set out in the Factual Basis as true and accurate, and the Defendant hereby stipulates and agrees that the Factual Basis is admissible as evidence to prove the facts stated therein.

## Factual Basis for the Guilty Plea

If this case proceeded to a trial on the charge set out in Count Three of the Indictment, the government's evidence would prove the facts set out in the Factual Basis.   The Defendant agrees and stipulates that those facts are true; that the Factual Basis is admissible as evidence in this case; and that the Court should consider the Factual Basis in determining whether to accept the Defendant's plea of guilty, and in determining the Defendant's sentence.

The parties understand that the Factual Basis does not bind the Court.   The Court may find facts and reach conclusions that contradict the Factual Basis or do not appear in the Factual Basis.

## Voluntariness

In entering into this Plea Agreement, agreeing to plead guilty, and waiving the rights set forth above, the Defendant affirms the following:

1.      The Defendant has discussed with his attorney the charges, the possible punishments upon conviction, the evidence and any defenses to the charges, and the benefits and risks of going to trial.

2.      The Defendant has had sufficient time to discuss the case with his attorney, and is satisfied with the advice given by counsel.

3.      The Defendant is not under the influence of alcohol, drugs or medicines and understands the gravamen of the proceedings and the importance of the decision to plead guilty and waive rights.

4.      The Defendant enters this agreement and decision to plead guilty voluntarily, and not on account of force, threats, promises or inducements, apart from the promises and inducements set forth in this agreement.

5.      The Defendant agrees to plead guilty because he is guilty of the offense charged.

## Entire Agreement

This Plea Agreement constitutes the entire agreement between the Defendant and the United States Attorney's Office and is binding only upon those parties.   No other promises, inducements or agreements have been made or entered into between the parties.

RICHARD L. DURBIN, JR.
Acting United States Attorney

By:

ROBERT A. KEMINS
TRIAL ATTORNEY
Massachusetts State Bar No. 267330
717 North Harwood, Suite 400
Dallas, TX 75201
Office (214) 880-9781
Email:   robert.a.kemins@usdoj.gov

Plea Agreement - Page 6

**Defendant's Signature**:   I, the Defendant, have carefully read and reviewed the foregoing plea agreement in its entirety.   After giving careful and mature consideration to the making of this plea agreement, thoroughly discussing the plea agreement with my attorney, fully understanding my rights with respect to the pending criminal charge(s), and in reliance upon my own judgment and the advice of my attorney, I freely and voluntarily agree to the specific terms and conditions of the plea agreement.   I admit that all of the facts contained in the Factual Basis are true and correct, and that I am guilty of the offense to which I am pleading guilty. Moreover, I am satisfied with my attorney's representation in this matter, with the advice my attorney has provided to me, and that my attorney has rendered effective assistance.

_____   
Defendant

4/1/15   
Date

**Defense Counsel's Signature**:   I am counsel for the Defendant in this case.   I have fully explained to the Defendant all of his rights with respect to the pending criminal charge(s). I have carefully reviewed this plea agreement in its entirety with the Defendant and provided the Defendant with my best professional advice.   In my opinion, the Defendant's decision to enter into this plea agreement is made freely, voluntarily, and with full knowledge of its obligations and consequences.

_____   
Attorney for Defendant

4-1-15   
Date

**Plea Agreement - Page 7**

# EXHIBIT H

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL NO: |
| vs. | § | AU:14-CR-00282(1)-LY |
| | § | |
| (1) DENNIS ANTOLIK | § | |

## ORDER SETTING SENTENCING

IT IS HEREBY ORDERED that the above entitled and numbered case is set for **SENTENCING** in Courtroom 7, on the Seventh Floor, United States Courthouse, 501 West Fifth Street, Austin, TX, on **Friday, August 07, 2015 at 09:00 AM**.

IT IS FURTHER ORDERED that the Clerk of Court shall send a copy of this order to counsel for defendant, the United States Attorney, United States Pretrial Services and the United States Probation Office. Counsel for the defendant shall notify the defendant of this setting and, if the defendant is on bond, advise the defendant to be present at this proceeding.

IT IS FINALLY ORDERED that in the event the services of a court interpreter are required, counsel for the defendant shall notify the U.S. District Clerk's Office within five days of the date of the hearing.

IT IS SO ORDERED this 2nd day of April, 2015.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

A true copy of the original, I certify.
Clerk, U.S. District Court

By:_____
Deputy Clerk